FILED
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

MARK WALKER,

      Plaintiff - Appellant,

v.

PARK COUNTY SHERIFF'S OFFICE;
LEIGH COCHRAN, Deputy; DUMB
FRIENDS LEAGUE HARMONY
EQUINE CENTER; BOBBI PRIESTLY,

      Defendants - Appellees.

No. 21-1119
(D.C. No. 1:20-CV-00364-PAB-NY)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **McHUGH**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

Mark Walker appeals the district court's judgment dismissing his 42 U.S.C.

§ 1983 action, which raised claims concerning the seizure of his horses. The primary

issue in this appeal is whether Leigh Cochran and Bobbi Priestly are entitled to

qualified immunity from Mr. Walker's Fourth Amendment unreasonable-seizure

claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND[1]

For more than 40 years, Mr. Walker bred horses to be resistant to the cold winters typically found in the high country.  He used his horses in his outfitting business.  In January 2019, Mr. Walker had 78 horses at three different locations in Park County, Colorado:  48 at Badger Basin Ranch, 20 at Hartsel Springs Ranch, and 10 at another ranch (Durbin Ranch).  The weather was particularly harsh, with more than 30 inches of snow and temperatures as low as negative 40°F for a two-week period.  This required Mr. Walker to double the amount of time it took him to feed the herd, from three to at least six hours, and to plow lanes in the pasture to bring out feed.

On January 28, 2019, defendant Leigh Cochran, the animal control officer for defendant Park County Sheriff's Office (PCSO), received complaints regarding thin horses at Badger Basin Ranch.  Deputy Cochran went to the ranch, but could not find any horses, so she contacted Mr. Walker to inform him of the complaints.  On January 29, another deputy received a call regarding a dead horse on the same ranch.  Deputy Cochran went to the ranch and found the dead horse; according to Mr. Walker, the horse, Ringo, was 32 years old and not of his heartier breed.  Deputy

---

[1] Because we are reviewing an order granting a Fed. R. Civ. P. 12(b)(6) motion to dismiss, we draw the background facts from Mr. Walker's amended complaint. *See Mobley v. McCormick* , 40 F.3d 337, 340 (10th Cir. 1994) (explaining that "a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true").  But as we later discuss, *see* footnote 6, *infra*, it is permissible to consider the affidavits and warrants when resolving the legal issues in this case.

Cochran again told Mr. Walker about the complaints regarding thin horses on his ranch.  That same day, "Deputy Cochran posted a Notice of Warning that Mr. Walker was to provide food, water, and veterinary care for the horses."  Aplt. App., Vol. I at 16, ¶ 12.  On February 4, Deputy Cochran went back to the ranch, where she saw that "Mr. Walker was feeding milo round bales, grass hay, alfalfa hay and high protein range cake" to his horses, buffalo, and cattle in the same pasture.  *Id.*, ¶ 14.  Over the next few days, Mr. Walker separated the animals "so they could be fed independently."  *Id.*

On February 14, Deputy Cochran contacted defendant Bobbi Priestly, the manager of Field Services for defendant Dumb Friends League Harmony Equine Center ("Harmony") and a peace officer with the Colorado Department of Agriculture.  Agent Priestly went to Badger Basin Ranch, where she saw Mr. Walker moving his horses.  Also on February 14, Deputy Cochran issued Mr. Walker a second notice that he had to provide food, water, and veterinary care to his herd. Although the notice stated that he had until February 18 to improve the herd's condition, Deputy Cochran told him he had 30 days.

On February 15, Deputy Cochran and Agent Priestly returned to Badger Basin Ranch.  Mr. Walker moved seven skinny horses to a pen near the ranch buildings. Deputy Cochran drove through the fields with Mr. Walker and identified four more horses to be brought to the pen.  Later that day, Mr. Walker's veterinarian inspected one horse in the "'skinny pen'" and told Mr. Walker to "keep doing what he was

doing with [that horse]." *Id.* at 17, ¶ 18. The veterinarian made no comment about the other horses in the skinny pen.

