UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MARK WALKER,

     Plaintiff-Appellant,                         Case No. 21-1119

vs.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY,

     Defendants-Appellees.

---

**OPENING BRIEF**

---

Appeal from an order of dismissal by Chief Judge Phillip A. Brimmer,
United States District Court Judge for the District of Colorado,
Case No. 20-cv-00364

Oral argument is requested.

Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
ATTORNEY FOR APPELLANT

# I. CORPORATE DISCLOSURE STATEMENT

Not required by this party.

# II. TABLE OF CONTENTS

Jurisdictional statement ................................................................. 2
Issues presented for review  ....................................................... 3
Statement of the case  ................................................................. 3
Statement of the facts  ................................................................. 5
Summary of argument  ............................................................... 16
Argument  .................................................................................. 16
Conclusion ................................................................................ 25
Certificate of compliance with Rules 25.3 and 32(a)  ................. 25
  Attachment 1, District Court Order filed March 10, 2021
  Attachment 2, Judgment filed March 10, 2021

# III. TABLE OF AUTHORITIES

***Kapinski v. City of Albuquerque***, 964 F.3d 900 (10th Cir. 2020)............. 19
***Mullenix v. Luna***, 136 S. Ct. 305 (2015)  ................................................ 23
***Pierce v. Gilchrist***, 359 F.3d 1279 (10th Cir. 2004)  ................................ 18
***Puller v. Baca***, 781 F.3d 1190 (10th Cir. 2015).......................................... 18
***United States v. Danhauer***, 229 F.3d 1002, 1007 (10th Cir. 2000)  ... 15, 23

# IV. STATEMENT OF RELATED CASES

There are no prior nor related cases.

# V. JURISDICTIONAL STATEMENT

The district court had jurisdiction over a federal question pursuant to

28 U.S.C. §1331 because plaintiff asserted a claim under 42 U.S.C. §1983.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because it is

an appeal from a final order of summary judgment on all claims in favor of

defendant.  Final judgment was entered on March 10, 2021 (Apdx 178),

and Mr. Walker filed his notice of appeal on April 6, 2021 (Apdx 180).

## VI.  ISSUES PRESENTED FOR REVIEW

1. Was there probable cause to believe that Mr. Walker was abusing his horses to justify seizure of 58 horses?

2. Did the affidavit supporting the search warrant intentionally or recklessly omit material facts?

## VII.  STATEMENT OF THE CASE

Plaintiff Mark Walker had been in the horse-outfitting business for

over 40 years.  He owned some 78 horses outside of Hartsel, Colorado, in

a region known as South Park in Park County.  Over the years he had bred

his horses to withstand harsh winters but February, 2019, was a cruel

weather month even for Park County.

He doubled his efforts to care for his horses by providing better feed

and ensuring they all had water.  But, as would be expected, a few older

horses died.  The Park County animal control officer, defendant Deputy

Leigh Cochran, told Mr. Walker on February 18 that he had 30 days to

improve the condition of the herd.  Mr. Walker complied.  Nonetheless,

three days later defendants came with 21 people and 11 horse trailers

because they had predetermined that they were going to seize most of the

horses.  They seized 48 horses that day and an additional 10 horses a week later.  In doing so, they ran Mr. Walker out of business.  He was charged with eight counts of cruelty to animals and was found not guilty on all charges.

One day after Deputy Cochran told Mr. Walker he had 30 days to improve the condition of his herd, Agent Bobbi Priestley,[1] from defendant Harmony Equine Center (in Franktown, south of Denver), told Deputy Cochran that it would be difficult for any healthy animal to survive in the harsh conditions.  Therefore, Deputy Cochran changed her mind and drafted the affidavit to support the seizure of the horses.  Mr. Walker alleged that the seizure was done to support the business model of the equine center – it needed horses to provide its customers.

Mr. Walker brought two claims under 42 USC §1983 for an unreasonable seizure[2] and malicious prosecution, as well as three pendant state tort claims, against the Park County Sheriff defendants and against the Harmony Equine Center defendants (who acquired the horses).  Both

---

[1] Agent Priestley had formerly held Deputy Cochran's position.  **See** amended complaint, ¶ 15.

[2] Plaintiff abandons his 14th amendment claim and only pursues the unreasonable seizure claim under the fourth amendment.

sets of defendants filed motions to dismiss and the case was stayed. Apdx 110. The district court dismissed the §1983 claims upon defendant's qualified immunity and dismissed without prejudice the pendent state court claims for lack of jurisdiction.[3]

## VIII.  STATEMENT OF THE FACTS

Mr. Walker had a herd of 78 horses split among three locations near Hartsel, Colorado. He had 48 horses at the Badger Basin Ranch, 10 brood mares and 10 two-year-olds at the Hartsel Spring Ranch, and 10 foals at the ranch of Lynn Durbin. Most of the horses were his, but approximately 10-15 belonged to other people who left them in the care of Mr. Walker. **See** Apdx 14, amended complaint, ¶ 4.

Mr. Walker had been successfully breeding horses for 40+ years to produce strong, hearty, mountain horses resistant to the colder winters in the high country. As an outfitter his horses were integral to his business, doing horseback rides, camping expeditions, hunting expeditions, and he often leased his horses to other outfitters for similar activities in the high country. *Id.*, ¶ 5.

---

[3] The pendent state tort claims were refiled in state court.

January, 2019, was a cruel weather month in Park County.  The snowfall exceeded 30 inches in places and the temperature dropped to 40° below zero for a two-week period.  As a result, Mr. Walker, and two ranch hands, had been giving extra care to the herd at Badger Basin since December, 2018.  The horses at the Hartsel Spring Ranch and at the ranch of Lynn Durbin required less effort to bring them feed and water.   Mr. Walker provided Lynn Durbin and a resident in Harstsel Springs Ranch feed which they provided daily to these horses.  *Id.*, ¶ 7.

In a typical winter, it would require three hours per day for Mr. Walker and his two ranch hands to feed the herd.  By mid-January, 2019, it required at least six hours per day to feed the herd because of the amount of snow and the low temperatures.  The extreme weather required regular plowing to bring feed to the animals.   Mr. Walker began plowing lanes through the snow in the pasture beginning in early January.  *Id.*, ¶ 8.  Twice in December-January Mr. Walker had brought part of the herd to the ranch headquarters, but the horses would on their own wander back to the remoter areas of the ranch.  *Id.*, ¶ 9.

On January 28, 2019, Deputy Leigh Cochran received a report that there were thin horses on the Badger Basin Ranch.  Deputy Cochran was

the animal control officer for the Sheriff's office and had been so for four years. She went to the ranch, but did not locate any horses. She contacted Mr. Walker and told him that she had received a report of nine thin horses near the highway. He said he would check on them and bring them to the ranch buildings. *Id.*, ¶ 10.

On the next day, January 29, Deputy Mercier received a call from a Marcy Sturuna that Ms. Sturuna saw a dead gray and white horse on the Badger Basin Ranch. Deputy Cochran found the dead horse and called Mr. Walker. He identified the horse as Ringo who was 32 years old and could not take the cold. Deputy Cochran told him that a few of the horses were thin and that she was receiving complaints. Mr. Walker stated he was already feeding the horses and was bringing them closer to the ranch headquarters to facilitate bringing the horses feed. *Id.*, ¶ 11.

On January 29, Deputy Cochran posted a Notice of Warning that Mr. Walker was to provide food, water, and veterinary care for the horses. In response, he continued to provide proper care for the animals. *Id.*, ¶ 12. On January 30, Deputy Cochran saw Mr. Walker moving the horses by foot. *Id.*, ¶ 13. On February 4, Deputy Cochran again went to the ranch. She saw that Mr. Walker was feeding in a pasture adjacent to Highway 9

and that there were cattle, buffalo, and horses in this pasture, which is several hundred acres.  Mr. Walker was feeding milo round bales, grass hay, alfalfa hay and high protein range cake.  Mr. Walker was able over the next few days to separate the cattle, buffalo and horses into different pastures so they could be fed independently.  *Id.*, ¶ 14.