On February 16, Deputy Cochran returned to the ranch and suggested feeding the horses grass hay instead of oat hay. She contacted another veterinarian to assess Dakota, who was more than 30 years old. The veterinarian rated Dakota "as a 1 on the Henneke scoring system, which is the lowest rating out of nine points," and recommended a particular feeding plan, with which Mr. Walker agreed. *Id.* at 17, ¶ 19. Deputy Cochran returned on February 18 and "noted that all the horses were eating better grass hay and all had water." *Id.*, ¶ 20. Dakota, however, had "gone down" and "was not doing well," and "Mr. Walker did not think she would survive." *Id.* Ultimately, Ringo, Dakota, and two other horses died in Hartsel (a 2.5-year old who "was not skinny and died of colic" and a 25-year old "far out in the pasture beyond where the tractor could go," *id.* at 18, ¶ 23). Two more died after being moved to Harmony.

The next day, Agent Priestly informed Deputy Cochran that she did not think Mr. Walker had been "adequately caring for" his horses and "their survival was not likely if left in [his] care." *Id.* at 17-18, ¶ 21. Agent Priestly added that "it would be difficult for any healthy animal to survive in the harsh conditions during that winter in Hartsel." *Id.* at 18, ¶ 21. Deputy Cochran agreed and "drafted an affidavit to support a warrant to seize the horses." *Id.*, ¶ 22. Deputy Cochran "signed all the

search warrants [sic[2]] used," and "Agent Priestly decided to execute the warrants." *Id.* at 19, ¶ 26.

On February 21, "defendants" went to Badger Basin Ranch with "11 trailers and 21 people" and "seized 48 horses." *Id.* at 18, ¶ 24. An additional 10 horses were seized from the other two ranches on February 25 and 27, for a total of 58 horses. The horses were brought to Harmony. In early- to mid-March, the weather in Hartsel "greatly improved." *Id.* at 19, ¶ 29.

Mr. Walker tried to retrieve his horses, but to do so, "he had to put up a bond of $250 per month for each horse to pay for its care." *Id.* at 20, ¶ 30. He could not afford the bond.

The Park County district attorney charged Mr. Walker with eight counts of animal cruelty. Mr. Walker was found not guilty on all counts in December 2019. Soon after, Mr. Walker asked Harmony to return any horses remaining in its possession. By then, all but five of the horses had apparently been adopted, and Harmony declined to return any of the remaining five horses.

Mr. Walker then filed this action. He asserted two constitutional claims against all defendants: unconstitutional seizure of the horses in violation of the Fourth and Fourteenth Amendments (apparently including a constitutional excessive-bond claim), and malicious prosecution in violation of the Fourth Amendment. He also asserted three state-law claims: civil theft, outrageous

---

[2] Deputy Cochran signed all four supporting affidavits; the warrants bear only judges' signatures.

conduct, and defamation.  Defendants filed motions to dismiss under

Fed. R.  Civ. P. 12(b)(6), arguing, among other things, that they were entitled to

qualified immunity and that Mr. Walker failed to state a claim for relief.  In response

to those motions, Mr. Walker agreed to dismiss his malicious-prosecution claim

against Harmony and his § 1983 claim against the PCSO.

The district court granted both motions to dismiss.  The court dismissed the

§ 1983 claims on the merits, ruling (among other things) that Deputy Cochran and

Agent Priestly were entitled to qualified immunity.  The court declined to exercise

supplemental jurisdiction over the state-law claims.  Mr. Walker appeals.

## II.  SCOPE OF APPEAL

In his opening brief, Mr. Walker states that he "abandons his

14th [A]mendment claim and only pursues the unreasonable seizure claim under the

[F]ourth [A]mendment."  Aplt. Opening Br. at 4 n.2.  We construe this as

abandonment of his excessive-bond claim, which he raised as a Fourteenth

Amendment claim.  In his reply brief, he has abandoned any remaining claims

against Harmony and the PCSO.  *See* Aplt. Reply Br. at 5.  And he has not argued

that the district court should have retained jurisdiction over his state-law claims, so

we do not consider that ruling.  *See Sawyers v. Norton*, 962 F.3d 1270, 1286

(10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or

waived." (internal quotation marks omitted)).  Consequently, what remains for our

consideration is whether the district court erred in dismissing the Fourth Amendment

unreasonable-seizure claim against Deputy Cochran and Agent Priestly on the ground of qualified immunity.