On February 14, Deputy Cochran contacted Agent Bobbi Priestley with the Colorado Humane Society.  Ms. Priestley had previously held the position that Deputy Cochran now held in the Park County Sheriff's office. Ms. Priestley came to Badger Basin where she saw that Mr. Walker was moving horses with two horse trailers.  *Id.*, ¶ 15.  Also on February 14, Deputy Cochran gave Mr. Walker a second Notice of Warning stating that he was to provide food and water for the herd and to provide vet care for an older horse named Starburst.  Although the notice stated that he was to correct the herd's condition by February 18, Deputy Cochran told Mr. Walker that he had 30 days to improve the condition of the herd. *Id.*, ¶ 16.

On February 15, Agent Priestley and Deputy Cochran again went to the ranch.  Mr. Walker moved seven skinny horses to a pen near the ranch buildings.  He and Deputy Cochran went into the fields on a tractor.  Deputy Cochran identified four additional horses in the fields that needed to be

8

brought to the pens, which Mr. Walker did.  *Id.*, ¶ 17.  Later on February 15,
Mr. Walker's vet, Leslie Harrison, inspected Starburst, who was in the
"skinny pen" with six other skinny horses.  Dr. Harrison had been Mr.
Walker's vet for over 15 years.  The vet told Mr. Walker to keep doing what
he was doing with Starburst and made no comment regarding the other
horses in the "skinny pen."  *Id.*, ¶ 18.

On February 16, Deputy Cochran returned to the ranch and
suggested that Mr. Walker feed the horses grass hay as opposed to the oat
hay he was feeding them.  She contacted veterinarian Sadie Maybach to
assess an older horse (Dakota, over 30 years old, who soon died) that had
fallen down.  Ms. Maybach rated the horse as a 1 on the Henneke scoring
system, which is the lowest rating out of nine points.  She recommended a
feeding plan of alfalfa hay, grass hay, or pellets.  Mr. Walker agreed with
this feeding plan.  *Id.*, ¶ 19.

On February 18, Deputy Cochran went to check on the horses and
feed.  She noted that all the horses were eating better grass hay and all
had water.  She noted that the older horse, Dakota, who had previously
gone down, was not doing well.  Mr. Walker did not think she would survive
(she did not).  *Id.*, ¶ 20.

On February 19, 2019, Agent Priestley told Deputy Cochran that Agent Priestley believed that Mr. Walker was not adequately caring for the animals and that their survival was not likely if left in Mr. Walker's care.  Ms. Priestley said it would be difficult for any healthy animal to survive in the harsh conditions during that winter in Hartsel. However, both Agent Priestley and Deputy Cochran should have known that this cold snap was highly unusual and would probably break in the near future. They also should have known that transporting the horses to the Harmony Center would have stressed them more than had they remained in Hartsel.  *Id.*, ¶ 21.  Nonetheless, Deputy Cochran agreed with Agent Priestley and drafted an affidavit to support a warrant to seize the horses.  *Id.*, ¶ 22.

In all, six horses died, four in Hartsel and two at the equine center in Franktown after their seizure:

1. Ringo, 32 years old.  He was not of Mr. Walker's heartier breed.
2. Dakota, over 30 years old.  She was the older horse referenced above.
3. A grulla,[4] 2 ½ years old.  She was not skinny and died of colic.
4. A palomino, 25 years old.  It died far out in the pasture beyond where the tractor could go.
5. A grulla weanling, 10 months old.  It died of infection after its seizure.
6. Pokey, 32 years old.  It was put down in April, after its seizure.

---

[4] A grulla horse is not a breed.  Rather, grulla is a type of coloring, marked by the horse's mane and legs being of a darker color than the body.

*Id.*, ¶ 23.

On February 21, 2019, defendants came to the Badger Basin Ranch with 11 trailers and 21 people.  They seized 48 horses.  At that time, Deputy Cochran was asked why they were seizing the horses and she said that it was out of her hands, indicating that the decision to seize the horses was Ms. Priestley's decision.  *Id.*, ¶ 24.  On February 25 and February 27, defendants returned to seize an additional 10 horses from Hartsel Springs Ranch and from the ranch of Lynn Durbin.  In total, defendants seized 58 of the 78 horses.  *Id.*, ¶ 25.

Deputy Cochran signed all four affidavits in support of the search warrants[5] (*id.*, ¶ 26) used to seize the 58 horses.  **See** Apdx 50, 58, 62, and 66.  Agent Priestley decided to execute the warrants.  Apdx 19, ¶ 26. Given Agent Priestley's belief that it would be difficult for any healthy animal to survive in the harsh conditions during that winter, there was no reason to believe that Mr. Walker was cruel to any horse.  *Id.*, ¶ 31.  The 58 horses were seized and taken to Priestley's employer, the Colorado Humane Society, Harmony Equine Center.  The business of the Harmony

---

[5] There were two search warrants dated February 20 for the search at Badger Basin Ranch and there were two search warrants dated February 22 for the search at Hartsel Springs Ranch.  There was no difference of substance in the affidavits supporting the four warrants.

Equine Center is to provide the horses for adoption by private owners. Thus, the seizures promoted its business. *Id.*, ¶ 26.

A veterinarian, Barbara Page, physically examined 12 of the horses at the Harmony Equine Center on March 7, 2019, two weeks after the initial seizure. *Id.*, ¶ 27. Harmony had put these 12 horses in a pen because Harmony was most concerned about the health of these horses.[6] Dr. Page examined and touched these 12 horses and gave a more thoroughly exam to two of the horses. All the horses were thin but healthy, except for one young horse who had an infection.[7] *Id.* The horses would not have shown any weight gain visible to the eye or touch for approximately 30 days, so they were in the same condition when Dr. Page saw them as when they were seized two weeks earlier. *Id.* Even if Deputy Cochran and Agent Priestley had reason to take the 12 horses, they intentionally took more horses than was merited so that Mr. Walker could not bond out the animals under the payment scheme discussed below and Harmony could keep them as part of its business model. *Id.*, ¶ 31.

---

[6] These may have been the seven horses in the "skinny pen" plus the four horses that Deputy Cochran identified as needing to be brought to the pens. **See** Apdx, page 17, ¶ 17.

[7] This is probably horse #5 of 6 on page 10 above.

Dr. Page reviewed the weather reports for Badger Basin and noted that there was three times more snow in 2019 than in the year before. It was her opinion that the horses were thin solely because of the cold and snowy weather and not because of any improper care. In addition, because taking the horses out of their home environment would cause them stress, it would have been better to have left them at Badger Basin. *Id.*, ¶ 28. The weather greatly improved in early- to mid-March and the horses would have done as well had they stayed in Hartsel as at the Harmony Equine Center. *Id.*, ¶ 29.

Mr. Walker attempted to retrieve his horses after they were seized but, in order to do so, he had to put up a statutory bond of $250 per month for each horse to pay for its care. This amounted to $15,450 paid within 10 days and an additional $15,450 every 30 days thereafter. Mr. Walker did not have enough money even to pay the first bond. Thus, he had no choice but to surrender the horses. *Id.*, ¶ 30.

Mr. Walker was charged with eight counts of cruelty to animals under CRS §18-9-202. He went to trial on these charges and was found not guilty on all charges on December 6, 2019. *Id.*, ¶ 32.

A few days after the not guilty verdict, his criminal attorney called counsel for the Harmony Equine Center and asked for a return of the six horses still in Harmony's possession.  The Harmony attorney said that one of the six horses had been adopted out the day before and that the center would not return the remaining five horses even though Mr. Walker was not guilty of cruelty to animals.  *Id.*, ¶ 34.