## III. DISCUSSION

We review de novo the grant of a motion to dismiss under Rule 12(b)(6) due to qualified immunity. *See Moya v. Schollenbarger*, 465 F.3d 444, 454-55 (10th Cir. 2006). In doing so, "we accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party." *Id.* at 455 (brackets and internal quotation marks omitted).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "When a defendant raises the qualified-immunity defense, the plaintiff must . . . establish (1) the defendant violated a federal statutory or constitutional right and (2) the right was clearly established at the time of the defendant's conduct." *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020). Courts have discretion to decide which of the two prongs of the qualified-immunity analysis to address first. *Pearson*, 555 U.S. at 236. The district court decided the qualified-immunity question on the first prong, and so do we.

In the qualified-immunity context, personal liability "for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was

taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. When a seizure is conducted pursuant to a warrant, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt*, 565 U.S. at 546.[3] However, as relevant to the probable-cause issue in this appeal, there are two situations, drawn from *United States v. Leon*, 468 U.S. 897 (1984), where a seizure pursuant to a warrant will not cloak an officer with qualified immunity: (1) "the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (2) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for [her] 'reckless

---

[3] In his reply brief, Mr. Walker argues that reliance on *Messerschmidt* is problematic, because unlike *Messerschmidt*, this case involves specialized knowledge of horses—that his were bred to withstand the cold, they could be skinny without being abused, transporting them might stress them more than leaving them at the ranches, and the veterinary standard to use in deciding which horses would be seized. *See* Aplt. Reply Br. at 6-8. We reject this argument. The issuing judges were not called on to make specialized judgments regarding the horses' condition but to evaluate facts set forth in the affidavit for probable cause, which is their "responsibility" and a matter within their "professional competence," *Messerschmidt*, 565 U.S. at 547-48 (internal quotation marks omitted).

disregard of the truth.'" *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (quoting *Leon*, 468 U.S. at 923).[4]

The district court determined that Mr. Walker had invoked the first *Leon* situation, because he argued that Deputy Cochran and Agent Priestly lacked probable cause to seize the horses. The court observed that because the amended complaint contained nearly the same information and allegations as the affidavits, Mr. Walker could not have argued that the affidavit contained false or misleading information (the second *Leon* situation). The court identified thirteen relevant facts stated in the affidavits and concluded that those facts "establish[ed] a fair probability that [Mr. Walker] had not been adequately caring for his herd and [were] sufficient indicia of probability to support the magistrate's issuance of the warrant." R., Vol. II at 166. Those thirteen facts are:

> (1) Deputy Cochran received reports regarding thin horses off Highway 24 and made contact with plaintiff regarding those reports; (2) another deputy received complaints regarding thin horses off the same highway; (3) a citizen reported that she saw a dead horse and that no one had been feeding the horses; (4) Deputy Cochran saw the dead horse herself, which was "mostly covered by snow"; (5) plaintiff told Deputy Cochran he had been unable to move his horses and that the dead horse probably died from the cold; (6) plaintiff informed Deputy Cochran "that he could not access the far back north side of the property due to large snow drifts"; (7) plaintiff had not separated his previously identified thin horses from the rest of his herd and plaintiff "could not point out specifically where the nine horses were";[5] (8) plaintiff told Deputy

---

[4] Although *Leon* was a criminal case involving a suppression hearing, the situations described in *Leon* apply in qualified-immunity cases. *See Malley v. Briggs*, 475 U.S. 335, 344 (1986).

[5] The references to "nine horses" in the affidavits for Badger Basin Ranch were to nine apparently skinny horses that were photographed standing near a fence

Cochran that "two, possibly four" horses had died; (9) plaintiff informed Deputy Cochran he did not want the horses at the ranch on two separate occasions, to which Deputy Cochran responded that the horses needed adequate care and feeding; (10) on a visit to plaintiff's ranch, Deputy Cochran and plaintiff rode a tractor through plaintiff's fields and found more thin horses; plaintiff was "shocked" that the horses were thin "because they were fine" the week prior; (11) on several occasions, starting on January 30, Deputy Cochran directed plaintiff to provide his thin horses different feed, but plaintiff did not feed "better hay" until February 18; however, at that point, he had still not fed the horses the feed directed by Deputy Cochran; (12) a veterinarian assessed one of plaintiff's horses on the Henneke body score and rated it a one, the lowest score, because "[t]he horse had little to no body fat that could be felt, with deep spaces between the ribs" and the "withers down the back to the hips and tail head were all protruding"; and (13) "there could be as many as ten" deceased horses and two were missing from the originally identified nine.