Brand Inspector Colby stated that Ms. Priestley asked him in March, 2019, how she could seize Mr. Walker's cattle.  Mr. Colby told her that she could not seize the cattle.  *Id.*, ¶ 35.

In 2018, Harmony and Ms. Priestley had orchestrated a similar seizure of horses from Penny Gingrich.  Upon information and belief, an agent from Harmony came to Ms. Gingrich's ranch in the summer of 2018 to determine which horses Harmony would seize that following winter.  In that following winter, Harmony unreasonably seized 65 horses from Ms. Gingrich.  Ms. Gingrich was charged with 65 counts of cruelty and was found not guilty on all counts.  *Id.*, ¶ 36.

Both sets of defendants filed their own motion to dismiss and Mr. Walker separately responded to each motion.  Mr. Walker agreed to dismiss the ***Monell*** claim against the Sheriff's office.  Apdx 130.  The

remaining defendants moved to dismiss upon grounds that they had

probable cause to seize the horses set forth in the search warrants and that

they had qualified immunity regarding such claims.

### *The District Court's Order*

The district court noted four situations where a seizure pursuant to a

warrant will not provide an officer with qualified immunity.  **See** attached

order, page 8.  The first situation reads as follows: "'the issuing magistrate

was misled by an affidavit containing false information…'"  **Id.**, citing **United

States v. Danhauer**, 229 F.3d 1002, 1007 (10th Cir. 2000).  The court cited

13 relevant facts in the affidavit supporting probable cause to seize the

horses on page 10 of its order.  However, the court neglected to take into

account several of plaintiff's allegations stating that plaintiff had complied

with the deputy sheriff's requests to provide feed and water and that there

was nothing else that Mr. Walker could have done given the extreme

weather.  Furthermore, Agent Priestley said it would be difficult for any

healthy animal to survive in the harsh conditions, so there was little Mr.

Walker could do except to wait out the weather.  Nonetheless, the court

found that the 13 facts established probable cause for the seizure and

provided qualified immunity to the individuals.

## IX.  SUMMARY OF ARGUMENT

The officers did not have qualified immunity because the affidavit supporting the warrant did not establish probable cause and, second, materially misled the issuing magistrate.  Mr. Walker complied with the deputy's requests and was doing everything he could do to protect his horses.  A death of an old horse under extreme conditions is not unheard of, but this does not mean that there was reason to believe that the owner was criminally abusing the horses.  Furthermore, Agent Priestley brought 11 horse trailers to the seizure because she had decided to take far more animals than were necessary.  These facts were not conveyed to the officer signing the warrant and, thus, the officer was misled into believing there was probable cause for the seizure of a limited number of horses.

## X.  ARGUMENT

The district court ruled on the issue being appealed at Apdx. 156. This Court reviews *de novo* an order dismissing the case, taking the facts in the light most favorable to plaintiff.

In the instant case, Mr. Walker had been caring for his animals in the same way for 40 years.  There was no allegation that he had ever abused a horse before.  As January approached, he doubled his efforts in caring for

his horses.  On February 15, he moved seven skinny horses to a pen near the ranch buildings.  Later that day, his vet inspected the horses and told Mr. Walker to keep doing what he was doing.  Another veterinarian suggested a different feeding plan and Mr. Walker agreed to that feeding plan.  Three days later, on February 18 (a Monday), Deputy Cochran noted that the horses were eating better grass and all had water.

On February 14 (a Thursday), Deputy Cochran told Mr. Walker he had 30 days to improve the condition of his herd.  According to her affidavit, five days later (on February 19, a Tuesday) Agent Priestley told Deputy Cochran  it would be difficult for any healthy animal to survive in the harsh conditions.  Apdx 49, last paragraph.  Because of this, Deputy Cochran changed her mind and drafted the affidavit to support the seizure of the horses.  However, she did not tell the magistrate that Harmony Equine Center (and Agent Priestley) would profit from that seizure.

In the end, there was no probable cause to assert that Mr. Walker was abusing his animals.  That is, given the unusual conditions, there was little more that he could do.  The problem with the affidavit is that this was not explained to the magistrate so that he could determine whether there was actual probable cause to believe that Mr. Walker had abused his

horses.  Nor was the magistrate told that the horses were specially bred to withstand the cold.  Mr. Walker does not deny that, due to the weather, some of his horses were skinny.  However, a skinny horse is not the same as an abused horse, and that was never explained in the affidavit.  As it turned out, the four horses that died on the ranch were 25, 30, and 32 years old.  An otherwise healthy 2½-year-old died of colic.  Two other horses died in Franktown after their seizure, one from infection and one was put down because of its age.

Nor was there any reason to take 58 horses, destroying Mr. Walker's carefully bred herd and destroying his business.  At most, they should have stopped at the seven horses in the skinny pen or, perhaps, the 12 horses set aside in Franktown.  However, that was never the plan when they brought 11 horse trailers and 21 people to the initial seizure.

"In a case involving the withholding of exculpatory evidence, the existence of probable cause is determined by examining the evidence 'as if the omitted information had been included' and inquiring whether probable cause existed in light of all the evidence, including the omitted information." *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004).  **See *Puller v. Baca***, 781 F.3d 1190 (10th Cir. 2015), which, after adding the omitted facts,

still found there was probable cause.  The omitted information must be both material and was either intentionally or recklessly omitted.  **See *Kapinski v. City of Albuquerque***, 964 F.3d 900, 905-09 (10th Cir. 2020).

The following are the facts supporting probable cause paraphrased from page 10 of the order, plus additional material facts that Deputy Cochran intentionally omitted from the affidavit to hide the influence of Agent Priestley:

1. two deputies received reports that there were thin horses off Highway 24;
2. there was a dead horse in the area;
3. a citizen reported that no one had been feeding the horses (which was obviously not true);
4. Deputy Cochran saw the dead horse, which plaintiff said was old and probably died from the cold;
5. plaintiff told Deputy Cochran that the snow kept him from accessing all the property;
6. plaintiff told Deputy Cochran that two or four horses had died;
7. plaintiff told Deputy Cochran he did not want the horses at the ranch because they would not learn how to paw for grass under the snow, but, nonetheless, he soon brought them to the ranch;
8. plaintiff had specially bred his herd to withstand the cold winters;
9. plaintiff had not yet separated his thin horses, which he did at Agent Priestley's suggestion, initially bringing seven horses to the ranch;[8]

---

[8] Up to this point, there was no reason to believe that plaintiff had abused his horses.

10. Deputy Cochran said the horses needed adequate care and feeding, which plaintiff provided;[9]

11. on a tractor ride through the fields, Deputy Cochran found four more thin horses which plaintiff was allegedly shocked to see (according to the affidavit) because they were fine the week prior – he brought these to the pen;

12. Mr. Walker's veterinarian inspected the animals in the pen and told Mr. Walker to continue what he was doing.

13. Deputy Cochran directed plaintiff to provide different feed, which plaintiff provided;[10]

14. a second veterinarian assessed an older horse (Dakota, who soon died) as having the lowest body score;

15. there could have been as many as 10 deceased horses (there were actually four, as stated in ¶ 6 above);

16. on February 14, Deputy Cochran told Mr. Walker he had 30 days to improve the herd's condition (they seized the horses seven days later);

17. when asked why they seized the horses, Deputy Cochran said it was out of her hands, indicating it was Agent Priestley's decision to seize the horses;

18. the seized animals fulfilled the business model of Harmony Equine Center;

19. given the number of trailers and people brought to the ranch, Harmony Equine Center, through Agent Priestley, intended to seize most of the horses;

---

[9] There was a factual dispute on this point (**see** amended complaint, ¶¶ 14 and 19) but, in a motion to dismiss, the court was required to take the alleged facts in the light most favorable to Mr. Walker.