*Id.* at 165-66 (citing and quoting affidavit, *see id.*, Vol. I at 46-50).[6]

We agree with the district court's assessment.  "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018) (internal quotation marks omitted).  Here, the affidavit was based on suspected

---

adjacent to Highway 24 by another PCSO deputy on January 29, 2019.  *See* Aplt. App., Vol. I at 46.

[6] The affidavit and warrants are central to Mr. Walker's claims, and he has never disputed their authenticity.  Thus, the district court could consider them when ruling on the motions to dismiss, even though they were not attached to the amended complaint.  *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also . . . documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." (internal quotation marks omitted)).

violations of Colo. Rev. Stat. § 18-9-202, cruelty to animals.  Relevant here, a violation of the statute occurs when a person "knowingly, recklessly, or with criminal negligence . . . fails to provide [an animal] with proper food, drink, or protection from the weather consistent with the species, breed, and type of animal involved," § 18-9-202(1)(a).  Consistent with this language, Deputy Cochran asserted in the affidavits that the number of horses "in poor condition" supported a violation of the statute because Mr. Walker was "unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death."  Aplt. App., Vol. I at 50, 58, 62, 64.

The two affidavits for Badger Basin Ranch were each five single-spaced pages and very detailed.[7]  They contain sufficient indicia of probable cause such that an official could reasonably believe there was a fair probability that Mr. Walker had failed to provide his horses with proper nutrition and shelter.  As the district court aptly summarized, the Badger Basin affidavits described how Mr. Walker had "failed to provide his horses the appropriate feed until several weeks after he was directed, and at least two horses, and possibly ten, had died."  *Id.*, Vol. II at 166.  They also described his "refus[al] to bring his horses near the barn for proper shelter until he

---

[7] These affidavits were identical, except the second affidavit added that law enforcement would collect feed and hay samples.  Although the affidavits for Hartsel Springs Ranch and the Durbin Ranch were shorter in length and smaller in scope than the affidavits for Badger Basin Ranch, Mr. Walker agrees there is no material difference between the four affidavits, and he does not advance any arguments relating only to the Hartsel Springs and Durbin affidavits.  We therefore do not separately analyze those affidavits.

was given several warnings and directives." *Id.* And the affidavits described "plaintiff's property, plaintiff's horses, plaintiff's care of the horses, and plaintiff's dilatory response to caring for the horses," which "establishe[d] a fair probability that plaintiff had not been adequately caring for his herd." *Id.*

Although Mr. Walker contends both that the affidavits "did not establish probable cause" and that they "materially misled the issuing magistrate," Aplt. Opening Br. at 16, he does not contest the accuracy of the information included in the affidavits or develop any argument regarding the first *Leon* situation described above—that the included information was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923. He instead argues that Deputy Cochran misled the issuing judges by intentionally omitting information from the affidavits that, he claims, was crucial to the judges' decisions to issue the warrants.

Deputy Cochran and Agent Priestly point out that Mr. Walker never presented an "omitted information" theory to the district court, either through allegations in his amended complaint or as an argument in response to the motions to dismiss. Mr. Walker counters that omissions are "simply the inverse" of *Leon*'s indicia-of-probable-cause inquiry, Aplt. Reply Br. at 9. We disagree with Mr. Walker. In *Salmon v. Schwarz*, 948 F.2d 1131, 1139-40 (10th Cir. 1991), we explained that the "reckless disregard" standard set out in *Leon* includes "material omissions" from an affidavit. Thus, allegedly omitted information fits within the second *Leon* situation noted above, where an affidavit misleads an issuing judge by

setting forth "false information or information that the affiant would have known was false if not for his 'reckless disregard of the truth,'" *Danhauer*, 229 F.3d at 1007 (quoting *Leon*, 468 U.S. at 923).

Mr. Walker never presented his "omitted information" theory to the district court. When a party fails to raise a legal theory below, we typically treat the argument as forfeited. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011). But when an appellant fails to preserve a theory and also fails to make a plain-error argument on appeal, we ordinarily deem the theory waived (rather than merely forfeited) and decline to review it at all—for plain error or otherwise. *Id.* at 1130-31. Under such circumstances, "the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court." *Id.* at 1131.