[10] Even adding these four facts, there was still no reason to believe that Mr. Walker abused his horses.

20. there was no explanation given to the magistrate as to why they planned on seizing more than the seven horses in the skinny pen;[11]

21. Mr. Walker had been in the outfitting business for 40 years and cared for his horses in the month before the seizure as he had done for 40 years;

22. transporting the animals stressed them, causing them more harm than had they been left at the ranch;

23. Deputy Cochran should have known that the weather would turn, as it in fact did;[12]

24. Agent Priestley said it would be difficult for any healthy animal to survive in the harsh conditions; and

25. there was nothing Mr. Walker could have done to have satisfied Agent Priestley.[13]

The above facts boil down to the following.  It is undisputed that four horses died at the ranch, the three old horses from the cold and one young horse from colic.  Whenever Deputy Cochran or Agent Priestley asked Mr. Walker to move the horses or change their feed or water, he did it. Nonetheless, they seized the horses because the weather was severe, even though moving the horses would cause them more stress and harm

---

[11] These last seven facts negate probable cause.

[12] These last three facts also negate probable cause.

[13] These last two facts sum up the purported probable cause – Mr. Walker was guilty of raising horses in the mountains.

than had they left the horses in Hartsel.  They seized the horses to satisfy the business model of the Harmony Equine Center.

The intent to seize numerous horses was reinforced when, after the not guilty verdicts were rendered, the equine center refused to return the remaining five horses.  The intent was also reinforced by the allegation that Agent Priestley did this to another large horse owner in the area.

After the seizure, veterinarian Page inspected 12 horses at the Harmony Equine Center that were kept separate because they were allegedly the most concerning.  All 12 horses were healthy, but thin, and, given the short time span since the seizure, they would have been in the same condition at the time of the seizure.   The last paragraph of the affidavit stated that "[a]ll equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries.  Based on veterinary recommendations equines will be seized and impounded…" **See** Apdx 50, penultimate paragraph.  There was no standard by which the horses were seized except that they be in a compromised health condition, whatever that might mean.  According to Dr. Page, the horses were seized because they were thin, not because they were abused, that is, there was no probable cause to believe that a crime had occurred.

Of course, the other 46 seized horses (in addition to the 12 above) would presumably have been in better condition than the 12 Dr. Page inspected. A thin, but healthy, horse is not an abused horse and, therefore, there was no probable cause to believe that abuse had occurred. Furthermore, it was Dr. Page's opinion that taking the horses out of their environment caused them more stress and, therefore, it would have been less abusive to the horses to have left them at Badger Basin.

The question of probable cause arose in the context of qualified immunity. Plaintiff had to show that the two officers knew they were violating Mr. Walker's clearly established rights. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" ***Mullenix v. Luna***, 136 S. Ct. 305, 308 (2015). Mr. Walker maintains that under the facts of this case, probable cause was not established because, ultimately, there was no standard by which the veterinarians could say that a crime had occurred or, alternatively, the magistrate was not given all the material facts. **See *Danhauer***, 229 F.3d at 1007.

Of course, the officers' objectively reasonable belief in whether Mr. Walker was abusing the horses would not be measured by a typical officer

off the street.  Rather, the issue herein was specialized and required a specialized knowledge of what a well-bred horse can and cannot put up with in a harsh environment.  The mere fact that some of the horses were skinny (Agent Priestley originally designated only seven horses for the "skinny pen") does not mean that they were unhealthy or were being abused.

Second, according to Agent Priestley, there was nothing Mr. Walker could have done because, according to her, it would have been difficult for even a healthy animal to have survived the harsh conditions, or so she told Deputy Cochran.  The fact that only three horses died of the cold, all over 25 years old, demonstrates that Mr. Walker's horses were hearty and could withstand harsh conditions.  In short, Mr. Walker was guilty of raising horses in the mountains, not of abusing his animals.

Third, Mr. Walker alleged that the seizure was designed to fulfill the business model of the Harmony Equine Center.  Deputy Cochran was content to give Mr. Walker an additional 30 days to improve the conditions in his herd.  He was doing so as he was bringing in better feed and moving some of the horses closer to the ranch.  But then Agent Priestley became involved and Deputy Cochran changed her mind.  Why?  Mr. Walker

alleged that the reason was to support the business model of Harmony Equine Center.  This is clearly an improper motive and defeats qualified immunity.

## XI.  CONCLUSION

Mr. Walker respectfully requests that this Court reverse the decision of the district court and remand for further proceedings.

Oral argument is requested to address the factual issues.

## XII.    CERTIFICATE OF COMPLIANCE WITH RULE 25.3

Counsel hereby certifies that:

1.  All required privacy redactions have been made;

2.  The hard copies of the pleadings submitted to the clerk's office are exact copies of the ECF filing; and

3.  The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, Webroot Endpoint antivirus, scanned daily, and, according to the program, is free of viruses.

## XIII.  CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 5,582 words, inclusive of everything including footnotes.

A copy of the order being appealed and the judgment are attached.

Respectfully submitted this June 17, 2021.

By:   s/    *Robert M. Liechty*
      Robert M. Liechty
      ROBERT M LIECHTY PC
      1800 Gaylord St.
      Denver, Colorado 80206
      Tel: (303) 861-5300
      Fax: (303) 861-2746
      Email:  rliechty@crossliechty.com
      ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that on this June 17, 2021, a true and correct copy of the above and foregoing **OPENING BRIEF** was filed electronically with the Court who provides notice to the following:

Tiffanie D. Stasiak
Lisa M. Saccomano
KUTAK ROCK LLP
1801 California St., #3000
Denver, CO 80202-2652
Attorneys for Colorado Humane Society and Bobbi Priestley

Andrew R. McLetchie
Eden R. Rolland
FOWLER, SCHIMBERG, FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
Attorneys for Park County Sheriff's Office and Leigh Cochran

*Signed original in Office of Robert M Liechty*

s/    *Robert M. Liechty*
Robert M. Liechty

Page: 27

Date Filed: 06/17/2021

Document: 010110536811

Appellate Case: 21-1119

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-00364-PAB-NYW

MARK WALKER,

      Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY,

      Defendants.

---

**ORDER**

---

This matter is before the Court on Dumb Friend League Harmony Equine Center and Bobbi Priestly's Motion to Dismiss [Docket No. 32] and Park County Sheriff's Office and Deputy Leigh Cochran's Motion to Dismiss [Docket No. 33]. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

## I. BACKGROUND[1]

Plaintiff is a rancher who, prior to the events giving rise to this suit, had a total of 78 horses at three ranches in Hartsel, Colorado. *See* Docket No. 18 at 2, ¶ 4. Plaintiff has been breeding and raising horses for over 40 years. *See id.*, ¶ 5. In January, 2019, the winter in Hartsel was difficult; snowfall exceeded 30 inches and temperatures reached 40 degrees below zero for a two week period. *See id.*, ¶ 7. The harshness of

---

[1] The Court assumes that the allegations in plaintiff's complaint are true in considering the motion to dismiss. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 28

winter required extra work for plaintiff.  In a normal winter, it would take plaintiff and his two ranch hands three hours to feed the herd, but, in January 2019, it took at least six hours per day.  *Id.* at 3, ¶ 8.  Plaintiff had to plow through the snow to reach his horses. *See id.*

On January 28, 2019, defendant Deputy Leigh Cochran, the animal control officer for the Park County Sheriff's Office, received complaints regarding thin horses at one of plaintiff's ranches.  *See id.*, ¶ 10.  Deputy Cochran went to plaintiff's ranch, but could not find any horses, so she contacted plaintiff to inform him of the complaints. *See id.*  On January 29, 2019, another deputy received a call regarding a dead horse on the same ranch; Deputy Cochran went to the ranch and found the dead horse.  *See id.*, ¶ 11.  Deputy Cochran again told plaintiff about the complaints regarding thin horses on his ranch.  *Id.*  That same day, Deputy Cochran "posted a Notice of Warning that Mr. Walker has to provide food, water, and veterinary case for the horses."  *See id.* at 4, ¶ 12.  On February 4, Deputy Cochran went back to plaintiff's ranch, where she saw that plaintiff was feeding his horses, buffalo, and cattle in the same pasture; over the next few days plaintiff separated the animals "so they could be fed independently."  *Id.*, ¶ 14.