Applying these rules, we conclude that Mr. Walker has waived appellate review of his omitted-information theory. He failed to advance it in the district court, and he has not made a plain-error argument on appeal.[8]

---

[8] Even if we were to review this argument, we would reject it. The omitted information largely comprises: (1) Mr. Walker's opinions regarding (a) whether he complied with Deputy Cochran's instructions, (b) what constitutes animal cruelty, (c) Agent Priestly's profit motive (due to her affiliation with Harmony), and (d) the role of the weather; (2) an event that occurred after the warrants were issued (the presence of 11 trailers on the first day of seizure); and (3) assertions that the horses were bred to resist the cold. Mr. Walker's opinions are not facts Deputy Cochran was required to include in the affidavits, and each of the affidavits did in fact observe that the weather had been "harsh" and stated that "[s]upplement[al] feeding for horses during periods of cold weather and deep snow is paramount to survival," Aplt. App., Vol. I at 50, 58, 61, 65. Further, the number of trailers brought on the first day of seizure post-dated the completion of the affidavits and therefore could not

13

Mr. Walker also argues that even if there was probable cause to seize between 7 and 12 horses, there was not probable cause to seize 58 horses.  This appears to be a challenge to the district court's consideration of an argument it characterized as an overbreadth challenge to the warrants and rejected.  The court observed that the warrant directed seizure and impoundment of horses "'based on veterinary recommendations.'"  Aplt. App., Vol. II at 169 (brackets omitted) (quoting *id.*, Vol. I at 52).  That description, the court determined, was sufficiently particular for a reasonable officer to conclude she was permitted to seize any horses the veterinarian recommended for seizure, given that animal cruelty was the alleged offense.

The district court's analysis is sound.  The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  *United States v. Cooper*, 654 F.3d 1104, 1126 (10th Cir.

---

have been included in the affidavits, and Mr. Walker's own allegations reveal that a number of horses bred to withstand the cold were faring poorly.  Mr. Walker also claims the issuing judges should have been informed that he had been breeding horses and using them in his business for more than 40 years, but we fail to see how omitting that information misled the judges regarding Deputy Cochran's observations in January and February of 2019.  In any event, all four affidavits referred to the most recent 20 years of Mr. Walker's career by stating he had been at Badger Basin Ranch for 10 years and had run another Colorado ranch for 10 years before that.  And contrary to Mr. Walker's argument, the affidavits did not mislead the issuing judges into believing law enforcement would seize only seven horses in the skinny pen.  The affidavits recited the poor condition of more than just seven horses, and they informed the issuing judges that any horse could be seized if an assessing veterinarian recommended it.

14

2011) (internal quotation marks omitted).  And "whether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated." *Id.* at 1127.

In this case, because animal cruelty was under investigation, Deputy Cochran and Agent Priestly could reasonably conclude that the warrants permitted them to seize any horses the examining veterinarian recommended for seizure based on the standard set forth in the warrant—the presence of "compromising health conditions to include physical injuries," Aplt. App., Vol. I at 44, 52, 60, 64.  Mr. Walker never alleged (and does not argue) that the horses were not seized pursuant to a veterinarian's recommendation.  And his contention that the "compromising health conditions" standard itself is overbroad misses the mark.  The qualified-immunity issue is not whether the warrant itself was overbroad, but whether it was reasonable for Deputy Cochran and Agent Priestly to conclude it was permissible to seize any horses the veterinarian recommended for seizure.  *See Messerschmidt*, 565 U.S. at 548-49 (explaining that even if a warrant is overbroad, qualified immunity protects an officer who has a reasonable belief, based on the circumstances presented in the warrant, that the warrant permits the seizure at issue).

Finally, Mr. Walker's reliance on post-seizure facts, whether construed as relevant to the probable-cause inquiry or the overbreadth inquiry, is misplaced.[9]

---

[9] The post-seizure facts Mr. Walker relies on include the improvement in the weather following the seizure, the jury verdict in his favor on the animal-cruelty charges, and the opinion of a veterinarian who examined 12 horses at Harmony that were in the worst shape and opined that the horses were skinny solely because of the

"Probable cause for a search warrant depends on the facts known to law-enforcement officers when they obtain the search warrant." *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1177 (10th Cir. 2017).[10]

## IV.  CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

---

cold and snow, and moving them caused more stress than having left them at the ranches.

[10] Based on our resolution of the issues in this appeal, we need not address Deputy Cochran's argument that an order denying Mr. Walker's motion to suppress in his state criminal proceeding precludes his unreasonable-seizure claim under principles of issue preclusion.