On February 14, Deputy Cochran contacted defendant Bobbi Priestly, the manager of Field Services for defendant Dumb Friends League, Harmony Equine Center ("Harmony") and a peace officer with the Colorado Department of Agriculture. *See id.* at 1, 4 ¶¶ 1, 15. Agent Priestly went to plaintiff's ranch, where she saw plaintiff moving his horses.  *Id.*  Deputy Cochran issued a second notice to plaintiff on February 14, alerting him that he had to provide food, water, and veterinary care to his herd.  *See*

*id.* Although the notice stated that plaintiff had until February 18 to improve the condition of his herd, Deputy Cochran told plaintiff that he had 30 days. *id.* at 16. On February 15, Deputy Cochran and Agent Priestly returned to plaintiff's ranch. *See id.* at 5, ¶ 17. Plaintiff moved seven skinny horses closer to the ranch buildings and, after a drive through plaintiff's fields, Deputy Cochran identified four additional horses that should "be brought to the pens." *Id.* Later that day, plaintiff's veterinarian inspected one horse in the "skinny pen," and told plaintiff to "keep doing what he was doing"; the veterinarian said nothing regarding the other horses in that pen. *Id.*, ¶ 18.

On February 16, Deputy Cochran returned to the ranch and suggested an alternate feeding plan for the horses. *See id.*, ¶ 19. Another veterinarian also came to assess one of plaintiff's horses, "rated the horse as a 1 on the Henneke scoring system, which is the lowest rating out of nine points," and recommended a particular feeding plan, to which plaintiff agreed. *Id.* Deputy Cochran returned on February 18 and "noted that all the horses were eating better grass hay and all had water." *Id.*, ¶ 20. One horse, however, was not doing well; plaintiff "did not think she would survive." *Id.* The next day, Agent Priestly informed Deputy Cochran that she did not think that plaintiff had been properly caring for his animals and "their survival was not likely" if left in plaintiff's care. *Id.* at 5-6, ¶ 21. Deputy Cochran agreed and, as a result, "drafted an affidavit to support a warrant to seize the horses." *Id.* at 6, ¶ 22. Deputy Cochran "signed all the search warrants used" and "Agent Priestly decided to execute the warrants." *Id.* at 7, ¶ 26. On February 21, 2019, "defendants" went to plaintiff's ranch with "11 trailers and 21 people" and seized 48 horses. *Id.* at 6, ¶ 24. Defendants seized an additional 10 horses on February 25 and 27, for a total of 58 horses. *Id.*,

3

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 30

¶ 25.  The horses were brought to Harmony.[2]  *See id.* at 8, ¶ 26.

Plaintiff attempted to retrieve his horses.  *See id.* at 8, ¶ 30.  To do so, however, "he had to put up a bond of $250 per month for each horse to pay for its care."  *Id.*  This meant he had to pay an upfront bond of $15,450 and that same amount every month thereafter.  *Id.*  Plaintiff could not afford the bond.  *Id.*

The district attorney for Park County charged plaintiff with eight counts of animal cruelty, for which plaintiff was found not guilty on December 6, 2019.  *Id.*, ¶ 32.  After he was found not guilty, plaintiff asked Harmony to return any horses remaining in its possession.  *Id.* at 8-9, ¶ 34.  Harmony "would not return the remaining five horses."[3]  *Id.*

Plaintiff filed suit on February 12, 2020.  *See* Docket No. 1.  In his amended complaint, plaintiff brings five claims: (1) unconstitutional seizure "in violation of the Fourth Amendment or the [Fourteenth] Amendment, or both" against all defendants; (2) malicious prosecution in violation of the Fourth Amendment against all defendants; (3) state law civil theft against Agent Priestly and Deputy Cochran; (4) state law outrageous conduct against Agent Priestly; and (5) state law defamation against Agent Priestly.  *See* Docket No. 18 at 9-13.  *See* Docket No. 18 at 6.  Both the Law Enforcement defendants and the Harmony defendants have filed motions to dismiss, *see* Docket Nos. 32-33, arguing, inter alia, that they are entitled to qualified immunity and, even if

---

[2] Plaintiff lists the Dumb Friend Friends League as a defendant in this case, but his allegations often refer to the Humane Society.  While both are animal organizations, they are different.  Nevertheless, given that the Dumb Friends League was properly served and has filed a motion to dismiss, the Court assumes that plaintiff meant the Dumb Friends League and not the Humane Society in his allegations.

[3] Plaintiff believes the other horses were adopted.  *Id.*

they were not, plaintiff has failed to state a claim. *See id.*

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). However, a plaintiff still must provide "supporting factual averments" with his allegations. *Cory v. Allstate Insurance*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)). Otherwise, the Court need not accept conclusory allegations. *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to

Appellate Case: 21-1119   Document: 010110536811   Date Filed: 06/17/2021   Page: 31

Appellate Case: 21-1119     Document: 01011053681     Date Filed: 06/17/2021     Page: 32

dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

Before addressing the merits of defendants' motions to dismiss, the Court first notes that plaintiff has conceded that several claims should be dismissed.  First, plaintiff "concurs that the § 1983 malicious prosecution claim against Harmony may be dismissed." *See* Docket No. 40 at 9.  Plaintiff also agrees to dismiss his municipal liability claims against the Park County Sheriff's Office without prejudice.  *See* Docket No. 41 at 11.  Accordingly, the Court will dismiss these claims.

### A.  Fourth Amendment Seizure

All defendants argue that plaintiff has failed to provide any non-conclusory allegations that they committed an unreasonable seizure and, even if plaintiff did, defendants are entitled to qualified immunity. *See* Docket No. 32 at 3-6; Docket No. 33 at 3-6.

Qualified immunity "protects public employees from both liability and 'from the burdens of litigation' arising from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Allstate Sweeping, LLC v. Black*, 705 F.3d 1261, 1266 (10th Cir. 2013)).  For a claim to survive a qualified immunity defense, a

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 33

plaintiff must "demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Id.* (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).  Courts are permitted to address the prongs of the qualified immunity analysis in any order that they wish and, should "think hard" before addressing both prongs of the analysis.  *See Hunt v. Bd of Regents of Univ. of N.M.*, 792 F. App'x 595, 600-01 (10th Cir. 2019) (unpublished) (citing *Camreta v. Greene*, 563 U.S. 692, 707 (2011)); *see also Yeasin v. Durham*, 719 F. App'x 844, 850 (10th Cir. 2018) (unpublished) ("We can analyze either prong of the qualified immunity test first and can resolve the case solely on the clearly established prong." (citing *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Plaintiff can demonstrate that a right is clearly established "by identifying an on-point Supreme Court or published Tenth Circuit decision" establishing the unlawfulness of the defendant's actions.  *Cummings*, 913 F.3d at 1239 (quoting *Quinn*, 780 F.3d at 1005).  "Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the 'plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000)).

"The general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *See Bailey v. United States*, 568 U.S. 186, 192 (2013). When a search or seizure is conducted pursuant to a warrant, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). However, issuance by a neutral magistrate does not necessarily end the inquiry. There are four situations where a seizure pursuant to a warrant will not provide an officer with qualified immunity: (1) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth"; (2) "[the] issuing magistrate wholly abandons her judicial role"; (3) "the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "[the] warrant is so facially deficient that the executing officer could not reasonably believe it was valid." *See United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (citations, quotations, and alterations omitted).

The Court finds that plaintiff has failed to establish any of the four exceptions. Regarding the first, second, and third exceptions, none of plaintiff's allegations go to the falsity of the affidavit, the magistrate abandoning her judicial role, or the facial deficiency of the warrant. *See Danhauer*, 229 F.3d at 1007. Nor does plaintiff argue in either of his responses that these three exceptions apply.[4] *See* Docket Nos. 40, 41.

---

[4] Plaintiff in particular could not argue that the affidavit contained false or misleading information as the affidavit contains information and allegations nearly identical to those found in plaintiff's complaint.

Appellate Case: 21-1119   Document: 010110536811   Date Filed: 06/17/2021   Page: 34

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 35

Rather, plaintiff contends that he has alleged that there was no probable cause to seize his horses.  *See* Docket No. 40 at 5-6; Docket No. 41 at 5-6.  Thus, plaintiff's allegations and arguments go to the third exception, the indicia of probable cause to support the warrant itself.  *See Danhauer*, 229 F.3d at 1007.

Under the third exception, a suit against an officer will be allowed "when it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *See Millender*, 565 U.S. at 547.  However, "the threshold for establishing this exception is a high one." *Id.*  "[I]n the ordinary case, an officer cannot be expected to question the magistrate's probable cause-determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant." *Id.* (citing *United States vs. Leon*, 468 U.S. 897, 921 (1983)).  "[W]here a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." *See id.* at 547-48 (citing *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986)).

In reviewing the affidavit, the Court finds that it is not so lacking in indicia of probable cause such that the issuance of the warrant was not within the range of professional competence.[5]  *See Millender*, 565 U.S. 547.  The affidavit states the

---

[5] Although this is a motion to dismiss, the Court may consider the warrants and the affidavits supporting so long as the are relied on in the complaint, "central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *See Rathbun v. Montoya*, 628 F. App'x 988, 990 n.2 (10th Cir. 2015) (unpublished) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (evaluating the warrants and affidavits in reviewing a Fourth Amendment seizure case).  Plaintiff does not object to the use of these documents or dispute their authenticity.  *See, e.g.*, Docket No. 40 at 2-3 n.3.

following relevant facts: (1) Deputy Cochran received reports regarding thin horses off Highway 24 and made contact with plaintiff regarding those reports; (2) another deputy received complaints regarding thin horses off the same highway; (3) a citizen reported that she saw a dead horse and that no one had been feeding the horses; (4) Deputy Cochran saw the dead horse herself, which was "mostly covered by snow"; (5) plaintiff told Deputy Cochran he had been unable to move his horses and that the dead horse probably died from the cold; (6) plaintiff informed Deputy Cochran "that he could not access the far back north side of the property due to large snow drifts"; (7) plaintiff had not separated his previously identified thin horses from the rest of his herd and plaintiff "could not point out specifically where the nine horses were"; (8) plaintiff told Deputy Cochran that "two, possibly four" horses had died; (9) plaintiff informed Deputy Cochran he did not want the horses at the ranch on two separate occasions, to which Deputy Cochran responded that the horses needed adequate care and feeding; (10) on a visit to plaintiff's ranch, Deputy Cochran and plaintiff rode a tractor through plaintiff's fields and found more thin horses; plaintiff was "shocked" that the horses were thin "because they were fine" the week prior; (11) on several occasions, starting on January 30, Deputy Cochran directed plaintiff to provide his thin horses different feed, but plaintiff did not feed "better hay" until February 18; however, at that point, he had still not fed the horses the feed directed by Deputy Cochran; (12) a veterinarian assessed one of plaintiff's horses on the Henneke body score and rated it a one, the lowest score, because "[t]he horse had little to no body fat that could be felt, with deep spaces between the ribs" and the "withers down the back to the hips and tail head were all protruding"; and (13) "there could be as many as ten" deceased horses and two were

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 37

missing from the originally identified nine.  *See* Docket No. 32-1 at 4-8.

The affidavit paints a clear picture: the weather was harsh and plaintiff's horses were in rough condition.  Plaintiff failed to provide his horses the appropriate feed until several weeks after he was directed, and at least two horses, and possibly ten, had died.  Plaintiff refused to bring his horses near the barn for proper shelter until he was given several warnings and directives.  This is not a situation where there is nothing to connect plaintiff to the horses, the care received, or the ranch.  *See United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) (finding an affidavit lacking where there was nothing connecting the plaintiff to criminal activity except his status as a felon).  "An affidavit establishes probable cause . . . if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place."  *See United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018).  The affidavit here describes plaintiff's property, plaintiff's horses, plaintiff's care of the horses, and plaintiff's dilatory response to caring for the horses.  This establishes a fair probability that plaintiff had not been adequately caring for his herd and is sufficient indicia of probability to support the magistrate's issuance of the warrant.

Plaintiff argues that there was no probable cause because: (1) Deputy Cochran and Agent Priestly should have known that the cold weather would eventually end; (2) a veterinarian at Harmony, post seizure, found the majority of his horses healthy; (3) there was a conspiracy to seize his horses so that Harmony could profit off their sale; and (4) he was acquitted of animal cruelty after a jury trial. See Docket No. 40 at 4-7; Docket No. 41 at 5-8.  Regarding two and four, the post-hoc veterinary analysis and criminal acquittal, both of those occurred after the warrant was issued and, as a result,

are irrelevant to whether there was sufficient information in the affidavit to support the magistrate's issuance of the warrant.  The question is not whether, after the warrant was issued, other information came to light that might have contradicted the magistrate's determination, but whether, in the affidavit itself, there was sufficient information to support the magistrate's conclusion.  The Court already found that there was and, thus, any post-hoc information is irrelevant.

As to the alleged conspiracy, plaintiff provides no "supporting factual averments," *Cory*, 583 F.3d at 1244, for his allegation that there was some conspiracy to seize his horses.  Rather, he states in conclusory fashion that, because Harmony profits off the selling of seized horses, there must be some conspiracy.  *See* Docket No. 18 at 7, ¶ 26 ("The business of the Harmony Equine Center is to provide the horses for adoption by private owners.  Thus, the seizures promoted its business.").  However, without any supporting facts – when the conspiracy started, how it was enacted, who was part of it – plaintiff's allegation is merely conclusory, and the Court need not accept it.  *See Cory*, 583 F.3d at 1244.  Finally, the Court finds plaintiff's argument regarding the weather unpersuasive.  He alleges that any "cruelty to the animals . . . was caused by an act of God," and that Deputy Cochran and Agent Priestly should have known that the weather would warm up.  *See* Docket No. 18 at 5-6, 10, ¶¶ 21, 40.  However, even if the weather is out of plaintiff's control, plaintiff provides no support for argument that he is not required to respond to that weather and act accordingly such that there was no probable cause to issue the warrant.

Plaintiff, in response to the motions to dismiss, cursorily makes a second argument, that the warrants were overbroad.  *See* Docket No. 41 at 6 ("The instant

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 38

Appellate Case: 21-1119    Document: 010110536811    Date Filed: 06/17/2021    Page: 39

case is controlled by the line of cases in which an officer seizes items not listed in the warrant."). The Court notes that nowhere in plaintiff's complaint are there any allegations regarding the overbreadth or non-specificity of the warrants.[6] This alone is sufficient to dismiss plaintiff's claim. However, the Court finds that, even if plaintiff sufficiently presented this argument in his complaint, the warrants were not so overbroad as to be invalid.

Under the Fourth Amendment, warrants must (1) be supported by probable cause and (2) "particularly describe the place to be searched, and the persons or things to be seized." *See Rathbun v. Montoya*, 628 F. App'x 988, 993 (10th Cir. 2015) (unpublished) (citing U.S. Const. amend. IV). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014) (citation and quotations omitted). However, even if overbroad, a validly issued warrant will shield an officer from suit so long as it is not unreasonable for the officer to conclude that the warrant permitted the officers to seize the items that were seized. *See Rathbun*, 628 F. App'x at 994. An officer can "reasonably conclude[] that the warrant was sufficiently particular, even though it described the items to be seized in broad or generic terms, given the nature of the crime[] under investigation." *Id.*; *see also United States v. Cooper*, 654 F.3d 1104, 1127 (10th Cir. 2011) ("[W]hether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated.").

---

[6] Plaintiff does allege that extra horses were seized in violation of the Fourteenth Amendment, *see* Docket No. 18 at 10, ¶ 41, but that allegation does not reference the breadth of the warrant, just the breadth of the seizure and the corresponding bonding scheme.

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 40

The Court finds that it was not unreasonable for defendants to conclude that the warrant permitted them to seize the horses seized.  First, as described above, the warrant was validly issued and supported by probable cause.  Second, the context of the underlying criminal allegations was that plaintiff was failing to provide care for his herd.  The warrant states that, "[b]ased on veterinary recommendations[,] equines will be seized and impounded."  *See* Docket No. 32-2 at 2.  This sufficiently describes that any horse recommended by a veterinarian to be seized is permitted to be seized.  The seizing officers could reasonably conclude – indeed the warrant specifically states – that any horse recommended to be seized shall be seized, particularly given the context of the underlying criminal charges.  Plaintiff does not argue, or allege, that the horses were not seized pursuant to veterinarian recommendation, rather, plaintiff "disputes which horses met this criteria."  *See* Docket No. 41 at 6.  But plaintiff disagreeing with a veterinarian's recommendation – in a response to a motion to dismiss and not his complaint – is not the appropriate constitutional test.  The question is whether the validly issued warrant described the items to be seized with sufficient particularity such that a reasonable officer could conclude she was permitted to seize the items seized.  *See Rathbun*, 628 F. App'x at 994.  That was the situation here.

In sum, the Court finds that the horses were seized pursuant to a validly issued warrant, that the warrant described with appropriate particularity the horses to be seized, and that the warrant was supported by sufficient probable cause.  As a result, Deputy Cochran and Agent Priestly are entitled to qualified immunity and plaintiff's

Appellate Case: 21-1119   Document: 010110536811   Date Filed: 06/17/2021   Page: 41

claim for unreasonable seizure is dismissed.[7]

### B. Fourteenth Amendment Excessive Bond

Plaintiff asserts that defendants "seized [] extra horses knowing that this would make it impossible for [plaintiff] to bond out the horses and, therefore, Harmony could keep the additional horses." *See* Docket No. 18 at 10, ¶ 41. He alleges that "[t]his violates the 14th Amendment." *Id.* Defendants argue that plaintiff's allegations regarding the bonding scheme are conclusory and therefore should be dismissed. *See* Docket No. 46 at 7; Docket No. 47 at 1.

First, the basis for plaintiff's claim that his Fourteenth Amendment rights were violated is unclear. The only indication in his complaint is that the seizure of the "extra horses" violates the Fourteenth Amendment because they were seized in order to "make it impossible for [plaintiff] to bond out the horses." *See* Docket No. 18 at 10, ¶ 41. Therefore, the Court does not know if plaintiff is asserting an excessive fine claim based on the Eighth Amendment made applicable to the states by the Fourteenth Amendment, a procedural due process claim, or a substantive due process claim. *See, e.g.*, *Campbell v. City of Spencer*, 682 F.3d 1278, 1285 (10th Cir. 2012) (excessive fine claim for seized horses). Additionally, plaintiff's description of the bonding requirement is vague. He provides no details, other than to say that "he had to put up a bond of $250 per month for each horse." *See* Docket No. 18 at 8, ¶ 30. Thus, there are no

---

[7] Plaintiff also asserts a claim against Harmony for unreasonable seizure, but he provides no support for Harmony being a government official such that § 1983 is applicable to it or that it had anything to do with the preparation or execution of the warrant. Plaintiff's only argument is that Harmony is "liable under §1983 because it was the beneficiary of the conspiracy to seize as many horses as possible to fulfill the business purposes of Harmony." *See* Docket No. 40 at 8-9. The Court already concluded that plaintiff's allegations regarding the conspiracy are conclusory.

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 42

allegations regarding whether this bonding requirement is a municipal ordinance, a state statute, or simply Harmony's boarding rules.

Second, as already described above, plaintiff has failed to assert any non-conclusory allegations regarding a bonding conspiracy or claim.  Without any well-pled allegations, plaintiff cannot succeed against defendants.

Third, if the "bond" is simply Harmony's own rules and fee for taking care of boarded horses, plaintiff fails to explain how this private organization's boarding rules could supply the requisite state action to support a § 1983 claim, whether against Harmony or any of the defendants.  In plaintiff's initial citation to *Robbins v. City of Greeley*, No. 15-cv-00683-RPM, 2016 WL 454999 (D. Colo. Feb. 5, 2016), plaintiff suggests that the "bond" requirement is just boarding fees, as he states "*[a]lthough the bond was pursuant to a city municipal code*, the principal in *Robbins* is the same as that herein."  *See* Docket No. 40 at 7.  This suggests that, unlike the municipal bond in *Robbins*, the bond here is Harmony's requirement.  However, plaintiff later argues that the "abuse of this bonding statute was simply a cover used to steal the horses."  *Id.* at 8.  Given that plaintiff provides no support for the proposition that Harmony's private boarding fees could violate the Fourteenth Amendment and given plaintiff's statement that there is a "bonding statute," the Court assumes plaintiff is alleging that there is some ordinance or statute that requires the horses to be bonded at $250 per animal per month.

Fourth, even assuming as much, there are no allegations connecting defendants to the bonding requirement.  If plaintiff is alleging that (1) the bonding scheme is excessive, (2) he was denied due process to challenge it, or (3) the scheme violates

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 43

substantive due process, plaintiff has failed to allege that any of the named defendants are responsible for the underlying bond structure or his denial of due process, substantive or procedural.  Rather, he only alleges that seizing extra horses would benefit Harmony.  *See* Docket No. 18 at 10, ¶ 41.  However, as already concluded, the horses were seized pursuant to a valid warrant.  Plaintiff's real issue, then, is with the underlying bonding scheme, which, to avoid having the horses adopted, forces him to pay to have them taken care of by Harmony, regardless of the number of horses seized.  But plaintiff has not cited a single case where the officers executing a warrant could be liable under §1983 for the bond requirements concerning the seized property or where a private organization responsible for holding the seized property at the direction of law enforcement could be liable under § 1983.  Nor has he provided any allegations or argument that defendants prevented plaintiff from exercising his procedural due process rights to challenge the scheme.

Plaintiff's citation to *Robbins* is unpersuasive.  There, the plaintiff had her dogs seized and was required to pay a bond to have the dogs held by the Humane Society during the pendency of her criminal case.  *See Robbins*, 2016 WL 454999, at *3.  The plaintiff could not pay the bond, her dogs were taken and either euthanized or adopted, and she was eventually acquitted in the underlying criminal trial.  *Id.* at *3-*4.  Moreover, she was not permitted to challenge the scheme until after she was acquitted, and the corresponding criminal motion to suppress the evidence that resulted in her dogs being taken was not ruled on until some time after the dogs had been taken from her.  *See id.* at *3-*5.  The court ruled that the procedural due process claim was "so egregious" that it was also a violation of substantive due process.  *See id.* at *5.  *Robbins* is different

from plaintiff's situation in three respects. First, the plaintiff in *Robbins* sued the City of Greeley, whose municipal bond scheme caused plaintiff to lose her animals, not the officers who seized her dogs or the shelter who held them. *See id.* at *1. Second, the plaintiff was never permitted to challenge the bonding process and the motion to suppress was ruled on long after her dogs were taken. *See id.* at *3-4. By contrast, plaintiff here has not alleged that he was unable to challenge the bonding scheme or that he ever attempted to challenge it. Finally, the dogs were seized illegally in *Robbins* as a result of a traffic stop that lacked probable cause. *See id.* at *4. Here, there was sufficient probable cause for the magistrate judge to issue the warrant. In sum, *Robbins* dealt with a plaintiff who (1) sued the proper entity; (2) attempted to challenge the bonding scheme as unconstitutional; and (3) was deprived of challenging that scheme in a timely manner in order to prevent the adoption or euthanization of her animals. Plaintiff, on the other hand, (1) sues the officers rather than the entity whose code requires the bond; (2) does not allege that he attempted to challenge the scheme at any point; and (3) had his horses seized pursuant to a valid warrant. *Robbins* is thus inapposite.

In sum, plaintiff has failed to plead any non-conclusory allegations regarding a bonding conspiracy or scheme and has pled no allegations whatsoever that defendants are responsible for the underlying bonding requirement. As a result, plaintiff's Fourteenth Amendment claim will be dismissed.

### C. Malicious Prosecution

Defendants next seek to dismiss plaintiff's claim for malicious prosecution. *See* Docket No. 32 at 7; Docket No. 33 at 6-8. Defendants essentially argue that (1) there

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 45

was no constitutional violation and (2) they would be entitled to qualified immunity even if there was. *See id.*; *see also* Docket No. 47 at 1. As stated above, plaintiff agrees that the malicious prosecution claim against Harmony should be dismissed. *See* Docket No. 40 at 9. However, he contends that he has made sufficient allegations to support his claims against both Deputy Cochran and Agent Priestly. *See id.*; *see also* Docket No. 41 at 9-10.

To state a claim for malicious prosecution, a plaintiff must adequately allege: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *See Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (citation omitted). Even assuming that plaintiff can establish elements one, two, four, and five, Deputy Cochran and Agent Priestly would be protected by qualified immunity because the seizure of his horses and prosecution for animal cruelty occurred pursuant to a validly issued warrant. As a result, qualified immunity protects both Deputy Cochran and Agent Priestly from suit for malicious prosecution under the Fourth Amendment. *See Stonecipher v. Valles*, 759 F.3d 1134, 1147 (10th Cir. 2014) (applying the Fourth Amendment qualified immunity analysis to conclude an officer was shielded from liability for malicious prosecution); *see also Bailey v. Twomey*, 791 F. App'x 724, 733-35 (10th Cir. 2019) (unpublished) (same).[8]

---

[8] While *Bailey* questions whether "actual" or "arguable" probable cause is the relevant standard for qualified immunity for warrantless arrests, *see Bailey*, 791 F. App'x at 733-34, that discussion is irrelevant for the purposes of plaintiff's claim because plaintiff's horses were seized pursuant to a warrant. The Fourth Amendment qualified immunity analysis applies to the probable cause prong of the malicious

Appellate Case: 21-1119   Document: 010110536811   Date Filed: 06/17/2021   Page: 46

### D.  Remaining State Law Claims

Plaintiff's remaining claims arise under state law.  *See* Docket No. 18 at 11-13.
Although the Court may exercise supplemental jurisdiction over state law claims if there
is a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) provides that a district court
"may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district
court has dismissed all claims over which it has original jurisdiction."  The Tenth Circuit
has instructed that, "if federal claims are dismissed before trial, leaving only issues of
state law," courts should "decline to exercise pendent jurisdiction . . . absent compelling
reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229-30 (10th Cir. 2010)
(alterations, citations, and quotations omitted).  This rule is consistent with "[n]otions of
comity and federalism," which "demand that a state court try its own lawsuits."  *Id.* at
1230 (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

Plaintiff does not argue that the Court should retain jurisdiction over his state law
claims if his federal claims are dismissed, and the Court does not find any compelling
reason to do so.  Accordingly, plaintiff's third, fourth, and fifth claims for relief will be
dismissed without prejudice.  *See Thompson v. City of Shawnee*, 464 F. App'x 720, 726
(10th Cir. 2012) (unpublished) (holding that, when declining to exercise supplemental
jurisdiction over state-law claims, the court "had discretion either to remand the claims
to the state court or to dismiss them"); *see also* Colo. Rev. Stat. § 13-80-111 (permitting
claims properly commenced within the statute of limitations to be re-filed if involuntarily
dismissed because of lack of jurisdiction); *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 598

_____

prosecution claim, although the analysis may change depending on whether the arrest
or seizure occurred with or without a warrant.

Appellate Case: 21-1119   Document: 010110536811   Date Filed: 06/17/2021   Page: 47

(2018) (holding that 28 U.S.C. § 1367(d) tolls the statute of limitations for state law

claims asserted under § 1367(a) during the pendency of the federal litigation in which

such claims are brought and for thirty days following involuntary dismissal of those

claims on jurisdictional grounds).

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that the Dumb Friend League Harmony Equine Center and Bobbi

Priestly's Motion to Dismiss [Docket No. 32] is **GRANTED**.  It is further

**ORDERED** that the Park County Sheriff's Office and Deputy Leigh Cochran's

Motion to Dismiss [Docket No. 33] is **GRANTED**.  It is further

**ORDERED** that plaintiff's claim against the Park County Sheriff's Office for an

unconstitutional policy in violation of 42 U.S.C. § 1983 is **DISMISSED** without prejudice.

It is further

**ORDERED** that the remainder of plaintiff's first and second claims against all

defendants are **DISMISSED** with prejudice.  It is further

**ORDERED** that plaintiff's third, fourth, and fifth claims are **DISMISSED** without

prejudice.  It is further

**ORDERED** that judgment shall enter for defendants and against plaintiff on all

claims.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have

their costs by filing a bill of costs with the Clerk of the Court.  It is further

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 48

**ORDERED** that this case is closed.

DATED March 10, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 49

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00364-PAB-NYW

MARK WALKER,

     Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY,

     Defendants.

---

## FINAL JUDGMENT

---

    In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

    Pursuant to the Order [Docket No. 49] of Chief United States District Judge Philip

A. Brimmer entered on March 10, 2021, it is

    ORDERED that the Dumb Friend League Harmony Equine Center and Bobbi

Priestly's Motion to Dismiss [Docket No. 32] is GRANTED.  It is further

    ORDERED that the Park County Sheriff's Office and Deputy Leigh Cochran's

Motion to Dismiss [Docket No. 33] is GRANTED.  It is further

    ORDERED that plaintiff's claim against the Park County Sheriff's Office for an

unconstitutional policy in violation of 42 U.S.C. § 1983 is DISMISSED without prejudice.

It is further

    ORDERED that the remainder of plaintiff's first and second claims against all

Appellate Case: 21-1119     Document: 010110536811     Date Filed: 06/17/2021     Page: 50

defendants are DISMISSED with prejudice.  It is further

ORDERED that plaintiff's third, fourth, and fifth claims are DISMISSED without prejudice.  It is further

ORDERED that judgment shall enter for defendants and against plaintiff on all claims.  It is further

ORDERED that defendants are awarded their costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is further

ORDERED that this case is closed.

Dated at Denver, Colorado this 10th day of March, 2021.

FOR THE COURT:

Jeffrey P. Colwell, Clerk

By s/ S. Grimm
Deputy Clerk