UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MARK WALKER,

     Plaintiff-Appellant,                            Case No. 21-1119

vs.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY,

     Defendants-Appellees.

---

## APPENDIX I, pages 1-115

---

Appeal from an order of summary judgment by Chief Judge Phillip A.
Brimmer, United States District Court Judge for the
District of Colorado, Case No. 20-cv-00364

Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
ATTORNEY FOR APPELLANT

District Court Docket Sheet.................................................................. 1
Notice of filing Amended Complaint ..................................................... 11
Amended Complaint ............................................................................. 13
Motion to Dismiss by Harmony defendants .......................................... 27
     Exhibit A, search warrant, 2/20/19 ............................................... 43
     Exhibit B, search warrant, 2/20/19 ............................................... 51
     Exhibit C, search warrant, 2/21/19 ............................................... 59
     Exhibit D, search warrant, 2/21/19 ............................................... 63
Motion to Dismiss by County Defendants  ........................................... 67
     Exhibit A, order, *Hatlee v. Hardey*.............................................. 84
     Exhibit B, motion to suppress ....................................................... 94
     Exhibit C, transcript from criminal trial........................................ 103
County's Supplement to Motion ........................................................... 106
     Exhibit D, minute order ............................................................... 109
Order Granting Motion to Stay ............................................................. 110

Volume II

Response to Harmony Defendants' Motion to Dismiss ........................ 116
Response to County Defendants' Motion to Dismiss............................ 130
County Defendants' Reply Brief ........................................................... 142
Harmony Defendants' Reply Brief ........................................................ 153
Order from which appeal is taken ........................................................ 156
Judgment............................................................................................. 178
Notice of Appeal ................................................................................. 180

## CERTIFICATE OF COMPLIANCE WITH RULE 25.3

Counsel hereby certifies that:

1. All required privacy redactions have been made to both volumes of the Appendix;

2. The hard copies of the pleadings submitted to the clerk's office are exact copies of the ECF filing; and

3. The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, Webroot Endpoint antivirus, scanned daily, and, according to the program, is free of viruses.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this June 17, 2021, a true and correct copy of the above and foregoing Appendix, Vol. I and II, was filed electronically with the Court who provides notice to the following:

Tiffanie D. Stasiak
Lisa M. Saccomano
KUTAK ROCK LLP
1801 California St., #3000
Denver, CO 80202-2652
Attorneys for Colorado Humane Society and Bobbi Priestley

Andrew R. McLetchie
Eden R. Rolland
FOWLER, SCHIMBERG, FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
Attorneys for Park County Sheriff's Office and Leigh Cochran

*Signed original in Office of Robert M Liechty PC*

s/  *Robert M. Liechty*
Robert M. Liechty

APPEAL,JD1,MJ CIV PP,NDISPO,TERMED

## U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00364-PAB-NYW

Walker v. Park County Sheriff's Office et al
Assigned to: Chief Judge Philip A. Brimmer
Referred to: Magistrate Judge Nina Y. Wang
Cause: 42:1983 Civil Rights Act

Date Filed: 02/12/2020
Date Terminated: 03/10/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights:
Other
Jurisdiction: Federal Question

**Plaintiff**

**Mark Walker**                    represented by    **Robert Mark Liechty**
Robert M Liechty PC
1800 Gaylord St
5105 DTC Parkway
Denver, CO 80206
303-861-5300
Fax: 303-861-2746
Email: rliechty@crossliechty.com

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Park County Sheriff's Office**    represented by    **Andrew R. McLetchie**
Fowler Schimberg Flanagan &
McLetchie, P.C.
350 Indiana Street
Suite 850
Golden, CO 80401
303-298-8603
Fax: 303-298-8748
Email: a_mcletchie@fsf-law.com
*ATTORNEY TO BE NOTICED*

**Eden R. Rolland**
Fowler Schimberg Flanagan &

Apdx 001

CM/ECF - U.S. District Court:cod                                    Page 2 of 10
Case 1:20-cv-00364-PAB-NYW  Document 52-2   Filed 04/07/21   USDC Colorado   Page 2 of 10
Appellate Case: 21-1119    Document: 010110536823    Date Filed: 06/17/2021    Page: 5

McLetchie, P.C.
350 Indiana Street
Suite 850
Golden, CO 80401
303-298-8603
Fax: 303-298-8748
Email: e_rolland@fsf-law.com
*ATTORNEY TO BE NOTICED*

**Matthew Kakuang Sidran**
Fowler Schimberg Flanagan &
McLetchie, P.C.
350 Indiana Street
Suite 850
Golden, CO 80401
303-298-8603
Fax: 303-298-8748
Email: m_sidran@fsf-law.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Leigh Cochran**              represented by   **Andrew R. McLetchie**
*Deputy*                                        (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Eden R. Rolland**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Matthew Kakuang Sidran**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Dumb Friends League**        represented by   **Cynthia Dawn Lowery-Graber**
**Harmony Equine Center**                       Bryan Cave Leighton Paisner
                                                LLP-Denver
                                                1700 Lincoln Street
                                                Suite 4100
                                                Denver, CO 80203-4541
                                                303-861-7000
                                                Fax: 303-866-0200
                                                Email: cynthia.lowery-

Apdx 002

Case 1:20-cv-00364-RAB-NYW Document 52-2 Filed 04/07/21 USDC Colorado Page 6 of 10

Appellate Case: 21-1119    Document: 010110536823    Date Filed: 06/17/2021    Page: 6

graber@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bobbi Priestley**                    represented by **Cynthia Dawn Lowery-Graber**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/12/2020 | 1 | COMPLAINT *and jury deman* against Leigh Cochran, Dumb Friends League Harmony Equine Center, Park Cty Sheriff Office, Bobbie Priestly (Filing fee $ 400,Receipt Number 1082-7148964) Attorney Robert Mark Liechty added to party Mark Walker (pty:pla), filed by Mark Walker. (Attachments: # 1 Summons, # 2 Civil Cover Sheet)(Liechty, Robert) (Entered: 02/12/2020) |
| 02/12/2020 | 2 | Case assigned to Magistrate Judge Nina Y. Wang. Text Only Entry. (rsams, ) (Entered: 02/13/2020) |
| 02/13/2020 | 3 | SUMMONS issued by Clerk. (Attachments: # 1 Magistrate Judge Consent Form) (rsams, ) (Entered: 02/13/2020) |
| 03/05/2020 | 4 | ORDER by Magistrate Judge Nina Y. Wang on 3/5/20, Setting Scheduling/Planning Conference and Setting Deadline for Filing of Consent/Nonconsent Form Consent Form due by 5/12/2020. Proposed Scheduling Order due by 5/19/2020. Scheduling/Planning Conference set for 5/26/2020 10:00 AM in Courtroom A 502 before Magistrate Judge Nina Y. Wang. (nmarb, ) (Entered: 03/05/2020) |
| 03/26/2020 | 5 | WAIVER OF SERVICE Returned Executed by Mark Walker. Dumb Friends League Harmony Equine Center waiver sent on 3/25/2020, answer due 5/26/2020. (Liechty, Robert) (Entered: 03/26/2020) |
| 03/26/2020 | 6 | WAIVER OF SERVICE Returned Executed by Mark Walker. Bobbi Priestley waiver sent on 3/25/2020, answer due 5/26/2020. (Liechty, Robert) (Entered: 03/26/2020) |
| 03/26/2020 | 7 | NOTICE of Entry of Appearance by Cynthia Dawn Lowery-Graber on behalf of Dumb Friends League Harmony Equine Center, Bobbi Priestley Attorney Cynthia Dawn Lowery-Graber added to party Dumb Friends League Harmony Equine Center (pty:dft), Attorney Cynthia Dawn Lowery-Graber added to party |

Apdx 003

CM/ECF - U.S. District Court:cod    Case 1:20-cv-00364-PAB-NYW   Document 52-2   Filed 04/07/21   USDC Colorado   Page 4 of 10   Page 4 of 10

Appellate Case: 21-1119    Document: 010110536823    Date Filed: 06/17/2021    Page: 7

| | | Bobbi Priestley (pty:dft) (Lowery-Graber, Cynthia) (Entered: 03/26/2020) |
|---|---|---|
| 03/31/2020 | 8 | Mail Returned as Undeliverable re: 4 Order, Addressed to Leigh Cochran. (nmarb, ) (Entered: 03/31/2020) |
| 03/31/2020 | 9 | Mail Returned as Undeliverable re: 4 Order, Addressed to Park County Sheriff's Office. (nmarb, ) (Entered: 03/31/2020) |
| 04/10/2020 | 10 | NOTICE of Entry of Appearance by Eden R. Rolland on behalf of Leigh Cochran, Park County Sheriff's OfficeAttorney Eden R. Rolland added to party Leigh Cochran(pty:dft), Attorney Eden R. Rolland added to party Park County Sheriff's Office(pty:dft) (Rolland, Eden) (Entered: 04/10/2020) |
| 04/10/2020 | 11 | NOTICE of Entry of Appearance by Andrew R. McLetchie on behalf of Leigh Cochran, Park County Sheriff's OfficeAttorney Andrew R. McLetchie added to party Leigh Cochran(pty:dft), Attorney Andrew R. McLetchie added to party Park County Sheriff's Office(pty:dft) (McLetchie, Andrew) (Entered: 04/10/2020) |
| 04/29/2020 | 12 | NOTICE of Entry of Appearance by Matthew Kakuang Sidran on behalf of Leigh Cochran, Park County Sheriff's OfficeAttorney Matthew Kakuang Sidran added to party Leigh Cochran(pty:dft), Attorney Matthew Kakuang Sidran added to party Park County Sheriff's Office(pty:dft) (Sidran, Matthew) (Entered: 04/29/2020) |
| 05/07/2020 | 13 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 5/7/2020. The Scheduling Conference set for May 26, 2020, at 10:00 AM, by 4 Order is CONVERTED to a Telephonic Scheduling Conference for the same date and time. All participants shall use the following dial-in information: 888-363-4749, Access Code: 5738976#. Text Only Entry (nywlc2, ) (Entered: 05/07/2020) |
| 05/07/2020 | 14 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Mark Walker All parties do not consent.. (Liechty, Robert) (Entered: 05/07/2020) |
| 05/07/2020 | 15 | CASE REASSIGNED pursuant to 14 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Chief Judge Philip A. Brimmer. All future pleadings should be designated as 20-cv-00364-PAB. (Text Only Entry) (nmarb, ) (Entered: 05/08/2020) |
| 05/08/2020 | 16 | ORDER REFERRING CASE to Magistrate Judge Nina Y. Wang |

| | | |
|---|---|---|
| | | for **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1) (A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 5/8/2020. Text Only Entry (pabsec2) (Entered: 05/08/2020) |
| 05/19/2020 | 17 | NOTICE of Filing Amended Pleading *complaint* by Plaintiff Mark Walker (Attachments: # 1 Exhibit track-changes doc.) (Liechty, Robert) (Entered: 05/19/2020) |
| 05/19/2020 | 18 | AMENDED COMPLAINT *and jury demand* against Leigh Cochran, Dumb Friends League Harmony Equine Center, Park County Sheriff's Office, Bobbi Priestley, filed by Mark Walker. (Liechty, Robert) (Entered: 05/19/2020) |
| 05/20/2020 | 19 | Unopposed MOTION for Extension of Time to *File the Proposed Scheduling Order* by Defendants Leigh Cochran, Park County Sheriff's Office. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order Granting Unopposed Motion for Extension of Time to File the Proposed Scheduling Order)(Sidran, Matthew) (Entered: 05/20/2020) |
| 05/20/2020 | 20 | MEMORANDUM regarding 19 Unopposed MOTION for Extension of Time to *File the Proposed Scheduling Order* filed by Park County Sheriff's Office, Leigh Cochran. Motion referred to Magistrate Judge Nina Y. Wang, by Chief Judge Philip A. Brimmer on 5/20/2020. Text Only Entry (pabsec2) (Entered: 05/20/2020) |
| 05/20/2020 | 21 | Proposed Scheduling Order by Plaintiff Mark Walker. (Liechty, Robert) (Entered: 05/20/2020) |
| | | |

CM/ECF - U.S. District Court:cod    Case 1:20-cv-00366-PAB-NYW    Document 52-2    Filed 04/07/21    USDC Colorado    Page 6 of 10    Page 6 of 10

Appellate Case: 21-1119    Document: 010110536823    Date Filed: 06/17/2021    Page: 9

| 05/21/2020 | 22 | MINUTE ORDER granting 19 Unopposed Motion for Extension of Time to File the Proposed Scheduling Order. The Proposed Scheduling Order is due by 5/21/20. In addition to filing the Proposed Scheduling Order, the Parties must also submit a Word version by email to Wang_Chambers@cod.uscourts.gov. By Magistrate Judge Nina Y. Wang on 5/21/20. Text Only Entry (nywlc1) (Entered: 05/21/2020) |
|---|---|---|
| 05/26/2020 | 23 | COURTROOM MINUTES/MINUTE ORDER for Scheduling Conference held on 5/26/2020 before Magistrate Judge Nina Y. Wang. Discovery due by 10/28/2020. Dispositive Motions due by 11/27/2020. A Final Pretrial Conference is set for 4/14/2021 11:00 AM in Courtroom A 502 before Magistrate Judge Nina Y. Wang. The parties shall file their proposed pretrial order through CM/ECF and include a courtesy copy of the proposed order in Word format sent by email to Wang_Chambers@cod.uscourts.gov, seven days prior to the conference. FTR: Courtroom A-502. (bwilk, ) (Entered: 05/26/2020) |
| 05/26/2020 | 24 | SCHEDULING ORDER: by Magistrate Judge Nina Y. Wang on 5/26/20. Designation of Affirmative Experts due by 10/9/2020 Discovery due by 1/22/2021. Dispositive Motions due by 2/19/2021. Designation of Rebuttal Experts due by 11/6/2020. (nmarb, ) (Entered: 05/27/2020) |
| 05/27/2020 | 25 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 18 Amended Complaint by Defendants Leigh Cochran, Park County Sheriff's Office. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order Granting Unopposed Motion for Extension of Time to File Responsive Pleading)(Sidran, Matthew) (Entered: 05/27/2020) |
| 05/27/2020 | 26 | MEMORANDUM regarding 25 Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 18 Amended Complaint filed by Park County Sheriff's Office, Leigh Cochran. Motion referred to Magistrate Judge Nina Y. Wang, by Chief Judge Philip A. Brimmer on 5/27/2020. Text Only Entry (pabsec2) (Entered: 05/27/2020) |
| 05/29/2020 | 27 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 5/29/20 DENYING without prejudice 25 Defendants Unopposed Motion for Extension of Time to Answer or Otherwise Respond. (nmarb, ) (Entered: 05/29/2020) |
| | | |

Apdx 006

| | | |
|---|---|---|
| 06/01/2020 | 28 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 18 Amended Complaint by Defendants Leigh Cochran, Park County Sheriff's Office. (McLetchie, Andrew) (Entered: 06/01/2020) |
| 06/01/2020 | 29 | MEMORANDUM regarding 28 Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 18 Amended Complaint filed by Park County Sheriff's Office, Leigh Cochran. Motion referred to Magistrate Judge Nina Y. Wang, by Chief Judge Philip A. Brimmer on 6/1/2020. Text Only Entry (pabsec2) (Entered: 06/01/2020) |
| 06/01/2020 | 30 | ORDER granting 28 Amended Unopposed Motion for Extension of Time to Responsive Pleading. Defendants Park County Sheriff's Office and Leigh Cochran shall file an Answer or other responsive pleading to Plaintiff's Amended Complaint on or before 6/9/2020. By Magistrate Judge Nina Y. Wang on 6/1/20. Text Only Entry (nywlc1) (Entered: 06/01/2020) |
| 06/02/2020 | 31 | STIPULATION for Extension of Time to Answer or Respond to the Complaint *UNDER D.C.COLO.LCivR 6.1(a)* by Defendants Dumb Friends League Harmony Equine Center, Bobbi Priestley. Dumb Friends League Harmony Equine Center answer due 6/5/2020; Bobbi Priestley answer due 6/5/2020. (Lowery-Graber, Cynthia) (Entered: 06/02/2020) |
| 06/05/2020 | 32 | MOTION to Dismiss *Pursuant to F.R.C.P. 12(b)(1) and (6)* by Defendants Dumb Friends League Harmony Equine Center, Bobbi Priestley. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lowery-Graber, Cynthia) (Entered: 06/05/2020) |
| 06/09/2020 | 33 | MOTION to Dismiss for Failure to State a Claim *Pursuant to Fed. R. Civ. P. 12(b)(6)* by Defendants Leigh Cochran, Park County Sheriff's Office. (Attachments: # 1 Exhibit A - Order, # 2 Exhibit B - Motion to Suppress, # 3 Exhibit C - Transcript of Jury Trial)(McLetchie, Andrew) (Entered: 06/09/2020) |
| 06/10/2020 | 34 | MOTION to Stay re 24 Scheduling Order *Discovery* by Defendant Dumb Friends League Harmony Equine Center. (Attachments: # 1 Proposed Order (PDF Only) Granting Motion to Stay Discovery)(Lowery-Graber, Cynthia) (Entered: 06/10/2020) |
| 06/10/2020 | 35 | MEMORANDUM regarding 34 MOTION to Stay re 24 Scheduling Order *Discovery* filed by Dumb Friends League |

| | | |
|---|---|---|
| | | Harmony Equine Center. Motion referred to Magistrate Judge Nina Y. Wang, by Chief Judge Philip A. Brimmer on 6/10/2020. Text Only Entry (pabsec2) (Entered: 06/10/2020) |
| 06/12/2020 | 36 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 6/12/2020. Pending before this court is Defendants' Motion to Stay Discovery. 34 . In the Motion to Stay Discovery, Defendants indicate that counsel "conferred with counsel for Plaintiff regarding the relief requested herein and was informed that Plaintiff takes no position with respect to the relief requested herein." [Id. at 1]. To facilitate this court's expeditious consideration of the Motion to Stay Discovery, IT IS ORDERED that any response by Plaintiff should be filed no later than June 17, 2020. Text Only Entry (bwilk, ) (Entered: 06/12/2020) |
| 06/15/2020 | 37 | SUPPLEMENT/AMENDMENT to 33 MOTION to Dismiss for Failure to State a Claim *Pursuant to Fed. R. Civ. P. 12(b)(6)* by Defendants Leigh Cochran, Park County Sheriff's Office. (Attachments: # 1 Exhibit Exhibit D: Minute Order)(McLetchie, Andrew) (Entered: 06/15/2020) |
| 06/17/2020 | 38 | RESPONSE to 34 MOTION to Stay re 24 Scheduling Order *Discovery* filed by Plaintiff Mark Walker. (Liechty, Robert) (Entered: 06/17/2020) |
| 06/18/2020 | 39 | ORDER by Magistrate Judge Nina Y. Wang on 6/18/20 GRANTING 34 Defendant's Motion to Stay Discovery. Discovery in this matter is STAYED pending resolution of the Defendants' Motion to Dismiss Pursuant to F.R.C.P. 12(b)(1) and (6) [#32] and Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6) [#33]. If this matter proceeds in whole or part following Judge Brimmer's resolution of the Motions to Dismiss, within three days of such resolution, the parties are ORDERED to jointly telephonically contact chambers at 303-335-2600 to set a status conference.(nmarb, ) (Entered: 06/18/2020) |
| 06/26/2020 | 40 | RESPONSE to 32 MOTION to Dismiss *Pursuant to F.R.C.P. 12 (b)(1) and (6)* filed by Plaintiff Mark Walker. (Liechty, Robert) (Entered: 06/26/2020) |
| 06/30/2020 | 41 | RESPONSE to 33 MOTION to Dismiss for Failure to State a Claim *Pursuant to Fed. R. Civ. P. 12(b)(6)* filed by Plaintiff Mark Walker. (Attachments: # 1 Exhibit Harmony exhibit A)(Liechty, Robert) (Entered: 06/30/2020) |
| 07/10/2020 | 42 | Unopposed MOTION for Extension of Time to File |

Apdx 008

| | | Response/Reply as to 32 MOTION to Dismiss *Pursuant to F.R.C.P. 12(b)(1) and (6)* by Defendants Dumb Friends League Harmony Equine Center, Bobbi Priestley. (Attachments: # 1 Proposed Order (PDF Only))(Lowery-Graber, Cynthia) (Entered: 07/10/2020) |
|---|---|---|
| 07/13/2020 | 43 | ORDER by Chief Judge Philip A. Brimmer on 7/13/2020 re: 42 Motion for Extension of Time to File Response/Reply is GRANTED. Defendants shall reply to 32 Motion to Dismiss on or before **July 15, 2020**. Text Only Entry(pabsec2) (Entered: 07/13/2020) |
| 07/14/2020 | 44 | **STRICKEN** REPLY to Response to 33 MOTION to Dismiss for Failure to State a Claim *Pursuant to Fed. R. Civ. P. 12(b)(6)* filed by Defendants Leigh Cochran, Park County Sheriff's Office. (McLetchie, Andrew) Modified on 7/14/2020 (pabsec2, ). (Entered: 07/14/2020) |
| 07/14/2020 | 45 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 7/14/2020 re: 44 Reply to Response to Motion filed by Park County Sheriff's Office, Leigh Cochran is **STRICKEN** for failure to comply with § III.A of this Court's Practice Standards. "Replies shall not exceed ten pages." Defendants Park County Sheriff's Office and Leigh Cochran are granted leave to refile a complying reply no later than **July 16, 2020**. Text Only Entry (pabsec2) (Entered: 07/14/2020) |
| 07/15/2020 | 46 | REPLY to Response to 33 MOTION to Dismiss for Failure to State a Claim *Pursuant to Fed. Civ. P. 12(b)(6)* filed by Defendants Leigh Cochran, Park County Sheriff's Office. (McLetchie, Andrew) (Entered: 07/15/2020) |
| 07/15/2020 | 47 | REPLY to Response to 32 MOTION to Dismiss *Pursuant to F.R.C.P. 12(b)(1) and (6) Joinder* filed by Defendants Dumb Friends League Harmony Equine Center, Bobbi Priestley. (Lowery-Graber, Cynthia) (Entered: 07/15/2020) |
| 03/10/2021 | 48 | MINUTE ORDER: The Final Pretrial Conference set by this court's 24 Scheduling Order for 4/14/2021 at 11:00 A.M. is hereby CONVERTED to a Telephonic Final Pretrial Conference. All participants shall use the following dial-in information: 888-363-4749, Access Code: 5738976# at the designated time. By Magistrate Judge Nina Y. Wang on 3/10/2021. Text Only Entry (nywlc1, ) (Entered: 03/10/2021) |
| 03/10/2021 | 49 | ORDER. The Dumb Friend League Harmony Equine Center and |

| | | |
|---|---|---|
| | | Bobbi Priestly's Motion to Dismiss 32 is GRANTED. The Park County Sheriff's Office and Deputy Leigh Cochran's Motion to Dismiss 33 is GRANTED. Plaintiff's claim against the Park County Sheriff's Office for an unconstitutional policy in violation of 42 U.S.C. § 1983 is DISMISSED without prejudice. The remainder of plaintiff's first and second claims against all defendants are DISMISSED with prejudice. Plaintiff's third, fourth, and fifth claims are DISMISSED without prejudice. Judgment shall enter for defendants and against plaintiff on all claims. Within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court. This case is closed, by Chief Judge Philip A. Brimmer on 3/10/21.(sgrim) (Entered: 03/10/2021) |
| 03/10/2021 | 50 | FINAL JUDGMENT re: 49 Order, by Clerk on 3/10/21. (sgrim) (Entered: 03/10/2021) |
| 04/06/2021 | 51 | NOTICE OF APPEAL as to 49 Order on Motion to Dismiss,,,, Order on Motion to Dismiss for Failure to State a Claim,,, 50 Clerk's Judgment by Plaintiff Mark Walker (Filing fee $ 505, Receipt Number 1082-7800421) (Liechty, Robert) (Entered: 04/06/2021) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 20-cv-00364-PAB

MARK WALKER,

      Plaintiff,

vs.

PARK COUNTY SHERIFF'S OFFICE, OFFICER LEIGH COCHRAN, THE COLORADO
HUMANE SOCIETY, and BOBBI PRIESTLEY,

      Defendants.

---

**NOTICE OF FILING AMENDED COMPLAINT**

---

Plaintiff Mark Walker, by his attorney Robert M. Liechty of ROBERT M LIECHTY PC,
gives notice that he is filing an amended complaint pursuant to Rule 15(a)(1)(B).  The
amended complaint is filed prior to any responsive pleadings.  Pursuant to Local Rule
15.1, attached as exhibit A is a track-changes document showing the changes made to
the original complaint.

Respectfully submitted this May 19, 2020.


By:    s/   *Robert M. Liechty*
           Robert M. Liechty
           ROBERT M LIECHTY PC
           1800 Gaylord St.
           Denver, Colorado 80206
           Tel: (303) 861-5300
           Fax: (303) 861-2746
           Email:  rliechty@crossliechty.com
           ATTORNEY FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this May 19, 2020, a true and correct copy of the above **NOTICE OF FILING AMENDED COMPLAINT** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Cynthia Lowery-Graber
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO  80203-4541
cynthia.lowery-graber@bclplaw.com
Attorneys for Colorado Humane Society
and Bobbi Priestley

Andrew R. McLetchie
Eden R. Rolland
Matthew K. Sidran
FOWLER, SCHIMBERG, FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
a_mcletchie@fsf-law.com
e_rolland@fsf-law.com
m_sidran@fsf-law.com
Attorneys for Park County Sheriff's Office
and Leigh Cochran

*Signed Original at Office of Robert M Liechty PC*

s/    *Robert Liechty*
Robert Liechty

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 20-cv-00364

MARK WALKER,

      Plaintiff,

vs.

PARK COUNTY SHERIFF'S OFFICE, DEPUTY LEIGH COCHRAN, DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and BOBBI PRIESTLEY,

      Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Mark Walker, by his attorney Robert M. Liechty of ROBERT M LIECHTY PC, brings his amended complaint as follows:

1.     Plaintiff Mark Walker resides in Park County, outside of Hartsel, Colorado. The Park County Sheriff's office is located in Park County and Deputy Leigh Cochran is an officer in the Sheriff's office. The Dumb Friends League Harmony Equine Center is located in Franktown, Colorado. Bobbi Priestley is the Manager of Field Services for Harmony Equine Center. Ms. Priestley is also a peace officer under Colorado law and an employee of the Colorado Department of Agriculture.

2.     Plaintiff has brought a claim under 42 USC §1983 for violation of his fourth and fourteenth amendment rights to be free from unreasonable seizures and prosecutions. He claims that all defendants acted in a conspiracy to violate his rights and, therefore, this court has jurisdiction over the matter.

3.      On August 20, 2019, plaintiff sent a notice of intent to sue letter, pursuant to CRS §24-10-109, to the Park County Attorney and to the Colorado Attorney General. Plaintiff has received no response.

4.      Mr. Walker had a herd of 78 horses split among three locations near Hartsel, Colorado.  He had 48 horses at the Badger Basin Ranch, 10 brood mares and 10 two-year-olds at the Hartsel Spring Ranch, and 10 foals at the ranch of Lynn Durbin. Most of the horses were his, but approximately 10-15 belonged to other people who left them in the care of Mr. Walker.

5.      Mr. Walker had been successfully breeding horses for 40+ years to produce strong, hearty, tough, mountain horses resistant to the colder winters in the high country.  As an outfitter his horses were integral to his business, doing horseback rides, camping expeditions, hunting expeditions, and he often leased his horses to other outfitters for similar activities in the high country.

6.      Frank Wolthuis owns Badger Basin Ranch, which contains 4,200 acres.  It is roughly the shape of a triangle, with the two legs being some 3 miles long each. These legs are bordered by Highway 9 and Highway 24.  Consequently, unlike other ranches in the area, the Badger Basin Ranch has a high exposure to the public.

7.      January, 2019, was a cruel weather month in Park County.  The snowfall exceeded 30 inches in places and the temperature dropped to 40° below zero for a two-week period.  As a result, Mr. Walker, and two ranch hands, had been giving extra care to the herd at Badger Basin since December, 2018.  The horses at the Hartsel Spring Ranch and at the ranch of Lynn Durbin required less effort to bring them feed and

2

water.   Mr. Walker provided Lynn Durbin and a resident in Harstsel Springs Ranch feed which they provided daily to these horses.

8.      In a typical winter, it would require three hours per day for Mr. Walker and his two ranch hands to feed the herd.  By mid-January, 2019, it required at least six hours per day to feed the herd because of the amount of snow and the low temperatures.  The extreme weather required regular plowing in order to bring feed to the animals.   Mr. Walker began plowing lanes through the snow in the pasture beginning in early January.

9.      Twice in December-January Mr. Walker had brought part of the herd to the ranch headquarters, but the horses would on their own wander back to the remoter areas of the ranch.

10.      On January 28, 2019, Deputy Leigh Cochran received a report that there were thin horses on the Badger Basin Ranch.  Deputy Cochran was the animal control officer for the Sheriff's office and had been so for four years.  She went to the ranch, but did not locate any horses.  She contacted Mr. Walker and told him that she had received a report of nine thin horses near the highway.  He said he would check on them and bring them to the ranch buildings.

11.      On January 29, 2019, Deputy Mercier received a call from a Marcy Sturuna that Ms. Sturuna saw a dead gray and white horse on the Badger Basin Ranch.  Deputy Cochran found the dead horse and called Mr. Walker.  He identified the horse as Ringo who was 32 years old and could not take the cold.  Deputy Cochran told him that a few of the horses were thin and that she was receiving complaints.  Mr. Walker

stated he was already feeding the horses and was bringing them closer to the ranch headquarters to facilitate bringing the horses feed.

12.     On January 29, Deputy Cochran posted a Notice of Warning that Mr. Walker was to provide food, water, and veterinary care for the horses.  In response, he continued to provide proper care for the animals.

13.     On January 30, Deputy Cochran saw Mr. Walker moving the horses by foot.

14.     On February 4, Deputy Cochran again went to the ranch.  She saw that Mr. Walker was feeding in a pasture adjacent to Highway 9 and that there were cattle, buffalo, and horses in this pasture, which is several hundred acres.   Mr. Walker was feeding milo round bales, grass hay, alfalfa hay and high protein range cake.   Mr. Walker was able over the next few days to separate the cattle, buffalo and horses into different pastures so they could be fed independently.

15.     On February 14, Deputy Cochran contacted Agent Bobbi Priestley with the Colorado Humane Society.  Ms. Priestley had previously held the position that Deputy Cochran now held in the Park County Sheriff's office.  Ms. Priestley came to Badger Basin where she saw that Mr. Walker was moving horses with two horse trailers.

16.     On February 14, Deputy Cochran gave Mr. Walker a second Notice of Warning stating that he was to provide food and water for the herd and to provide vet care for a horse named Starburst.  Although the notice stated that he was to correct the herd's condition by February 18, Deputy Cochran told Mr. Walker that he had 30 days to improve the condition of the herd.

17.     On February 15, Agent Priestley and Deputy Cochran again went to the ranch.  Mr. Walker moved seven skinny horses to a pen near the ranch buildings.  He and Deputy Cochran went out into the fields on a tractor.  Deputy Cochran identified four horses in the fields that needed to be brought to the pens, which Mr. Walker did.

18.     Later on February 15, Mr. Walker's vet, Leslie Harrison, inspected Starburst, who was in the "skinny pen" with six other skinny horses.  Dr. Harrison had been Mr. Walker's vet for over 15 years.  The vet told Mr. Walker to keep doing what he was doing with Starburst and made no comment regarding the other horses in the "skinny pen."

19.     On February 16, Deputy Cochran returned to the ranch and suggested that Mr. Walker feed the horses grass hay as opposed to the oat hay he was feeding them.  She contacted veterinarian Sadie Maybach to assess an older horse (Dakota, over 30 yrs old) that had fallen down.  Ms. Maybach rated the horse as a 1 on the Henneke scoring system, which is the lowest rating out of nine points.  She recommended a feeding plan of alfalfa hay, grass hay, or pellets.  Mr. Walker agreed with this feeding plan.

20.     On February 18, Deputy Cochran went to check on the horses and feed.  She noted that all the horses were eating better grass hay and all had water.  She noted that the older horse, Dakota, who had previously gone down, was not doing well.  Mr. Walker did not think she would survive.

21.     On February 19, 2019, Agent Priestley told Deputy Cochran that Agent Priestley believed that Mr. Walker was not adequately caring for the animals and that

5

their survival was not likely if left in Mr. Walker's care.  Ms. Priestley said it would be difficult for any healthy animal to survive in the harsh conditions during that winter in Hartsel. However, both Ms. Priestley and Deputy Cochran should have known that this cold snap was highly unusual and would probably break in the near future. They also should have known that transporting the horses to the Harmony Center would have stressed them more than had they remained in Hartsel.

22.    Nonetheless, Deputy Cochran agreed with Agent Priestley and drafted an affidavit to support a warrant to seize the horses.

23.    In all, six horses died, four in Hartsel and two after their seizure:

- Ringo, 32 years old.  He was not of Mr. Walker's heartier breed.
- Dakota, over 30 years old.  She was the older horse in ¶¶ 19 & 20.
- A grulla,[1] 2 ½ years old.  She was not skinny and died of colic.
- A palomino, 25 years old.  It died far out in the pasture beyond where the tractor could go.
- A grulla weanling, 10 months old.  It died of infection after its seizure.
- Pokey, 32 years old.  It was put down in April, after its seizure.

24.    On February 21, 2019, defendants came to the Badger Basin Ranch with 11 trailers and 21 people.  They seized 48 horses.  At that time, Deputy Cochran was asked why they were seizing the horses and she said that it was out of her hands, indicating that the decision to seize the horses was Ms. Priestley's decision.

25.    On February 25 and February 27, defendants returned to seize an additional 10 horses from Hartsel Springs Ranch and from the ranch of Lynn Durbin.  In total, defendants seized 58 of the 78 horses.

---

[1] A grulla horse is not a breed.  Rather, grulla is a type of coloring, marked by the horse's mane and legs being of a darker color than the body.

Apdx 018

26.     Deputy Cochran signed all the search warrants used to seize the 58 horses.  Agent Priestley decided to execute the warrants.  The 58 horses were seized and taken to Priestley's employer, the Colorado Humane Society, Harmony Equine Center.  The business of the Harmony Equine Center is to provide the horses for adoption by private owners.  Thus, the seizures promoted its business.

27.     A veterinarian, Barbara Page, physically examined 12 of the horses at the Harmony Equine Center on March 7, 2019, two weeks after the initial seizure.  Harmony had put these 12 horses in a pen because Harmony was most concerned about the health of these horses.  Dr. Page examined and touched these 12 horses and gave a more thoroughly exam to two of the horses.  All the horses were thin but healthy, except for one young horse who had an infection.  The horses would not have shown any weight gain visible to the eye or touch for approximately 30 days, so they were in substantially the same condition when Dr. Page saw them as when they were seized two weeks earlier.

28.     Dr. Page reviewed the weather reports for Badger Basin and noted that there was three times more snow in 2019 than in the year before.  It was her opinion that the horses were thin solely because of the cold and snowy weather and not because of any improper care.  In addition, because taking the horses out of their home environment would cause them stress, it would have been better to have left them at Badger Basin.

29.     The weather greatly improved in early- to mid-March and the horses would have done as well had they stayed in Hartsel as at the Harmony Equine Center.

30.    Mr. Walker attempted to retrieve his horses after they were seized but, in order to do so, he had to put up a bond of $250 per month for each horse to pay for its care.  This amounted to $15,450  paid within 10 days and an additional $15,450 every 30 days thereafter.  Mr. Walker did not have enough money even to pay the first bond.  Thus, he had no choice but to surrender the horses.

31.    Even if Deputy Cochran and Ms. Priestley had reason to take the 12 horses referenced in ¶ 27 above, they intentionally took more horses than was merited so that Mr. Walker could not bond out the animals under the above payment scheme and Harmony could keep them as part of its business model.  Given Ms. Priestley's belief that it would be difficult for any healthy animal to survive in the harsh conditions during that winter, there was no reason to believe that Mr. Walker was cruel to any horse.

32.    Mr. Walker was charged with eight counts of cruelty to animals under CRS §18-9-202.  He went to trial on these charges and was found not guilty on all charges on December 6, 2019.

33.    Shortly after the seizure of the horses, the talk was widespread in Fairplay and Hartsel that Mr. Walker was cruel to his animals and violated the law.  This greatly harmed his reputation because his business was handling animals.

34.    A few days after the not guilty verdict, his criminal attorney called counsel for the Harmony Equine Center, Ms. Cynthia Lowery-Graber, and asked for a return of the six horses still in Harmony's possession.  The Harmony attorney said that one of the

six horses had been adopted out the day before and that the center would not return the remaining five horses even though Mr. Walker was not guilty of cruelty to animals.

35.    Agent Priestley and the Harmony Equine Center conspired with the County and Deputy Cochran to seize the horses.  Brand Inspector Colby stated that Ms. Priestley asked him in March, 2019, how she could seize Mr. Walker's cattle.  Mr. Colby told her that she could not seize the cattle.

36.    In 2018, Harmony and Ms. Priestley had orchestrated a similar seizure of horses from Penny Gingrich.  Upon information and belief, an agent from Harmony came to Ms. Gingrich's ranch in the summer of 2018 to determine which horses Harmony would seize that following winter.  In that following winter, Harmony unreasonably seized 65 horses from Ms. Gingrich.  Ms. Gingrich was charged with 65 counts of cruelty and was found not guilty on all counts.

37.    Thus, the scheme used to deprive Mr. Walker has been employed before by Ms. Priestley and Harmony.

### First Claim, unconstitutional seizure of the horses (all defendants)

38.    Defendants acted under the color of law.  Defendant Park County Sheriff's Office and Deputy Cochran are the law enforcement for Park County.  Agent Priestley used to work for Park County as its animal control officer.  She conspired with the county and with Deputy Cochran to unconstitutionally seize the horses in violation of the Fourth Amendment, the 14th Amendment, or both.

Apdx 021

39.     Agent Priestley is also a law enforcement officer and an officer of the Department of Agriculture.  She acted as the agent for Harmony in unreasonably seizing the horses for Harmony's purposes.

40.     As Agent Priestley stated in ¶ 21 above, it would be difficult for any healthy animal to survive in the harsh conditions during the 2019 winter in Hartsel.  Therefore, it was unreasonable to seize the horses where the cruelty to the animals, if any existed, was caused by an act of God, not by any failure of Mr. Walker's.

41.     In the alternative, it was unconstitutional to seize any more than the 12 horses referenced above in ¶ 27.  Defendants seized these extra horses knowing that this would make it impossible for Mr. Walker to bond out the horses and, therefore, Harmony could keep the additional horses.  This violates the 14th Amendment.

42.     The Sheriff's office is liable for this seizure because the seizure was done pursuant to the official custom or policy of the Sheriff's office.  The Sheriff left this official action to the sole decision of Ms. Priestley or Deputy Cochran or both.  Harmony is liable for the seizure because it conspired through Ms. Priestley to unreasonably seize the horses, as it did before with Ms. Gingrich's horses.

43.     Because of this unreasonable seizure, Mr. Walker lost his property and the property of others who entrusted the care of their horses to Mr. Walker.  Because he lost the horses, he lost his business as an outfitter.  He incurred emotional pain-and-suffering because of the loss of his horses.

Apdx 022

44.     The seizure by Harmony and Ms. Priestley was done with a reckless indifference to the rights of Mr. Walker, subjecting these two defendants to punitive damages.

45.     Under 42 USC §1988, plaintiff may recover his reasonable attorney's fees.

### Second Claim, unconstitutional malicious prosecution (all defendants)

46.     These defendants caused Mr. Walker's prosecution which terminated in favor of him.  There was no probable cause to support the original prosecution or, in the alternative, probable cause existed regarding only the care of the 12 horses referenced in ¶ 27 above.

47.     These defendants acted with malice because they knew that Mr. Walker was doing his best under adverse conditions, but that Harmony wanted the animals in order to fulfill its business plan.

48.     Mr. Walker suffered damages.  His attorney's fees to represent him in the criminal action came to $90,000 with costs of approximately $15,000.  In addition, as part of the prosecution, he lost all the horses because he could not afford the bond in ¶ 30 above.

49.     The prosecution violated the Fourth Amendment.

### Third Claim, civil theft (Priestley and Harmony)

50.     Ms. Priestley and Harmony knowingly obtained control over some or all of the seized horses and did so without authorization.  In this claim, Ms. Priestley was acting as a private agent of Harmony to execute the business plan of Harmony.  At a

minimum, these defendants are liable for civil theft for not returning the six horses still in Harmony's possession after the not-guilty verdict was returned.

51.    These defendants took the horses with the specific intent to permanently deprive the owners of the horses the benefit of their property.

52.    This violates the civil theft statute, CRS §18-4-405.  Under this statute, Mr. Walker is entitled to recover three times the amount of the actual damages sustained by him, including the loss of the horses and the loss of his business, and may also recover costs and reasonable attorney fees.

### *Fourth Claim, Outrageous Conduct (Priestley)*

53.    Ms. Priestley engaged in extreme and outrageous conduct by deciding to seize all the horses in spite of the fact that the horses' condition was caused by an act of God.  This was outrageous in light of the fact that Deputy Cochran was overheard as saying that Mr. Walker had an additional 30 days to care for his horses, by which time the weather would have improved.

54.    Ms. Priestley seized the horses recklessly or with the intent of causing Mr. Walker severe emotional distress.

55.    Her conduct caused Mr. Walker severe emotional distress by subjecting him to ridicule.  His business was to care for his horses, and the horses of others, and this business was ruined.  In addition, his business as an outfitter was destroyed causing him further emotional distress.

***Fifth Claim, defamation (Priestley)***

56.    Ms. Priestley caused to be published that Mr. Walker was cruel to his horses and to the horses left in his care.  This was false.

57.    This was the talk of the town in Hartsel and in Fairplay and greatly diminished Mr. Walker's reputation.

WHEREFORE, plaintiff Mark Walker respectfully requests that this court enter judgment in his favor and for interest, costs, attorney's fees, and such other relief as this court may deem proper.

Plaintiff requests trial to a jury.

Respectfully submitted this May 19, 2020.


By:    s/    *Robert M. Liechty*
Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
Fax: (303) 861-2746
Email:  rliechty@crossliechty.com
ATTORNEY FOR PLAINTIFF

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this May 19, 2020, a true and correct copy of the above **AMENDED COMPLAINT AND JURY DEMAND** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Cynthia Lowery-Graber
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO  80203-4541
cynthia.lowery-graber@bclplaw.com
Attorneys for Colorado Humane Society
and Bobbi Priestley

Andrew R. McLetchie
Eden R. Rolland
Matthew K. Sidran
FOWLER, SCHIMBERG, FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
a_mcletchie@fsf-law.com
e_rolland@fsf-law.com
m_sidran@fsf-law.com
Attorneys for Park County Sheriff's Office
and Leigh Cochran

*Signed Original at Office of Robert M Liechty PC*

s/    *Robert Liechty*
Robert Liechty

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 20-cv-00364-PAB-NYW

MARK WALKER

Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE; DEPUTY LEIGH COCHRAN; DUMB FRIENDS
LEAGUE HARMONY EQUINE CENTER; and BOBBY PRIESTLY

Defendants.

---

**MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) AND (6)**

---

Defendants Dumb Friends League Harmony Equine Center ("Harmony") and Bobbi

Priestly ("Priestly")[1] (together, "Harmony Defendants") respectfully submit this Motion to

Dismiss Pursuant to F.R.C.P. 12(b)(1) and (6), the claims against them, as set forth in the

Amended Complaint and Jury Demand (ECF. No. 18, "Am. Compl.")[2].

Between Jan. 28, 2019 and Feb. 20, 2019, Defendant Deputy Leigh Cochran investigated,

including communications with Plaintiff, several reports of malnourished horses Badger Basin

Ranch. Am. Compl. ¶ 10; Warrants 19PS13, 19PS14, 19PS15 and 19PS16, attached hereto as

Exhibits A, B, C and D respectively and incorporated herein by reference.[3]

---

[1] The Complaint erroneously spells Ms. Priestly's name, it is corrected here, Bobbi Priestly.
[2] Even though it is believed that no amendment could rectify the issues herein, the undersigned
conferred with counsel for Plaintiff about this Motion but was advised that Plaintiff did not agree
with the Harmony Defendants' positions contained herein.
[3] Where warrants and the affidavits on which the warrants are based are central to the plaintiff's
claims, the court may properly consider them on a motion to dismiss. *Boudette v. Sanders*, No.
18-CV-02420, 2019 WL 3935168, at *8-9 (D. Colo. Aug. 19, 2019).  Additionally, because the
search warrants and affidavits here are part of Plaintiff's criminal case, they are part of the public

On Feb. 20, 2019, Cochran drafted and submitted affidavits detailing the observations and requesting search warrants at the Badger Basin Ranch, as well as two other properties where Plaintiff cared for horses. *See* Exs. A-D.  The Park County District Court issued all four search warrants. *Id.*  On Feb. 21, 2019, a search warrant was executed and 48 horses were seized. Am. Compl. ¶ 24. The remaining warrants were executed on Feb. 25 and 27, where 10 additional horses were seized. *Id.* ¶ 25. The horses were transferred by the Park County Sheriff's Office to the Harmony Equine Center for immediate medical care. *Id.* ¶ 26.[4]

Plaintiff was charged with eight counts of animal cruelty under § 18-9-202, C.R.S. *Id.* ¶ 32. Because he could not afford to pay the bond for the expenses to care for the seized horses, he surrendered them. *Id.* ¶ 32. Plaintiff was found not guilty of animal cruelty. *Id.* ¶ 32. He attempted to regain custody of some of the horses but was unable to. *Id.* ¶ 34.[5]

### STANDARD FOR DISMISSAL

Dismissal under Rule 12(b)(1) is a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).

---

record and thus subject to judicial notice.  *See Hodgson v. Farmington City*, 675 F. App'x 838, 841 (10th Cir. 2017) (citation omitted); *Eckert v. Dougherty*, 658 F. App'x 401, 404 (10th Cir. 2016); *Rathbun v. Montoya*, 628 F. App'x 988, 990 n.2 (10th Cir. 2015).

[4] Harmony is a private rehabilitation and adoption facility for abused and neglected horses. Once they have been permanently surrendered to the center, as Plaintiff did here, they are evaluated for rehabilitation and potential adoption.

[5] Plaintiff only sought "six horses still in Harmony's possession" which suggests the other horses had already been adopted out or had died. *See* Am. Compl. ¶ 34.

Apdx 028

Under Rule 12(b)(6), a court "assume[s] the factual allegations are true and ask[s] whether it is plausible that the plaintiff is entitled to relief." *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions, bare assertions, and conclusory allegations are likewise "not entitled to the assumption of truth." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-80 (2009). "The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009).

<div align="center">

**ARGUMENT**

</div>

I.    **First and Second Claims: Fourth Amendment Unreasonable Seizure (All Defendants) and Unconstitutional Malicious Prosecution (all Defendants)**

A.  **Priestly is Entitled to Qualified Immunity Against Plaintiff's § 1983 Claims.**

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation, ellipsis, and quotations omitted). A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show "both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (citation omitted).

"A constitutional right is clearly established if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). The plaintiff must show there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

<div align="center">

3

</div>

authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) (quotations omitted). "[T]he salient question . . . is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The key to the analysis is notice—an official must be on notice that the conduct in question could violate the plaintiff's constitutional rights. *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001).

"In the context of a qualified immunity defense on an unlawful search or arrest claim, we ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quotation marks and citation omitted). Likewise, the Plaintiff's claim for a § 1983 malicious prosecution violation contains the following elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Here, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner" and that probable cause existed *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citation omitted); *see also Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007).

The Amended Complaint alleges that Priestly is a public employee of the State of Colorado. *See* Am. Compl. ¶ 1 ("Ms. Priestley *[sic]* is also a peace officer under Colorado law and an employee of the Colorado Department of Agriculture."); Ex. A at 7 (stating Priestley is a "state commission Bureau of Animal Protection Agent with the state of Colorado Department of

Agriculture since 2004"); 8 Colo. Code Regs. § 1201-18(1.6.4) ("'Department of Agriculture agent' means an agent of the Bureau of Animal Protection who is employed by the Colorado Department of Agriculture.").

Priestly did not violate any of Plaintiff's constitutional rights in any aspect because the warrants were supported by arguable probable cause. Courts have routinely found observations of animals who appear malnourished, deceased, or otherwise in dangerous health conditions to warrant probable cause to support a search warrant for suspected animal cruelty. *See, e.g. People v. Harris*, 405 P.3d 361, 369 (Colo. App. 2016) (finding sufficient probable cause for warrant where "the affiant observed . . . several horses that appeared underfed because they had visible spines and pin bones, and a deceased horse that appeared malnourished"); *Walker v. Wegener*, No. 11-CV-03238, 2012 WL 4359365, at *16-17 (D. Colo. Aug. 30, 2012), *report and recommendation adopted*, No. 11-CV-03238, 2012 WL 4355621 (D. Colo. Sept. 24, 2012).

The affidavits prepared are comprehensive and contain specific, detailed factual recitations of Cochran's visits to the properties, her personal observations of the horses' grave conditions, including multiple deceased horses, and Plaintiff's failure comply with the two Notices of Warning to provide adequate food and water to the horses. The observations were more than sufficient to support a reasonable belief and probable cause that Plaintiff had engaged in conduct amounting to animal abuse. *See, e.g. Harris*, 405 P.3d at 369.

Plaintiff's sole factual allegation is that Priestly stated "it would be difficult for any healthy animal to survive the harsh conditions during the 2019 winter in Hartsel. Therefore, it was unreasonable to seize the horses where the cruelty to the animals, if any existed, was caused by an act of God, not by Mr. Walker." Am. Compl. ¶ 40. This contention is without merit. However, "the defense of an Act of God [is] available only to defendants who can prove that the

5

injury resulted solely from the Act of God without any contributory negligence on the part of the defendant." *Moore v. Standard Paint & Glass Co. of Pueblo*, 145 Colo. 151, 157 (1960).

Instead, Mr. Walker, who had "been successfully breeding horses for 40+ years," Am. Compl. ¶ 5, was experienced and knew that the horses required additional care in winter conditions. *Id.* ¶¶ 7-8, 11, 17, 21-23. Moreover, the allegations, affidavits and warrants indicate that a number of horses died in his care during the relevant time period, and that Plaintiff was not otherwise taking steps to provide adequate food and water in response to the Notices of Warning issued. *See* Am. Compl. ¶ 10-12, 16-23; Ex. A at 1, 4-7.

In addition, it appears Plaintiff's Fourth Amendment claim is premised on a lack of probable cause and not a challenge to the *execution* of the warrant. *See* Am. Compl. ¶¶ 38-44. In *Salmon v. Schwarz*, 948 F.2d 1131, 1140-41 (10th Cir. 1991), the Court found that because the defendant officer "had no role in preparing the affidavit, and because the warrant issued by the magistrate was facially valid, his execution of the warrant [wa]s protected by the doctrine of qualified immunity." The Court found that defendant could only face potential liability for the execution of the warrant, and not the application itself. *Id.* at 1136-37.

Here, the Am. Compl. alleges, and the attached affidavits confirm, that Cochran drafted and submitted the affidavits, and the warrants were issued by a judge. Am. Compl. ¶¶ 22, 26; Exs. A-D.  Priestly had no role in the affidavits and only participated in the execution of the warrants. Am. Compl. ¶ 26. Therefore, as in *Salmon*, Priestly is entitled to qualified immunity and Plaintiff's Fourth Amendment claim against her should be dismissed.

**B. Harmony Is Not Liable Because It Did Not Participate in the Warrant Application and There is No Underlying Constitutional Violation.  Likewise, Harmony and Priestly Are Not Liable for Malicious Prosecution Because They Did Not Pursue the Prosecution of the Criminal Case Against Plaintiff.**

The Harmony Defendants are not liable for allegedly violating Plaintiff's Fourth Amendment rights for at least two reasons. First, as discussed *supra,* Harmony – either directly, or through its "agent," Priestly – had no involvement with the <u>application</u> for the warrant. Because Plaintiff has not challenged the <u>execution</u> of the warrant, Harmony and Priestly cannot be liable here. Likewise, there is no allegation that Harmony and Priestly pursued the prosecution of the criminal claims against Plaintiff, nor could they.

If Plaintiff is alleging Harmony is vicariously liable through Priestly's actions, that theory fails. For supervisory liability, "[p]ersonal participation is an essential allegation in a 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  Moreover, "[a] supervisor cannot be held vicariously liable for the constitutional violations of subordinates." *Doe v. Woodard*, 912 F.3d 1278, 1290 (10th Cir.) (citation omitted). While Priestly did not commit a constitutional violation, even if she did, such liability would not extend to Harmony. Finally, Plaintiff alleges that "the seizure was done pursuant to the official custom or policy *of the Sheriff's office*" not of Harmony. Am. Compl. ¶ 42 (emphasis added).

**II. The Court Lacks Subject Matter Jurisdiction Over The Remaining Tort Allegations Against Priestly (Claims Three, Four and Five ) Because She is Immune From Liability Under the Colorado Governmental Immunity Act ("CGIA").**

"A public employee's sovereign immunity is a question of subject matter jurisdiction." *Duke v. Gunnison Cty. Sheriff's Office*, 456 P.3d 38, 44. "As our supreme court recently made clear, all issues related to an employee's immunity, including factual issues such as whether a public employee acted in a willful and wanton manner, are to be determined by the district court

prior to trial, pursuant to C.R.C.P. 12(b)(1)." *Id.* (citing *Martinez v. Estate of Bleck*, 379 P.3d

315); *see also Martin v. Perman,* No. 18-CV-00122, 2020 WL 838483, at *2 (D. Colo. Jan. 30,

2020), *report and recommendation adopted*, No. 18-CV-00122, 2020 WL 836640 (D. Colo. Feb.

20, 2020).[6]

Under the CGIA, public employees are immune from tort liability unless the employee's

act or omission was "willful and wanton." §§ 24-10-103(4)(a), 24-10-118(2)(a), C.R.S. (2019).

A plaintiff must "do more than merely assert that [the defendant] made statements in reckless

disregard of the truth"; a plaintiff must "set forth facts to support a reasonable inference that [the

defendant] recklessly disregarded the consequences of her actions." *Wilson v. Meyer*, 126 P.3d

276, 282 (Colo. App. 2005); *see also* § 13-21-102(1)(b), C.R.S. (2019) (defining "willful and

wanton" conduct, in the context of exemplary damages, as "conduct purposefully committed

which the actor must have realized as dangerous, done heedlessly and recklessly, without regard

to consequences, or of the rights and safety of others, particularly the plaintiff"); *Moody v.

Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (borrowing same definition for determining CGIA

immunity). Thus, a plaintiff must plead specific facts to show or raise an inference that the

defendant's conduct was "specifically calculated to cause the alleged harm" or that defendant

was "aware her conduct would cause the alleged harm." *Wilson*, 126 P.3d at 282.

As set forth *supra*, Priestly is alleged to be a public employee of the state of Colorado and

thus is immune from liability under the CGIA unless her actions were "willful and wanton." *See*

Sec. I, A. Plaintiff's allegations fall far short of meeting that standard. For example, in his civil

theft claim, Plaintiff merely alleges in conclusory fashion the bare elements for that cause of

---

[6] Additionally, "[f]ailure to plead the factual basis of an allegation that an act or omission of a
public employee was willful and wanton shall result in dismissal of the claim for failure to state a
claim upon which relief can be granted." § 24-10-110(5)(b), C.R.S. (2019).

action. *See* Am. Compl. ¶¶ 50-52. There is no factual allegation that Priestly exceeded the scope

of the warrant or acted recklessly without regards to Plaintiff's rights. *See id.* Under the

outrageous conduct claim, Plaintiff similarly alleges in conclusory terms that "Priestly seized the

horses recklessly or with the intent of causing Mr. Walker severe emotional distress." *Id.* ¶ 54.

Plaintiff's allegation that the seizure was unreasonable because the horses' condition was caused

by an "act of God" fails to allege that Priestly or Harmony acted recklessly without regard for

Plaintiff's rights. *Id.* ¶ 53.

## III.   Third Claim: Civil Theft (Harmony, Priestly)

"[T]he Civil Theft Statute only applies to property 'obtained by theft, robbery, or

burglary.'" *Welch v. Saunders*, No. 15-CV-2286, 2016 WL 8577463, at *8 (D. Colo. May 26,

2016).. To prevail on a claim of theft, plaintiff must prove "(1) that the defendant knowingly

obtained control over the owner's property without authorization and (2) that he or she did so

with the specific intent to permanently deprive the owner of the benefit of property." *Id.* (citing §

18-4-401(1)).

Here, Walker fails to allege sufficient facts to meet either element. Under the specific

claim in the Am. Compl., Plaintiff merely recites the bare elements of a cause of action for civil

theft without alleging any underlying factual allegations, because none exist. Am. Compl. ¶¶ 50-

52.  As a matter of law, these bare recitals without any factual support warrant dismissal of the

civil theft claim. *Gallagher*, 587 F.3d at 1068.

Even if Harmony Defendants are forced to speculate which of the remaining allegations

in the Complaint support Plaintiff's cause of action for civil theft, the claim still fails. Plaintiff

must also establish that Priestly and Harmony's conduct amounted to *criminal* theft. *See Itin v.*

*Ungar*, 17 P.3d 129, 133 (Colo. 2000). Plaintiff fails to allege any facts that Harmony and

Apdx 035

Priestly seized the horses "without authorization." Instead, the Am. Compl. alleges that the

horses were seized pursuant to court-issued warrants, upon veterinary assessment and

recommendation and that Plaintiff surrendered them. Am. Compl. ¶¶ 24-26; Exs. A-D at 1.

The Am. Compl. lacks any factual allegation that Harmony Defendants were not

authorized to impound the seized horses. To the contrary, Priestly is authorized to execute a

search warrant and impound an animal suspected to be a victim of abuse under C.R.S. § 18-9-

202(1.8) and Colo. R. Crim. P. 41. Moreover, Plaintiff acknowledges that he voluntarily

surrendered the horses, Am. Compl. ¶ 30, further negating his claim that the horses were taken

"without authorization." *See West v. Roberts,* 143 P.3d 1037, 1045 (Colo. 2006).

## IV.   Fourth Claim: Outrageous Conduct (Priestly)

### A.   Plaintiff's Claim For Outrageous Conducts Fails as a Matter of Law Because the Facts Underlying This Claim are Similar or Identical to the Facts Underlying His Federal and Other Claims.

"The tort [of outrageous conduct] contemplates an extreme level of *independently*

*ascertainable misconduct* from which the ineluctable conclusion is the calculated or reckless

infliction of severe mental suffering." *Visor v. Sprint/United Mgmt. Co*., 965 F. Supp. 31, 33 (D.

Colo. 1997). Thus, "where the allegations forming the basis of a claim for outrageous conduct

are the same as those forming the basis for a [federal claim], and nothing more, they fail to state

an independently cognizable claim for which relief can be granted under rule 12(b)(6)." *Visor*,

965 F. Supp. at 33; *see also Emerson v. Wembley USA Inc*., 433 F. Supp. 2d 1200, 1228 (D.

Colo. 2006); *Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1021 (D. Colo. 2000); *Kashawny v.

Xcel Energy Servs., Inc.,* No. 08-CV-02635, 2010 WL 1009897, at *3 (D. Colo. Mar. 17, 2010).

Here, as in the aforementioned cases, Plaintiff's claim for outrageous conduct should be

dismissed because it is based on the same alleged facts underlying his federal claim. Specifically,

Apdx 036

Plaintiff alleges that Priestly "engaged in extreme and outrageous conduct by deciding to seize all the horses in spite of the fact that the horses' condition was caused by an act of God" and that "[t]his was outrageous in light of the fact that Deputy Cochran was overheard as saying that Mr. Walker had an additional 30 days to care for his horses." Am. Compl. ¶ 53. These allegations are virtually identical to the factual allegations underlying his Fourth Amendment claim – namely, that it was unreasonable to seize the horses because their poor health conditions were due to an "act of God," and not his own doing. *Id.* ¶¶ 38- 40. Therefore, because the allegations underlying his claim for outrageous conduct are the same as the factual allegations underlying his Fourth Amendment claim, it should be dismissed for failure to state a claim. *Visor*, 965 F. Supp. at 33.

### B.  Plaintiff Fails to Allege Sufficient, Plausible Facts to Support His Claim.

In Colorado, "[t]he elements of outrageous conduct are: (1) the Defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the Plaintiff severe emotional distress, and (3) causing the Plaintiff severe emotional distress." *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. Ct. App. 2002) (citation omitted). "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Lewis v. Strong*, No. 09-CV-02861, 2010 WL 2232359, at *3 (D. Colo. June 2, 2010) (citation and quotation marks omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty*, 173 Colo. 170, 177 (1970) (citation omitted). Indeed, "[a] review of the apposite caselaw demonstrates that the universe of viable outrageous conduct claims is extremely limited." *Lewis*, 2010 WL 2232359, at *4 (collecting demonstrative cases) (citations omitted);

*see also Carani v. Meisner*, 2009 WL 2762719 at *3 (D. Colo. Aug. 26, 2009) (stating claim is

"available in response to a very narrow type of conduct") (citation and quotation marks omitted).

Here, reasonable people could not differ on whether Priestly's alleged conduct was

"outrageous" within the "very narrow type of conduct" found actionable under Colorado law.

The Amended Complaint alleges that the horses were seized pursuant to court-issued warrants,

after numerous visits by law enforcement concerning the poor condition of the horses and

Plaintiff's failure to comply with the two Notices of Warning. *See* Am. Compl. ¶¶ 12, 16, 21-26.

Plaintiff's assertion that the warrant-based seizures were "outrageous" because the horses'

conditions were caused by an "act of God," and because he thought he had more time than was

stated in the official written Notices, fall far short of an act that  is "to be regarded as atrocious,

and utterly intolerable in a civilized community." *Rugg*, 173 Colo. at 177. Moreover, Plaintiff

alleges only in conclusory fashion that the seizure of the horses was done "recklessly." Am.

Compl. ¶ 54. Therefore, Plaintiff's claim for outrageous conduct should be dismissed.

## V.    Fifth Claim: Defamation (Priestly)

### A.  Plaintiff's Defamation Claim Fails Because the Alleged Statements are a Matter of Public Concern, and Plaintiff has Not Pled all Necessary Elements.

In Colorado, the elements for a cause of action for defamation are: (1) a defamatory

statement (2) publication; (3) fault amounting to at least negligence on the part of the publisher;

and (4) damages. *Williams v. Dist. Court, Second Judicial Dist., City & Cty. of Denver*, 866 P.2d

908, 912 n.4 (Colo. 1993). However, "[i]f an allegedly defamatory statement pertains to a matter

of public concern, 'the defamed party is subject to heightened burdens of proof.'" *Anderson v.*

*Colorado Mountain News Media, Co*., No. 18-CV-02934, 2019 WL 6888275, at *3 (D. Colo.

Dec. 18, 2019) (quoting *Lawson v. Stow*, 2014 COA 26, ¶ 18). Accordingly, Plaintiff must prove

Apdx 038

(1) the falsity of the statement by clear and convincing evidence; (2) that the speaker published the statement with actual malice; and (3) actual damages. *Id.* at *4 (citation omitted).

Colorado courts have consistently found that statements implicating the commission of a crime pertain to a matter of public concern. *See, e.g., Shoen v. Shoen*, 2012 COA 207, ¶ 25 (statements implicating individual in a murder investigation related to a matter of public concern); *Lawson*, 2014 COA ¶ 23 (statements conveying allegation of child abuse related to a matter of public concern); *Anderson*, 2019 WL 6888275, at *3 (statements implicating plaintiff's husband's in fraudulent scheme were matter of public concern). Similarly, here, Plaintiff alleges that Priestly caused to be published that Plaintiff "was cruel to his animals *and violated the law*." Am. Compl. ¶ 31 (emphasis added).

Furthermore, "[m]atters of public concern are issues of interest to the community, whether for social, political, or other reasons." *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1181 (10th Cir. 2018) (internal quotation marks omitted). Here, Plaintiff alleges the defamatory statements were "the talk of the town." *Id.* ¶ 49. Thus, because Plaintiff alleges the defamatory statements implicated him in a crime, and were of great interest to the community, the heightened standard for a matter of public concern should apply.

Applying that standard here, at minimum, Plaintiff's claim fails because he has not alleged that Priestly acted with malice. "In order to establish actual malice, a plaintiff must show by clear and convincing evidence that the defendant published the statement with knowledge of its falsity or in reckless disregard of the truth." *Anderson*, 2019 WL 6888275, at *5 (citation omitted). "To show reckless disregard in particular, 'the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement, or acted with a high

degree of awareness of its probable falsity.'" *Id.* (quoting *Lewis v. McGraw-Hill Broad. Co.,* 832 P.2d 1118, 1123 (Colo. App. 1992)).

Here, Plaintiff has failed to allege any facts suggesting that Priestly knew the alleged statements were false, entertained serious doubt as to their veracity, or disregarded their probable falsity. Instead, Plaintiff merely alleges in conclusory terms, "[t]his was false." Am. Compl. ¶ 56. By failing to allege actual malice, Plaintiff's claim for defamation fails as a matter of law.

Alternatively, even if the Court were to determine that the alleged defamatory statements are not a matter of public concern, Plaintiff's allegation still fails. Courts in this Circuit have found that statements accusing a person of engaging in wrongdoing or lacking moral character are protected opinion. *See, e.g. Hogan v. Winder*, 762 F.3d 1096, 1107 (10th Cir. 2014); *Henderson v. Times Mirror Co.*, 669 F. Supp. 356 (D. Colo. 1987). Here, similarly, Plaintiff's allegation that he was defamed because Priestly stated he was "cruel to his horses," Am. Compl. ¶ 56, is protected opinion and fails to state a claim to relief.

**B.  Plaintiff's Claims are Too Vague and Conclusory to State a Claim to Relief.**

"[A] defamation complaint cannot couch allegations . . . in vague, conclusory terms." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (citations omitted). Indeed, where the allegations lack specificity as to date, time and context, they are subject to dismissal for failure to state a claim. *Proffitt v. Cornuke,* No. CIV.A. 03-CV-00810, 2005 WL 2171860, at *2 (D. Colo. Sept. 7, 2005) (citation omitted); *see also U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 108-09 (D. Conn. 2006) ("Although *in haec verba* or verbatim pleading is not required, [plaintiff] must plead, in order to provide sufficient notice, "what defamatory statements . . . were made concerning the plaintiff, when they were made, [and] to whom they might have been made.") (quotation marks and citation omitted); *Fisher v.*

Apdx 040

*Koopman*, No. 15-CV-0166, 2016 WL 8540859, at *12 (D. Colo. Aug. 1, 2016), *aff'd*, 693 F. App'x 740 (10th Cir. 2017) (dismissing claim where plaintiff did "not identify what defamatory statements she claims [were] made, their content, when they were made, or to whom").

Here, Plaintiff alleges only that "Ms. Priestly caused to be published that Mr. Walker was cruel to his horses and to the horses left in his care. This was false" and that "[t]his was the talk of the town in Hartsel and in Fariplay and greatly diminished Mr. Walker's reputation." Am. Compl. ¶¶ 56-57. The Amended Complaint fails to identify when the statements were made, the context, or to whom they were made, asserting only in conclusory fashion that Priestly "caused to be published" such statements. *Id.* ¶ 56. Plaintiff's defamation claim is too vague and conclusory to state a claim to relief and should be dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiff's claims against Harmony and Priestly fail to state a cause of action upon which relief can be granted and should be dismissed.

Respectfully submitted this 5th day of June, 2020.

<div style="margin-left:40%">

*s/Cynthia Lowery-Graber*
Cynthia Lowery-Graber
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone: (303) 861-7000
E-mail: Cynthia.lowery-graber@bclplaw.com
*Attorneys for DefendantsDumb Friends League*
*Harmony Equine Center and Bobby Priestly*

</div>

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on June 5, 2020, a true and correct copy of the foregoing **MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6)** was filed with the Court and served via CM/ECF:

Robert Liechty
Robert M. Liechty P.C.
1800 Gaylord Street
Denver, CO 80206
rliechty@crossliechty.com
*Counsel for Plaintiff*

Andrew R. McLetchie
Eden R. Rolland
Matthew K. Sidran
Fowler, Schimberg, Flanagan & McLetchie, P.C.
350 Indiana Street, Suite 850
Golden, CO 80401
*Counsel for Park County Sheriff's Office and Leigh Cochran*

<div align="right">

*s/ Cynthia Lowery-Graber*
Cynthia Lowery-Graber, Esq.

</div>

Apdx 042

# EXHIBIT A

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

FILED IN COMBINED COURT
19 PS 13
FEB 2 0 2019

PARK COUNTY, COLORADO

SEARCH WARRANT

THE PEOPLE OF THE STATE OF COLORADO

TO:    THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO, GREETINGS:

WHEREAS, Deputy Leigh Cochran, has made an affidavit and complaint for the issuance of a search warrant.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( )    Stolen or Embezzled OR
(X )    Designed or intended for use or which is or has been used as a means of committing a criminal offense or the possession of which is illegal, OR
(X )    Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

The physical address of 33145 S HWY 9 Hartsel and schedule numbers located off of Highway 9, Hartsel, Colorado identified as schedule number 4515 including 684.6741 acres of Mixed Use-AgRes land with the legal description of T11 R76 S35 SW4 A PORTION OF N2 LYING WESTERLEY OF HWY 9 SE4, NE4SWA 35-11-76; ALL THAT PORTION LYING WESTERLY OF HWY 9 36-11-76. Along with schedule number 4516 including 2,112.95 acres of agricultural land with the legal description of T12 R76 S01 NE74 THAT PORT OF N2 LYING WESTERLY OF HWY 9, E2SE4 1-12-76; NE4, SE4 LYING NORTH OF CO RD 2-12-76; SE4, S2NE4, E2SW4, SW4SW4, SE4NW4 11-12-76; S2, S2NS, NSNE4 NORTH OF HWY 24 12-12-76; NW4,N2SW4, PART OF NE4 AND N2SE4 LYING NW OF HWY 24-14-12-76 W2NE4, SE4NE4 15-12-76. All property is owned and maintained by Badger Basin Ranch INC.

And you will search for:

All areas an animal of any size could reasonably be location were in. Locations such as, open pastures, stock pens, stables, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include all buildings located on the property, sheds, storage or any out building.  All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground.  Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death.

Page: 47

Date Filed: 06/17/2021

Document:010110536823

Appellate Case: 21-1119

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State; and that you further file a report with this Court inventorying the goods and things which were seized or reporting that nothing was so found and seized.

Done this _20_ day of _FEB_ 2019___.

BY THE COURT

JUDGE

BRIAN GREEN
PARK COUNTY COURT

COURT
SEAL

Page: 48   Date Filed: 06/17/2021   Document: 010110536823   Appellate Case: 21-1119

STATE OF COLORADO )

COUNTY OF PARK )

```
FILED IN COMBINED COURT
19PS13
FEB 2 0 2019
PARK COUNTY, COLORADO
```

AFFIDAVIT FOR
A SEARCH
WARRANT

In support of the issuance of a SEARCH WARRANT to search:

The physical address of 33145 S HWY 9 Hartsel and schedule numbers located off of Highway 9, Hartsel, Colorado identified as schedule number 4515 including 684.6741 acres of Mixed Use-AgRes land with the legal description of T11 R76 S35 SW4 A PORTION OF N2 LYING WESTERLEY OF HWY 9 SE4, NE4SWA 35-11-76; ALL THAT PORTION LYING WESTERLY OF HWY 9 36-11-76. Along with schedule number 4516 including 2,112.95 acres of agricultural land with the legal description of T12 R76 S01 NE74 THAT PORT OF N2 LYING WESTERLY OF HWY 9, E2SE4 1-12-76; NE4, SE4 LYING NORTH OF CO RD 2-12-76; SE4, S2NE4, E2SW4, SW4SW4, SE4NW4 11-12-76; S2, S2NS, NSNE4 NORTH OF HWY 24 12-12-76; NW4,N2SW4, PART OF NE4 AND N2SE4 LYING NW OF HWY 24-14-12-76 W2NE4, SE4NE4 15-12-76. All property is owned and maintained by Badger Basin Ranch INC.

I, Deputy Leigh Cochran, am a deputy sheriff for the Park County Sheriff's Office, and have been employed with this office since April, 2014. I have been an Animal Control Officer for over 4 years, and have over 40 hours in Animal Cruelty Investigations.  I, Deputy Leigh Cochran, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On January 28, 2019, I received a report regarding some thin horses off Highway 24 near mile marker 235. I did not locate any horses. I researched the area and discovered the property was known as the Badger Basin Ranch property. I made contact with the care taker of the ranch identified as:

## SU / Mark Walker

I explained to Walker that I had received a report of about nine thin horses near mile marker 235 off Highway 24 just down form Antero. Walker stated he thought all of his horses had been brought up, but he would check on them and bring them up.

On January 29, 2019, Deputy Mercier took a call that came into the Animal Control Office phone regarding skinny horses off Highway 24 near mile marker 235. The calling party was identified by voice as:

## RP/ Sturuna, Marcy

Sturuna stated that she saw a gray and white dead horse. She stated nobody had been feeding the horses. I explained to Sturuna that I had contacted Mark Walker regarding the horses and he was supposed to move them. Deputy Mercier was near the area and checked on the Walker horses on her way. Deputy Mercier stated the horses were by the fence and took some photographs.

Based on the photographs at that time the nine horses were described as:
- Black horse with white nip on nose and forehead
- Gray, black and white paint
- Dark bay black mane and tail
- Dark bay
- Buckskin
- Grulla white spot on forehead
- Black and white paint
- Chestnut
- Dark bay with white socks on back legs and blaze

Page: 49    Date Filed: 06/17/2021    Document: 010110536823    Appellate Case: 21-1119

I responded on January 29, 2019 and noticed a deceased horse down the embankment on Highway 24 near mile marker 235. It was unknown when the animal died. The dead horse was mostly covered by snow. I did not locate the Gray/black and white horse that was reported as dead. I contacted Walker by phone, and asked why the horses were still at the fence. He stated that he gave them some grass hay but was not able to move them because his large bull Buffalo had taken the fence down. He stated the snow was too deep to get his tractor up to the horses. I stated there was a dead horse down the embankment. He responded the horse was a palomino that was old and the cold was probably too much. He was going to have someone walk the horses up. I explained to him that a few of the horses were thin and I was receiving complaints. I told Walker he needed to care for the horses until they could be moved. Walker stated he would get them moved. A State Notice of Warning was posted advising Walker to provide feed and vet care for the horses as needed. (See attached).

On January 30, 2019, at approximately 0800, I observed horses being moved by foot. I made contact with Walker in person, and he stated the horse that died was an older horse. He stated he just did not know they had gone that far back. Walker stated the other thin horses were young and did not know how to find food under the snow. I explained with the notice I would be doing a follow on February 4, 2019. I explained that he must continue to supplement feed all of his livestock, not just the cows and buffalo. Walker stated the winter weather has been very bad and hard on his stock. He stated that he could not access the far back north side of the property due to large snow drifts.

On February 4, 2019, I responded to 33145 South Highway 9 Hartsel Colorado, County of Park to complete a follow up check on the horses. Walker had all of his livestock in one pasture area, to include horses, cattle and buffalo. While looking for the horses that were previously thin, I noticed two more horses that were thin on the top line. Walker could not point out specifically where the nine horses were. I was unable to locate the Gray and white or the Grulla. I explained to Walker that I would keep looking for the same horses, but he needed to get the animals separated. I did observe Walker feed all of the animals together. The buffalo ate first the cows on the outside and the horses just left the area. When Walker was asked what he was feeding he stated it was milo grass hay and all natural cake. I asked Walker if he was feeding any grass hay for the horses. He stated he was up next to the red barn off Highway 24. Deputy Mercier had stated to me previously that she saw grass hay in the far pasture near the old barn.

On February 14, 2019, I contacted Agent Bobbi Priestly with Colorado Humane Society for assistance with the Walker horses. The horses were continuing to decline and I could not locate two of the horses from the first warning. I contacted Walker by telephone and left a message that I had contacted Agent Bobbi Priestly with the Colorado Humane Society to help with the declining horses. I responded to the location off Highway 9. Walker and Agent Priestly were already at the location. Walker showed up with two horse trailers. Agent Priestly explained to Walker the seriousness of the situation with all the thin horses. Walker continued to state he was feeding. Walker agreed to have three horses transported to the ranch for special care due to their thin conditions. He stated he did not want a bunch of horses at the ranch because they would forget how paw for food. I stated to Walker the snow was too deep and the horses needed help.

I asked if he knew how many horses had died and he stated there were two, possibly four. I asked if the original nine had been located and he stated they were somewhere in the pasture. I asked Walker if I could check the horses that were too far out to body score. He stated he had checked them a week ago and they were doing fine. I stated that I still would like to check them. He stated we would have to go out with the tractor. Walker was issued a second State Notice of Warning on February 14, 2019 at 1629 stating provide food and water necessary to maintain weight through winter conditions.

On February 15, 2019 at approximately 0900, Bobbi Priestly, Walker and I responded back to highway 9 and 24. Walker again stated he did not want a bunch of horses up at the ranch to feed. I explained that he needed to provide grass hay for the horses or all would continue to lose weight. He became agitated and Priestly explained to him citizens were calling because he has skinny horses and then asked if he agreed. Walker did not respond, but asked what he should do. Priestly stated he should move the thin horses to a location out of the wind and provide better feed. Walker responded to Priestly that he would be willing to move the skinny horses. He then asked how many and if she could point them out. Priestly picked seven.

- Dark Bay with white blaze
- Bay red
- Gray
- Red and white paint
- White and brown paint
- Dark gray appaloosa
- Red appaloosa

Walker and I then took the tractor out to see the rest of the horses. While on the tractor Walker stated the horses were just checked by him a week ago and they were all fine. He stated they were pawing and getting plenty of food where they were and he did not want to bring any of them up because they were doing what they were supposed to. The tractor was a large one seat tractor and the snow was halfway up the wheels in some places. As we approached the horses I noticed some were thin and asked Walker to stop the tractor. He did so but I could not walk up to the horses due to the extremely deep snow. Photographs were taken and I identified two horses that needed to be brought up. We then proceeded farther out on the tractor to two other horses that Walker identified as his personal horses. I took photographs and told Walker both horses also needed to be brought up. Walker stated one of them was his old horse 28 years old. I explain to Walker that I would walk the horses up he stated he did not want me to because it was dangerous with all the buffalo. I asked Walker if he agreed they were thin he stated he was shocked because they were fine a week ago. I told him he needed to bring the four horses up as soon as possible.

It was discovered the horses brought up from the previous day had no water. I asked Walker about the water situation and he stated they could get back to the live spring where the red bull was located. Mark Walker's veterinarian Leslie Harrison arrived to check one of the thin horses named "Starburst". I checked the fenced area and the horses had no way to access the live spring. Harrison explained to Walker the thin horse needed a feeding plan and suggested some alfalfa hay with good quality grass hay. Walker stated he did not like alfalfa and stated he was feeding them all natural cake. She again suggested quality grass hay with some alfalfa. I spoke briefly with an acquaintance of Walkers who wants to remain anonymous. He stated he told Mark the horses had no water and Mark stated they could just eat snow. The acquaintance stated he did lead the horses to the live spring later that evening to drink. The acquaintance also stated Walker had more horses off County Road 53. The reported owner of the Badger basin Rand and property off Park County Road 53 was identified as:

### SU/Wolthuis, Frank

On February 16, 2019 at approximately 0900, I returned to the ranch again to assist with moving the rest of horses. The horses already moved behind the barn with covered shelter had grass hay and water. The thin horses in the front pen still had what appeared to be straw. They did have liquid water. When I approached Walker about the feed he stated it was oat hay and was good for the horses. I explained to him it was not sufficient feed for thin horses and they would continue to lose weight if he did not feed them grass hay. I then responded to the location where four horses were being brought up on Highway 9. One horse went down and needed extra time and assistance before she could get to the horse trailer.

I contacted Sadie Maybach DMV with Rocky Top veterinary service. Sadie arrived to check and assess the horse that had gone down. The down horse was described as bay color with a white blaze. She assessed the horse on a modified Henneke body score condition one.

The Henneke Scoring System is a scientific method of evaluating a horse's body condition regardless of breed, body type, sex or age. Six parts of a horse are checked in this system—the neck, withers (where the neck ends and the back begins), shoulder, ribs, loin, and tail head. When using the Henneke system, you should always try to make physical contact with the horse. The system used rates the horses on a scale of 1 to 9. A score of 1 is considered poor or emaciated with no body fat. A 9 is extremely fat or obese. Horse veterinarians consider a body score of between 4 and 7 as acceptable. A 5 is considered ideal. The horse had little to no body fat that could be felt, with deep spaces between the ribs. The withers down the back to the hips and tail head were all protruding.

She checked the mouth and stated the horse also needed dental work but her condition was too poor to make any corrections. Sadie spoke to Walker explaining that all the horses in the pen behind the barn were 1 and 1 1/2's. She explained to him a re-feeding plan to get the horses back to healthy weights. Walker stated he understood and would get the feed he needed for the horses to gain. Sadie listed alfalfa hay or pellets some equine senior and good quality grass hay.

I asked Sadie if she would look at the rest of the horses brought up. She assessed the horses in the front pen and stated they too should have good grass hay. We then proceeded to the location of the horses on highway 24 and 9. She stated there were only a few that looked okay and the rest needed to be brought up. She also stated with the oat hay the horses would continue to lose body weight. I then went back to the ranch to check the horses and advise Walker I was leaving. The acquaintance spoke to me while I was looking at horses again and stated there were more dead horses. He stated to check around the old barn off Highway 24. I left the ranch to check County Road 53 for more horses I did not locate them. I attempted to check the barn from the road, but could not see anything from the outside due to the large snow drifts. I then contacted the ranch owner Frank Wolthuis and explain to him Walker needed more grass hay. I also stated all horses should be brought up to be cared for. Wolthuis stated he would have Walker bring up all horses and he would get more grass hay. At approximately 1830, I received a phone call from Walker. Walker stated he would buy alfalfa and start feeding all horses grass hay. Walker stated the grass hay would be there Monday.

On February 18, 2019, at approximately 0900, I responded to the Walker property to check the horses and feed provided. All horses were eating what appeared to be better grass hay and had water. The old horse previously down and in the poorest condition was lying down and not doing well. Walker stated he did not think she would make it. I asked Walker if he knew how many horses he had lost. Walker stated he had lost six, and he did not know where the Gruella and Gray/black and white were. He stated the horses may have gone back to the far back pasture again. He stated that he was still feeding his own personal hay because the truck had not arrived yet with the hay that was ordered by Wolthius. I observed two large bales of alfalfa hay and alfalfa pellets. The bag of pellets had been opened but the hay had not been touched.

On February 19, 2019, Agent Priestly stated to me in her experience the animals under the care and control of Mark Walker are not receiving adequate food water and veterinary care that would ensure their ability to live in a normal fashion in accordance with their species breed age and sex. She stated due to the lack of water food and veterinary care the survival of these horses would be unlikely if left in the owner's care. It would be difficult for any healthy animal to survive in the harsh conditions during the winter in Hartsel Colorado 2019. The temperatures in that area at the Antero reservoir weather station have been documented to be below zero on several mornings. Agent Priestly stated she had contact with the Brand Inspector that had completed Walkers inspections on his horses. The Brand inspector was identified as:

Page: 52
Date Filed: 06/17/2021   Document: 010110536823

**IP/ Lewis, Brice**

Agent Priestly stated Lewis would be emailing the inspections he had completed on Walkers horses. The following list notes Agents Priestley's credentials.  She has been a state commission Bureau of Animal Protection Agent with the state of Colorado Department of Agriculture since 2004 and animal protection agents are designated as peace officers and defined by CRS 35-42 -107 (4) and CRS 16 – 2.5 – 101 have also worked over 17 years as an animal control officer and had several hundred hours of training and detection and investigation of offenses such as animal cruelty animal neglect animal hoarding dangerous dogs and animal fighting.

Due to the number of horses in poor condition I must agree with Agent Priestly in the above statement. Walker did not comply with warnings and has given inconsistence statements on the number of deceased horses. The acquaintance stated there could be as many as 10 and the two missing horses from my original nine are deceased. The winter conditions for the months of January and February have been harsh. Mark Walker previously ran the Magnus Ranch in Jefferson Colorado for approximately 10 yrs. and has been at the Badger Basin Ranch for approximately 10 years. Supplement feeding for horses during periods of cold weather and deep snow is paramount to survival. Based on my training and experience the horses will remain in jeopardy if left in Walkers care.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:

All areas an animal of any size could reasonably be location were in. Locations such as, open pastures, stock pens, stables, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include all buildings located on the property, sheds, storage or any out building.  All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground. Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death.

The property to be searched for, and seized if found, is:
- ( )  Stolen or embezzled OR
- ( X )  Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
- ( X )  Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this 20 day of FEB , 2019

_____
JUDGE   BRIAN GREEN   PARK CTY COURT

# EXHIBIT B

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

FILED IN COMBINED COURT
2019 PS 14
FEB 2 0 2019

SEARCH WARRANT

PARK COUNTY, COLORADO

THE PEOPLE OF THE STATE OF COLORADO

TO:    THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Deputy Leigh Cochran, has made an affidavit and complaint for the issuance of a search warrant.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( )    Stolen or Embezzled OR
( X )    Designed or intended for use or which is or has been used as a means of committing a criminal
offense or the possession of which is illegal, OR
( X )    Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

The physical address of 33145 S HWY 9 Hartsel and schedule numbers located off of Highway 9, Hartsel,
Colorado identified as schedule number 4515 including 684.6741 acres of Mixed Use-AgRes land with the legal
description of T11 R76 S35 SW4 A PORTION OF N2 LYING WESTERLEY OF HWY 9 SE4, NE4SWA 35-
11-76; ALL THAT PORTION LYING WESTERLY OF HWY 9 36-11-76. Along with schedule number 4516
including 2,112.95 acres of agricultural land with the legal description of T12 R76 S01 NE74 THAT PORT OF
N2 LYING WESTERLY OF HWY 9, E2SE4 1-12-76; NE4, SE4 LYING NORTH OF CO RD 2-12-76; SE4,
S2NE4, E2SW4, SW4SW4, SE4NW4 11-12-76; S2, S2NS, NSNE4 NORTH OF HWY 24 12-12-76;
NW4,N2SW4, PART OF NE4 AND N2SE4 LYING NW OF HWY 24-14-12-76 W2NE4, SE4NE4 15-12-76.
All property is owned and maintained by Badger Basin Ranch INC.

And you will search for:

All areas an animal of any size could reasonably be location were in. Locations such as, open pastures, stock
pens, stables, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include
all buildings located on the property, sheds, storage or any out building.  All equines will be assessed by a
Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary
recommendations equines will be seized and impounded, to include equines dead or alive above or below
ground.  Femur bones will be separated from deceased animals and collected for marrow test. Based on my
training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The
owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and
veterinary care, with this neglect often resulting in starvation, illness and death. Samples of all feed/ hay to be
collected from all potential feed sources for testing to determine nutritional value.

Page: 55    Date Filed: 06/17/2021    Document: 010110536823    Appellate Case: 21-1119

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State; and that you further file a report with this Court inventorying the goods and things which were seized or reporting that nothing was so found and seized.

Done this 28 day of FEB 2019.

BY THE COURT

COURT SEAL

PARK COUNTY COMBINED COURTS
STATE OF COLORADO

JUDGE

BRIAN L GREEN

Page: 56   Date Filed: 06/17/2021   Document: 010110536823   Appellate Case: 21-1119

STATE OF COLORADO )
                    )
COUNTY OF PARK   )

2019 PS 14
FEB 20 2019
PARK COUNTY, COLORADO

AFFIDAVIT FOR
A SEARCH
WARRANT

In support of the issuance of a SEARCH WARRANT to search:

The physical address of 33145 S HWY 9 Hartsel and schedule numbers located off of Highway 9, Hartsel, Colorado identified as schedule  number 4515 including 684.6741 acres of Mixed Use-AgRes land with the legal description of T11 R76 S35 SW4 A PORTION OF N2 LYING WESTERLEY OF HWY 9 SE4, NE4SWA 35-11-76; ALL THAT PORTION LYING WESTERLY OF HWY 9 36-11-76. Along with schedule number 4516 including 2,112.95 acres of agricultural land with the legal description of T12 R76 S01 NE74 THAT PORT OF N2 LYING WESTERLY OF HWY 9, E2SE4 1-12-76; NE4, SE4 LYING NORTH OF CO RD 2-12-76; SE4, S2NE4, E2SW4, SW4SW4, SE4NW4 11-12-76; S2, S2NS, NSNE4 NORTH OF HWY 24 12-12-76; NW4,N2SW4, PART OF NE4 AND N2SE4 LYING NW OF HWY 24-14-12-76 W2NE4, SE4NE4 15-12-76. All property is owned and maintained by Badger Basin Ranch INC.

I, Leigh Cochran, am a deputy sheriff for the Park County Sheriff's Office, and have been employed with this office since April 2019, I have been an animal Control Officer for over 4 years, and have over 40 hours in Animal Cruelty training.  I, Leigh Cochran, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On January 28, 2019, I received a report regarding some thin horses off Highway 24 near mile marker 235. I did not locate any horses. I researched the area and discovered the property was known as the Badger Basin Ranch property. I made contact with the care taker of the ranch identified as:

**SU / Mark Walker**

I explained to Walker that I had received a report of about nine thin horses near mile marker 235 off Highway 24 just down form Antero. Walker stated he thought all of his horses had been brought up, but he would check on them and bring them up.

On January 29, 2019, Deputy Mercier took a call that came into the Animal Control Office phone regarding skinny horses off Highway 24 near mile marker 235. The calling party was identified by voice as:

**RP/ Sturuna, Marcy**

Sturuna stated that she saw a gray and white dead horse. She stated nobody had been feeding the horses. I explained to Sturuna that I had contacted Mark Walker regarding the horses and he was supposed to move them. Deputy Mercier was near the area and checked on the Walker horses on her way. Deputy Mercier stated the horses were by the fence and took some photographs.
Based on the photographs at that time the nine horses were described as:
- Black horse with white nip on nose and forehead
- Gray, black and white paint
- Dark bay black mane and tail
- Dark bay
- Buckskin
- Grulla white spot on forehead
- Black and white paint
- Chestnut
- Dark bay with white socks on back legs and blaze

I responded on January 29, 2019 and noticed a deceased horse down the embankment on Highway 24 near mile marker 235. It was unknown when the animal died. The dead horse was mostly covered by snow. I did not locate the Gray/black and white horse that was reported as dead. I contacted Walker by phone, and asked why the horses were still at the fence. He stated that he gave them some grass hay but was not able to move them because his large bull Buffalo had taken the fence down. He stated the snow was too deep to get his tractor up to the horses. I stated there was a dead horse down the embankment. He responded the horse was a palomino that was old and the cold was probably too much. He was going to have someone walk the horses up. I explained to him that a few of the horses were thin and I was receiving complaints. I told Walker he needed to care for the horses until they could be moved. Walker stated he would get them moved. A State Notice of Warning was posted advising Walker to provide feed and vet care for the horses as needed. (See attached).

On January 30, 2019, at approximately 0800, I observed horses being moved by foot. I made contact with Walker in person, and he stated the horse that died was an older horse. He stated he just did not know they had gone that far back. Walker stated the other thin horses were young and did not know how to find food under the snow. I explained with the notice I would be doing a follow on February 4, 2019. I explained that he must continue to supplement feed all of his livestock, not just the cows and buffalo. Walker stated the winter weather has been very bad and hard on his stock. He stated that he could not access the far back north side of the property due to large snow drifts

On February 4, 2019, I responded to 33145 South Highway 9 Hartsel Colorado, County of Park to complete a follow up check on the horses. Walker had all of his livestock in one pasture area, to include horses, cattle and buffalo. While looking for the horses that were previously thin, I noticed two more horses that were thin on the top line. Walker could not point out specifically where the nine horses were. I was unable to locate the Gray and white or the Grulla. I explained to Walker that I would keep looking for the same horses, but he needed to get the animals separated. I did observe Walker feed all of the animals together. The buffalo ate first the cows on the outside and the horses just left the area. When Walker was asked what he was feeding he stated it was milo grass hay and all natural cake. I asked Walker if he was feeding any grass hay for the horses. He stated he was up next to the red barn off Highway 24. Deputy Mercier had stated to me previously that she saw grass hay in the far pasture near the old barn.

On February 14, 2019, I contacted Agent Bobbi Priestly with Colorado Humane Society for assistance with the Walker horses. The horses were continuing to decline and I could not locate two of the horses from the first warning. I contacted Walker by telephone and left a message that I had contacted Agent Bobbi Priestly with the Colorado Humane Society to help with the declining horses. I responded to the location off Highway 9. Walker and Agent Priestly were already at the location. Walker showed up with two horse trailers. Agent Priestly explained to Walker the seriousness of the situation with all the thin horses. Walker continued to state he was feeding. Walker agreed to have three horses transported to the ranch for special care due to their thin conditions. He stated he did not want a bunch of horses at the ranch because they would forget how paw for food. I stated to Walker the snow was too deep and the horses needed help.

I asked if he knew how many horses had died and he stated there were two, possibly four. I asked if the original nine had been located and he stated they were somewhere in the pasture. I asked Walker if I could check the horses that were too far out to body score. He stated he had checked them a week ago and they were doing fine. I stated that I still would like to check them. He stated we would have to go out with the tractor. Walker was issued a second State Notice of Warning on February 14, 2019 at 1629 stating provide food and water necessary to maintain weight through winter conditions.

Page: 58    Date Filed: 06/17/2021    Document: 010110536823    Appellate Case: 21-1119

On February 15, 2019 at approximately 0900, Bobbi Priestly, Walker and I responded back to highway 9 and 24. Walker again stated he did not want a bunch of horses up at the ranch to feed. I explained that he needed to provide grass hay for the horses or all would continue to lose weight. He became agitated and Priestly explained to him citizens were calling because he has skinny horses and then asked if he agreed. Walker did not respond, but asked what he should do. Priestly stated he should move the thin horses to a location out of the wind and provide better feed. Walker responded to Priestly that he would be willing to move the skinny horses. He then asked how many and if she could point them out. Priestly picked seven.

- Dark Bay with white blaze
- Bay red
- Gray
- Red and white paint
- White and brown paint
- Dark gray appaloosa
- Red appaloosa

Walker and I then took the tractor out to see the rest of the horses. While on the tractor Walker stated the horses were just checked by him a week ago and they were all fine. He stated they were pawing and getting plenty of food where they were and he did not want to bring any of them up because they were doing what they were supposed to. The tractor was a large one seat tractor and the snow was halfway up the wheels in some places. As we approached the horses I noticed some were thin and asked Walker to stop the tractor. He did so but I could not walk up to the horses due to the extremely deep snow. Photographs were taken and I identified two horses that needed to be brought up. We then proceeded farther out on the tractor to two other horses that Walker identified as his personal horses. I took photographs and told Walker both horses also needed to be brought up. Walker stated one of them was his old horse 28 years old. I explain to Walker that I would walk the horses up he stated he did not want me to because it was dangerous with all the buffalo. I asked Walker if he agreed they were thin he stated he was shocked because they were fine a week ago. I told him he needed to bring the four horses up as soon as possible.

It was discovered the horses brought up from the previous day had no water. I asked Walker about the water situation and he stated they could get back to the live spring where the red bull was located. Mark Walker's veterinarian Leslie Harrison arrived to check one of the thin horses named "Starburst". I checked the fenced area and the horses had no way to access the live spring. Harrison explained to Walker the thin horse needed a feeding plan and suggested some alfalfa hay with good quality grass hay. Walker stated he did not like alfalfa and stated he was feeding them all natural cake. She again suggested quality grass hay with some alfalfa. I spoke briefly with an acquaintance of Walkers who wants to remain anonymous. He stated he told Mark the horses had no water and Mark stated they could just eat snow. The acquaintance stated he did lead the horses to the live spring later that evening to drink. The acquaintance also stated Walker had more horses off County Road 53. The reported owner of the Badger basin Rand and property off Park County Road 53 was identified as:

**SU/Wolthuis, Frank**

On February 16, 2019 at approximately 0900, I returned to the ranch again to assist with moving the rest of horses. The horses already moved behind the barn with covered shelter had grass hay and water. The thin horses in the front pen still had what appeared to be straw. They did have liquid water. When I approached Walker about the feed he stated it was oat hay and was good for the horses. I explained to him it was not sufficient feed for thin horses and they would continue to lose weight if he did not feed them grass hay. I then responded to the location where four horses were being brought up on Highway 9. One horse went down and needed extra time and assistance before she could get to the horse trailer.

Page: 59   Date Filed: 06/17/2021   Document: 010110536823   Appellate Case: 21-1119

I contacted Sadie Maybach DMV with Rocky Top veterinary service. Sadie arrived to check and assess the horse that had gone down. The down horse was described as bay color with a white blaze. She assessed the horse on a modified Henneke body score condition one.

The Henneke Scoring System is a scientific method of evaluating a horse's body condition regardless of breed, body type, sex or age.  Six parts of a horse are checked in this system—the neck, withers (where the neck ends and the back begins), shoulder, ribs, loin, and tail head. When using the Henneke system, you should always try to make physical contact with the horse.  The system used rates the horses on a scale of 1 to 9. A score of 1 is considered poor or emaciated with no body fat. A 9 is extremely fat or obese. Horse veterinarians consider a body score of between 4 and 7 as acceptable. A 5 is considered ideal. The horse had little to no body fat that could be felt, with deep spaces between the ribs. The withers down the back to the hips and tail head were all protruding.

She checked the mouth and stated the horse also needed dental work but her condition was too poor to make any corrections. Sadie spoke to Walker explaining that all the horses in the pen behind the barn were 1 and 1 1/2's. She explained to him a re-feeding plan to get the horses back to healthy weights. Walker stated he understood and would get the feed he needed for the horses to gain. Sadie listed alfalfa hay or pellets some equine senior and good quality grass hay.

I asked Sadie if she would look at the rest of the horses brought up. She assessed the horses in the front pen and stated they too should have good grass hay. We then proceeded to the location of the horses on highway 24 and 9. She stated there were only a few that looked okay and the rest needed to be brought up. She also stated with the oat hay the horses would continue to lose body weight. I then went back to the ranch to check the horses and advise Walker I was leaving. The acquaintance spoke to me while I was looking at horses again and stated there were more dead horses. He stated to check around the old barn off Highway 24. I left the ranch to check County Road 53 for more horses I did not locate them. I attempted to check the barn from the road, but could not see anything from the outside due to the large snow drifts. I then contacted the ranch owner Frank Wolthuis and explain to him Walker needed more grass hay. I also stated all horses should be brought up to be cared for. Wolthuis stated he would have Walker bring up all horses and he would get more grass hay. At approximately 1830, I received a phone call from Walker. Walker stated he would buy alfalfa and start feeding all horses grass hay. Walker stated the grass hay would be there Monday.

On February 18, 2019, at approximately 0900, I responded to the Walker property to check the horses and feed provided. All horses were eating what appeared to be better grass hay and had water. The old horse previously down and in the poorest condition was lying down and not doing well. Walker stated he did not think she would make it. I asked Walker if he knew how many horses he had lost. Walker stated he had lost six, and he did not know where the Gruella and Gray/black and white were. He stated the horses may have gone back to the far back pasture again. He stated that he was still feeding his own personal hay because the truck had not arrived yet with the hay that was ordered by Wolthius. I observed two large bales of alfalfa hay and alfalfa pellets. The bag of pellets had been opened but the hay had not been touched.

On February 19, 2019, Agent Priestly stated to me in her experience the animals under the care and control of Mark Walker are not receiving adequate food water and veterinary care that would ensure their ability to live in a normal fashion in accordance with their species breed age and sex. She stated due to the lack of water food and veterinary care the survival of these horses would be unlikely if left in the owner's care. It would be difficult for any healthy animal to survive in the harsh conditions during the winter in Hartsel Colorado 2019. The temperatures in that area at the Antero reservoir weather station have been documented to be below zero on several mornings. Agent Priestly stated she had contact with the Brand Inspector that had completed Walkers inspections on his horses. The Brand inspector was identified as:

**IP/ Lewis, Brice**

Page: 60   Date Filed: 06/17/2021   Document: 010110536823   Appellate Case: 21-1119

Agent Priestly stated Lewis would be emailing the inspections he had completed on Walkers horses. The following list notes Agents Priestley's credentials. She has been a state commission Bureau of Animal Protection Agent with the state of Colorado Department of Agriculture since 2004 and animal protection agents are designated as peace officers and defined by CRS 35-42 -107 (4) and CRS 16 – 2.5 – 101 have also worked over 17 years as an animal control officer and had several hundred hours of training and detection and investigation of offenses such as animal cruelty animal neglect animal hoarding dangerous dogs and animal fighting.

Due to the number of horses in poor condition I must agree with Agent Priestly in the above statement. Walker did not comply with warnings and has given inconsistence statements on the number of deceased horses. The acquaintance stated there could be as many as 10 and the two missing horses from my original nine are deceased. The winter conditions for the months of January and February have been harsh. Mark Walker previously ran the Magnus Ranch in Jefferson Colorado for approximately 10 yrs. and has been at the Badger Basin Ranch for approximately 10 years. Supplement feeding for horses during periods of cold weather and deep snow is paramount to survival. Based on my training and experience the horses will remain in jeopardy if left in Walkers care.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:

All areas an animal of any size could reasonably be location were in. Locations such as, open pastures, stock pens, stables, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include all buildings located on the property, sheds, storage or any out building. All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground. Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death. Samples of all feed/ hay to be collected from all potential feed sources for testing to determine nutritional value.

The property to be searched for, and seized if found, is:

( )    Stolen or embezzled OR

(X )    Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR

(X )    Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this _20_ day of _FEB_____, 2019___.

_____
JUDGE

BRIAN L GREEN

Page: 61   Date Filed: 06/17/2021   Document: 010110536823   Appellate Case: 21-1119

# EXHIBIT C

Page: 63

Date Filed: 06/17/2021

Document: 010110536823

Appellate Case: 21-1119

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

| FILED IN COMBINED COURT |
| 19 PS 15 |
| FEB 2 1 2019 |
| PARK COUNTY, COLORADO |

SEARCH WARRANT

THE PEOPLE OF THE STATE OF COLORADO

TO:   THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Deputy Leigh Cochran, has made an affidavit and complaint for the issuance of a search warrant.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( )     Stolen or Embezzled OR
( X )   Designed or intended for use or which is or has been used as a means of committing a criminal
        offense or the possession of which is illegal, OR
( X )   Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:
The property and schedule numbers located off of Park County Road 53, Hartsel, Colorado identified as
schedule  number 21052 including 320 acres of vacant land with the legal description of T13 R75 S04 SW4
SW4 4-13-75 SE4 5-13- 75. As well as schedule number 4512 including  2,952.28 acres of agricultural and with
the legal description of T12 R75 S28 NE4 S2, NE4, E2NW4 28-12-75  S2 30-12-75  ALL 31-12-75  ALL 32-
12-75  ALL 33-12-75  S2S2 34-12-75. As well as schedule number 4513 including  1,313.97 acres of
agricultural land with the legal description of T13 R75 S05 NW4   SW4, S2NW4, NE4NW4 5-13-75;  S2NE4,
SE4 6-13-75; N2NE4,  S2N2, S2 8-13-75; W2W2 17-13-75.  All property is owned and
maintained by Hartsel Springs Ranch of CO INC.

And you will search for:

All areas an animal of any size could reasonably be located. The locations include, open pastures, stock pens,
barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include buildings
located on the property, sheds, or storage buildings.  All equines will be assessed by a Veterinarian for any and
all compromising health conditions to include physical injuries. Based on veterinary recommendations equines
will be seized and impounded, to include equines dead or alive above or below ground.  Femur bones will be
separated from deceased animals and collected for marrow test. Based on my training and experience the
number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable
or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this
neglect often resulting in starvation, illness and death.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them
until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State;
and that you further file a report with this Court inventorying the goods and things which were seized or
reporting that nothing was so found and seized.

Done this ___20th___ day of __February_____ 2019__.
                                        /BY THE COURT
                                        Stephen A. Grooms
                                        District Judge

COURT SEAL
PARK COUNTY COMBINED COURTS
STATE OF COLORADO

Exhibit C - Page 2

STATE OF COLORADO )
                        )
COUNTY OF PARK      )

In support of the issuance of a SEARCH WARRANT to search:

FILED IN COMBINED COURT
19 PS15
FEB 2 1 2019
PARK COUNTY, COLORADO

AFFIDAVIT FOR
A SEARCH
WARRANT

The property and schedule numbers located off of Park County Road 53, Hartsel, Colorado identified as schedule number 21052 including 320 acres of vacant land with the legal description of T13 R75 S04 SW4 SW4 4-13-75 SE4 5-13- 75. As well as schedule number 4512 including 2,952.28 acres of agricultural and with the legal description of T12 R75 S28 NE4 S2, NE4, E2NW4 28-12-75 S2 30-12-75 ALL 31-12-75 ALL 32-12-75 ALL 33-12-75 S2S2 34-12-75. As well as schedule number 4513 including 1,313.97 acres of agricultural land with the legal description of T13 R75 S05 NW4 SW4, S2NW4, NE4NW4 5-13-75; S2NE4, SE4 6-13-75; N2NE4, S2SE4 7-13-75; S2N2, S2 8-13-75; W2W2 17-13-75. All property is owned and maintained by Hartsel Springs Ranch of CO INC.

I, Leigh Cochran, am a Deputy Sheriff for the Park County Sheriff's Office, and have been employed with this office since April, 2014; I have been an Animal Control Officer for over 4 years, and have over 40 hours in Animal Cruelty training. I, Leigh Cochran, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 15, 2019, Agent Bobbi Priestly with Colorado Humane Society and I were responding to some thin horses on Highway 9. I had contacted Agent Priestly for assistance with the thin horses. The horses were continuing to decline and I could not locate two of the horses from the first State Notice of Warning issued on January 29, 2019. I made contact with the owner/caretaker of the horses identified as:

### SU/ Walker, Mark

I spoke briefly with an acquaintance of Walkers who wants to remain anonymous. The acquaintance stated Walker had more horses off Park County Road 53. The acquaintance stated the condition of the horses located at Park County Road 53 was unknown. He stated the horses belong to Walker and they may be pregnant females. He stated that the best of his knowledge no feed or water has been provided to any of the horses during the harsh winter conditions. The acquaintance identified the property owner as:

### SU/Wolthuis, Frank

Walker has given inconsistence statements on the number of horses he owns. The winter conditions for the months of January and February have been harsh. Mark Walker previously ran the Magnus Ranch in Jefferson, Colorado for approximately 10 years and has been at the Badger Basin Ranch for approximately 10 years. The property off Park County Road 53 is called Hartsel Springs Ranch of Colorado Inc. Walker also owns horses located at the Badger Basin Ranch. Based on my training and experience supplement feeding for horses during periods of cold weather and deep snow is paramount to survival. The unknown number of horses off Park County Road 53 must be assessed for poor body conditions. Any horses that are found to be in poor condition will continue to decline if left in Walkers care.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:

Page: 64    Date Filed: 06/17/2021    Document: 010110536823    Appellate Case: 21-1119

Exhibit C - Page 2061

All areas an animal of any size could reasonably be located. The locations include, open pastures, stock pens, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include buildings located on the property, sheds, or storage buildings. All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground. Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death.

The property to be searched for, and seized if found, is:
- ( )  Stolen or embezzled OR
- (X )  Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
- ( X )  Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_Rick Cochran_
AFFIANT

Subscribed and sworn to before me this _20th_ day of _February_ , 2019___.

_____
JUDGE

PARK COUNTY COMBINED COURTS
COURT SEAL
STATE OF COLORADO

Date Filed: 06/17/2021   Page: 65

Document: 010110536823

Appellate Case: 21-1119

Exhibit C - Page 3062

# EXHIBIT D

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

FILED IN COMBINED COURT
19PS16
FEB 2 1 2019
PARK COUNTY, COLORADO

SEARCH WARRANT

THE PEOPLE OF THE STATE OF COLORADO

TO: THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO, GREETINGS:

WHEREAS, Deputy Leigh Cochran, has made an affidavit and complaint for the issuance of a search warrant.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( ) Stolen or Embezzled OR
(X) Designed or intended for use or which is or has been used as a means of committing a criminal offense or the possession of which is illegal, OR
(X) Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

The physical address of, 881 Salt Ranch Trail Hartsel, Colorado County of Park identified as schedule number 41709. Described as 35 acres with the legal description of; T11 R76 S32 SW4 THOUSAND PEAKS RANCH AMEND Lot 169.Primary Owner listed as Durbin, Harry E. Revocable Trust.

And you will search for:

All areas an animal of any size could reasonably be located. The locations include, open pastures, stock pens, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include, stock trailers sheds, or storage buildings. All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground. Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death. Samples of all feed/hay to be collected from all potential feed sources for testing to determine nutritional value.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State; and that you further file a report with this Court inventorying the goods and things which were seized or reporting that nothing was so found and seized.

Done this 20th day of February 2019

BY THE COURT

COURT SEAL
PARK COUNTY COMBINED COURTS STATE OF COLORADO

JUDGE Stephen A. Groome

(Left margin, vertical text) Page: 67 Date Filed: 06/17/2021 Document: 010110536823 Appellate Case: 21-1119

STATE OF COLORADO )
                                )
COUNTY OF PARK      )

FILED IN COMBINED COURT
19PS14
FEB 2 1 2019
PARK COUNTY, COLORADO

AFFIDAVIT FOR
A SEARCH
WARRANT

In support of the issuance of a SEARCH WARRANT to search:

The physical address of, 881 Salt Ranch Trail Hartsel, Colorado County of Park identified as schedule number 41709. Described as 35 acres with the legal description of; T11 R76 S32 SW4 THOUSAND PEAKS RANCH AMEND Lot 169.Primary Owner listed as Durbin, Harry E. Revocable Trust.

I, Leigh Cochran am a deputy sheriff for the Park County Sheriff's Office, and have been employed with this office since April 2014. I have been an Animal Control Officer for over 4 years, and have over 40 hours in Animal Cruelty training. I, Leigh Cochran, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 19, 2019, while conducting an investigation regarding thin horses on Highway 9 and Park County Road 53 I received a third report for thin horses. The information was provided by an anonymous acquaintance of the owner/caretaker identified as:

### SU/ Walker, Mark

The acquaintance stated Walker had yearling horses located in the Thousand Peaks Ranch area. He stated he did not know if the horses were checked or fed. The address was unkown by the acquaintance but the directions given led to the horses. Located in the pen were approximately eight small horses and one burro. Some of the horses appeared thin from a visual inspection. The horses had water and grass hay. The quality of the feed is unknown but it had a yellow appearance. The small horses had no shelter and little to no cover to block the wind.

The winter conditions for the months of January and February have been harsh. Mark Walker previously ran the Magnus Ranch in Jefferson, Colorado for approximately 10 years and has been at the Badger Basin Ranch for approximately 10 years. Supplement feeding for horses during periods of cold weather and deep snow is paramount to survival. The horses visually appear very young. Based on my training and experience the horses will remain in jeopardy if left in Walkers care.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:

All areas an animal of any size could reasonably be located. The locations include, open pastures, stock pens, barns, and corrals or any enclosed space inside, or outside equines could be kept. Areas to include, stock trailers sheds, or storage buildings. All equines will be assessed by a Veterinarian for any and all compromising health conditions to include physical injuries. Based on veterinary recommendations equines will be seized and impounded, to include equines dead or alive above or below ground. Femur bones will be separated from deceased animals and collected for marrow test. Based on my training and experience the number of equines in poor condition support CRS 18-9-202 Cruelty to Animals. The owner/care taker is unable or unwilling to provide even minimal standards of nutrition, sanitation, shelter and veterinary care, with this neglect often resulting in starvation, illness and death. Samples of all feed/hay to be collected from all potential feed sources for testing to determine nutritional value.

Page: 68     Date Filed: 06/17/2021     Document: 01011053682     Appellate Case: 21-1119

The property to be searched for, and seized if found, is:
( )    Stolen or embezzled OR
( X )   Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
( X )   Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_Leigh Cochran_
AFFIANT

Subscribed and sworn to before me this _20th_ day of _February_ ,2019__.

_____
JUDGE / Stephen A. Groome

COURT SEAL
PARK COUNTY COMBINED COURTS
STATE OF COLORADO

Appellate Case: 21-1119     Document: 010110536823     Date Filed: 06/17/2021     Page: 69

Appellate Case: 21-1119   Document: 010110536823   Date Filed: 06/17/2021   Page: 70

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-CV-00364-PAB-NYW

MARK WALKER**,**

Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY

Defendants.

_____

## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
_____

Defendants, Park County Sheriff's Office ("the Sheriff" or "the Sheriff's Office") and Deputy Leigh Cochran ("Deputy Cochrane") (collectively "these Defendants"), by and through their attorneys Fowler, Schimberg, Flanagan & McLetchie, P.C., hereby submit their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), and in support thereof, Defendants state as follows:

### Certification Pursuant to D.C.COLO.LCivR 7.1

In accordance with D.C.COLO.LCivR 7.1(b), undersigned counsel has conferred with Plaintiff, who opposes the relief requested in this Motion.

## I.      INTRODUCTION

The issue presented by this Motion is whether these Defendants should be civilly liable just because Plaintiff was acquitted.   The core issue in this case is whether Defendants had probable cause to believe Plaintiff was guilty of animal cruelty.   Plaintiff's Amended Complaint is devoid of factual allegations above the speculative level concerning this dispositive issue. Instead, Plaintiff's Amended Complaint is premised upon the erroneous assumption that acquittal by a jury is tantamount to innocence and therefore there must not have been probable cause to charge Plaintiff.    Such is not the case and such a holding would result in law enforcement potentially being held liable every time a criminal defendant is acquitted.

On January 28, 2019, a concerned citizen reported observations of emaciated horses that were struggling to survive on the Badger Basin Ranch to the Park County Sheriff's Office. This report prompted an investigation that revealed Plaintiff starved horses in his care and several of them died, which led to the seizure of horses that were under the control of Plaintiff. As a result of the investigation, a warrant was issued by a neutral and detached magistrate Plaintiff was ultimately charged by the District Attorney with eight counts of animal cruelty under C.R.S. § 18-9-202, but Plaintiff was acquitted. Plaintiff now brings two claims against these Defendants for (1) Fourth Amendment "and/or" Fourteenth Amendment violations resulting from the seizure of horses and (2) malicious prosecution.[1] Plaintiff's Amended Complaint does not allege a plausible

---

[1] Plaintiff's Fourteenth Amendment due process claim is derivative of an alleged Fourth Amendment violation based upon lack of probable cause. The Fourth Amendment, not the Fourteenth Amendment, governs pretrial deprivations of liberty. *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996) (citing *Albright v. Oliver*, 510 U.S. 266, 270-71 (1994) (plurality opinion concluding that a claim alleging that a criminal prosecution lacked probable cause must be judged under the Fourth Amendment, and not substantive due process of the Fourteenth Amendment)). Defendants will therefore demonstrate no Fourth Amendment violation occurred

claim for relief against Deputy Cochran and the Sheriff. Because Plaintiff's Amended Complaint

fails to set forth any facts upon which he can show Deputy Cochran committed a constitutional

violation, Plaintiff fails to overcome Defendants' qualified immunity. Plaintiff also fails to plead

that there was no probable cause, an essential element for § 1983 actions fourth amendment

violations, including claims of malicious prosecution. Plaintiffs further fail to allege the elements

for municipal liability. Therefore, Plaintiff's claims should be dismissed pursuant to Fed. R. Civ.

P. 12(b)(6). Finally, these claims are subject to issue preclusion because probable cause was

litigated in *People v. Walker*, Park County Court Case No. 2019M000043.

## II.     STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels

and conclusions" are not sufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555). Nor can a complaint

withstand a motion to dismiss if it merely "tenders 'naked assertions' devoid of 'further factual

enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In reviewing a motion to dismiss under

Fed. R. Civ. P. 12(b)(6), "the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Id.*

---

and that Plaintiff has failed to allege a Fourth Amendment claim.

## III.     ARGUMENT

### A. Plaintiff's Amended Complaint Fails to Allege Facts to Overcome Qualified Immunity Or State A Claim Above The Speculative Level.

Under qualified immunity, Deputy Cochran and the Sheriff are protected "from liability for civil damages insofar as [Deputy Cochran's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. The City of Colo. Springs*, 709 Fed. Appx. 906, 913 (10th Cir. 2017) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome Deputy Cochran's qualified immunity, Plaintiff must demonstrate that Deputy Cochran violated one of Plaintiff's "clearly established" constitutional rights. *Id.*; *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

Here, the relevant issues for establishing whether a constitutional violation occurred are (1) whether the criminal prosecution violated Plaintiff's right to be free from unreasonable seizures and malicious prosecution and (2) whose actions caused the criminal prosecution to move forward. Plaintiff's Amended Complaint fails to allege constitutional violations. Thus, Plaintiff's Amended Complaint fails on two fronts: (1) it fails to allege facts to overcome qualified immunity and (2) it fails to state a claim above the speculative level.

### 1.   There Was No Unreasonable Search Or Seizure.

The general rule is that Fourth Amendment seizures are "reasonable" only if based on probable cause to believe that the individual has committed a crime." *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017) (citation omitted). Accordingly, the relevant issue for Plaintiff's claims of Fourth Amendment violations, including malicious prosecution, is whether there was probable

cause for the warrants to seize Plaintiff's horses.[2] The law in the Tenth Circuit adheres to the well settled principle that a law enforcement officer's reliance on a valid warrant entitles the officer to qualified immunity on a Fourth Amendment claim. *See generally*, *Davis v. Gracey*, 111 F.3d 1472 (10th Cir. 1997). As set forth below, qualified immunity bars Plaintiff's claims for constitutional violations and malicious prosecution, due to the inability to prove a lack of probable cause.

Evidence seized in reasonable, good-faith reliance on a search warrant, even if the warrant was subsequently found to be defective, passes muster under the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 900 (1984). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344-45. There are four circumstances in which an officer's shield of immunity will be lost: (1) where the magistrate was misled by knowingly or recklessly false information; (2) where the magistrate wholly abandoned his or her judicial role; (3) where the warrant is so facially deficient that the executing officers cannot reasonably determine the particular place to be searched; and (4) where the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Loera*, 59 F. Supp. 3d 1089, 1141 (D.N.M. 2014); *See People v. Pacheco*, 175 P.3d 91, 96 (Colo. 2006). Thus, to state a claim under § 1983 for prosecution without probable cause, a complaint must allege something in the process of obtaining the warrant was improper. *Poolaw v. Marcantel*, 565 F.3d 721, 729 (10th Cir. 2009)(We assess the validity of the

---

[2] *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (Holding "[W]hat has been inartfully termed… 'malicious prosecution'… is simply a claim founded on a Fourth Amendment seizure that incorporates the elements of….the common law tort of malicious prosecution…[requiring seizure]…pursuant to legal process that was not supported by probable cause...").

Apdx 071

warrant on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing judge); *Vaughn v. Byrd*, No. CIV-14-0262-HE, 2016 U.S. Dist. LEXIS 6433, at *13 n.13 (W.D. Okla. Jan. 20, 2016) *citing Manganiello v. City of New York*, 612 F.3d 149, 162 (2nd Cir. 2010) ("A presumption of probable cause…'may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"); *see also Rathbun v. Montoya*, 628 Fed. Appx. 988, 993 (10th Cir. 2015) (reversing denial of qualified immunity to officers who searched based upon a warrant issued by a detached and neutral magistrate judge and commenting, "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law") (citation omitted).

To sufficiently allege that the court that granted the warrant was misled, or that the warrant approving the seizure of Plaintiff's horses lacked an "indicia of probable cause," Plaintiff must allege that the contents of the affidavit were based on fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. *See Byrd*, 2016 U.S. Dist. LEXIS 6433, at *13 n.13. However, the only allegations in the Amended Complaint regarding the affidavit's contents concern what Officer Cochran should have known with respect to future events. *See* Am. Compl. ¶ 21. Therefore, there are no allegations above the speculative level concerning a lack of probable cause, and Plaintiff therefore fails to state a claim upon which relief can be granted.

### 2. Plaintiff Fails To Allege Deputy Cochran's Actions Caused A Fourth Amendment Violation.

The first prong of the qualified immunity test also cannot be satisfied because qualified immunity considers who the alleged actor was, *i.e.*, did the individual defendant personally participate in and cause the alleged harm. Here, it was Park County District Attorney's decision to prosecute. The principal player in carrying out a prosecution is not a police officer, but the

prosecutor. *See Taylor v. Meacham,* 82 F.3d 1556, 1563 n.8 (10th Cir. 1996) (quoting *Albright v. Oliver,* 510 U.S. at 279 n.5, Ginsburg, J. concurring)). Accordingly, an officer does not proximately cause a Fourth Amendment violation because the independent decisions of the prosecutor in bringing the charge and the court in issuing a warrant constitute superseding causes that break the chain of causation. *See e.g. Calvert v. Ediger,* 415 Fed. Appx. 80, 84-85 *3 (citing *Taylor,* 82 F.3d at 1562).

Officers are not shielded from liability if there is a causal connection demonstrating that the prosecutor and the court's actions were not truly independent causes. *See Pierce v. Gilchrist,* 359 F.3d 1279, 1292-93 (10th Cir. 1994); *see also United States v. United States Dist. Court,* 407 U.S. 297, 317, (1972) (Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights); *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir. 1995)(Courts consider whose actions caused the alleged constitutional violation in evaluating qualified immunity). Under *Gilchrist,* officers can be liable for Fourth Amendment violations if they conceal or misrepresent material facts to the prosecutor whose judgment is influenced by the statements. *See Calvert, supra.* (discussing *Gilchrist*). If a plaintiff can demonstrate that the prosecutor's decision to prosecute was influenced by the omissions, then the plaintiff can state a cause of action under § 1983 for fourth amendment violations. *Id.* Here, the Amended Complaint contains no allegations that either the affidavit or anything these Defendants told the prosecutor about the case was inaccurate, misleading, or contained material omissions. The failure to include such allegations is fatal.

Plaintiff also alleges he was subjected to prosecution without probable cause due to a "conspiracy" between Deputy Cochran and Defendant Priestly, without alleging how the

coordination between Deputy Cochran and Defendant rose to the level of an unconstitutional conspiracy. Furthermore, Plaintiff's Amended Complaint alleges only Defendant Priestly made the decision to execute the seizure warrants. Accordingly, the allegations lack a connection between Officer Cochran's individual actions and Plaintiff's alleged constitutional deprivation. As such, Plaintiff's allegations are merely a threadbare recital that a Fourth Amendment violation occurred. *Ashcroft*, 556 U.S. at 678 ("Mere labels…are not sufficient."). Therefore, the threadbare label of conspiracy is insufficient to associate Officer Cochran with any liability connected with Defendant Priestly's decision: Deputy Cochran's individual actions did not cause the seizure warrants to be executed.

Similarly, Plaintiff makes the conclusory allegation that "There was no probable cause to support the original prosecution or, in the alternative, probable cause existed regarding only the care of the 12 horses referenced in ¶ 27 above." Am. Compl. ¶ 46. This allegation of "no probable cause" is conclusory because Plaintiff fails to allege what Deputy Cochran knew, should have known or disregarded in determining that probable cause existed.

Finally, with respect to malicious prosecution, Plaintiff's only allegation concerning malice is that Deputy Cochran acted with "malice" because she knew Plaintiff was "doing his best under adverse conditions." Under *Ashcroft*, this is a conclusory allegation that cannot survive a motion to dismiss without "further factual enhancement" concerning Deputy Cochran's knowledge.

Accordingly, Plaintiff fails to meet the first prong of the *Albright* test for his claims of prosecution without probable cause against Deputy Cochran and SHERIFF because the alleged violations of Plaintiff's constitutional rights were not caused by Deputy Cochran's actions: The Court issued the warrants to seize Plaintiff's horses, Defendant Priestly decided to execute the

warrants and Park County District Attorney elected to prosecute Plaintiff. Therefore, pursuant to Fed. R. Civ. P. 12(b)(6), this Court should dismiss Plaintiff's claims against Deputy Cochran and the Sheriff.

### B.  Plaintiff Fails to Allege A Plausible  Claim Based Upon "Official Capacity."

Plaintiff's allegations of official capacity claims for Fourth and Fourteenth Amendment violations and malicious prosecution against the Sheriff fail to create a plausible basis for relief. The facts surrounding this claim are substantially similar to those presented in *Hatley* v. *Hardey*, U.S. District Court of Colorado Case No. 1 3-cv-02469-RM-MJW which also brought claims of malicious prosecution and Fourth Amendment violations against the Park County Sheriff's Office. Moreover, the arguments presented herein are parallel to arguments that were found persuasive in defeating the official capacity claims in that matter. Therefore, Defendants request this Court to take judicial notice of the Hon. Raymond P. Moore's Order, dated November 18, 2015, regarding Sheriff Wegener's Motion for Summary Judgment.) *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment). *See* **Exhibit A, Order Re: Motion for Summary Judgment.**

Here, Plaintiff's Amended Complaint fails to allege any evidence that would imply the Sheriff's Office had direct involvement in applying for the warrant to have Plaintiff's horses seized or in deciding to prosecute Plaintiff. Although, Plaintiff alleges that there is an "official custom or policy of the Sheriff's office" authorizing seizure warrants for emaciated horses. *see* Am. Compl. ¶ 4., However, this is a mere threadbare recital of one of the elements to establish municipal liability that is insufficient under *Ashcroft* to survive a motion to dismiss. Therefore, even when

Apdx 075

assuming everything in the Amended Complaint is true, the facts would not be sufficient to impose municipal liability under the relevant legal standards. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 477-84 (1986).

To establish municipal liability, a plaintiff must show: (1) the existence of a municipal policy or custom; and (2) a direct causal link between the policy or custom and the constitutional injury alleged; and (3) the municipal entity acted with the "state of mind" required to prove the underlying alleged violation. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

The existence of a policy or custom can be established by more than one means, including demonstrating the existence of

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotation marks omitted). Here, Plaintiff's Amended Complaint contains no factual allegations above the speculative level regarding any of these five ways of demonstrating a policy or custom. The absence of such allegations is fatal.

Additionally, Plaintiff fails to allege that the Sheriff personally made decisions regarding Plaintiff's horses. Nor does Plaintiff allege that the Sheriff had specific knowledge of the fact that

a warrant was issued to seize Plaintiff's horses or that Officer Cochran was inadequately trained.

Instead, Plaintiff merely states:

> The Sheriff's office is liable for this seizure because the seizure was done pursuant to the official custom or policy of the Sheriff's office. The Sheriff left this official action to the sole decision of Ms. Priestley or Deputy Cochran or both. [Defendant Dumb Friends League Harmony Equine Center ("Harmony')] is liable for the seizure because it conspired through Ms. Priestley to unreasonably seize the horses, as it did before with Ms. Gingrich's horses. *See* Amended Complaint, ¶ 42.

This conclusory allegation that the Sheriff "left [an] official action to the sole decision of Ms. Priestley or Deputy Cochran or both" does nothing to show that the seizure of Plaintiff's horses was an unconstitutional act or that it was performed pursuant to a decision by the Sheriff. *See Jenkins*, 81 F.3d at 994. The conclusory allegation further fails to include any factual allegations regarding a causal link between an alleged policy or custom of the Sheriff's Office and Deputy Cochran's actions in drafting the affidavit. Moreover, it also fails allege that the Sherriff's Office acted with a culpable "state of mind" to intentionally deprive plaintiff of his constitutional right to be free of prosecution without probable cause or that the action of drafting an affidavit based on observations in support of a warrant itself violates federal law. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. at 405.

However, Plaintiff does allege:

> In 2018, Harmony and Ms. Priestley had orchestrated a similar seizure of horses from Penny Gingrich. Upon information and belief, an agent from Harmony came to Ms. Gingrich's ranch in the summer of 2018 to determine which horses Harmony would seize that following winter. In that following winter, Harmony unreasonably seized 65 horses from Ms. Gingrich. Ms. Gingrich was charged with 65 counts of cruelty and was found not guilty on all counts. *See* Amended Complaint, ¶ 36.

This allegation fails to include how the Gingrich seizure was like seizure in this matter. In fact, the above allegation mentions a protracted timeline extending from notice given during the

summer months through the seizure that occurred later in winter. Furthermore, the circumstances of the Gingrich seizure are distinguishable from the seizure of Plaintiff's horses because the above allegation concerns only Defendant Harmony's actions and does not mention any actions by Deputy Cochran or the Sheriff. As such, this allegation is insufficient to allege a widespread practice or custom on which liability of the Sheriff's Office may be based. Lastly, even if the Gingrich seizure were similar to the seizure alleged here, a single instance of a similar event is not enough to allege a custom, policy or pattern, because any two points can be connected to make a straight line.

Additionally, this is not a case where municipal liability could attach to an action through "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval…" *Bryson*, 627 F.3d at 788. Plaintiff has not alleged that the Sheriff became aware that a warrant was issued to seize Plaintiff's horses, including the reasons for seeking that warrant, and ratified or otherwise gave approval Deputy Cochran's actions.

Deputy Cochran's individual actions con only lead to imposing municipal liability on the Sheriff's Office, her individual actions can only lead to municipal liability where those acts are taken by one with "final policymaking authority" or ratification by one with such authority. *Bryson*, 627 F.3d at 788 (emphasis added). Thus, in order for liability to attach to the Sheriff's Office solely based on the actions of Deputy Cochran, Plaintiff would first need to allege that Deputy Cochran was a final policymaker for the Sheriff. *See Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) Here, Plaintiff has alleged no facts that places Deputy Cochran in a position of such authority, as she was a subordinate officer. Because Deputy Cochran is not a final

Apdx 078

policymaker for the Sheriff, official capacity liability for the municipality may not attach based solely upon Deputy Cochran's actions.

Based on the forgoing, Plaintiff fails to allege a plausible claim for relief against the Park County Sheriff's Office based on "official capacity," and therefore this Court should dismiss the same.

### C.  Plaintiff's Claims Are Barred by Issue Preclusion.

Issue preclusion prevents the re-litigation of issues "if: (1) the issue is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding." *Stanton v. Schultz*, 222 P.3d 303, 307 (Colo. 2010) (citing *Rantz v. Kaufman,* 109 P.3d 132, 139 (Colo. 2005)); *See Willner v. Budig,* 848 F.2d 1032, 1034 (10th Cir. 1988). Here, the elements of issue preclusion are met, and this can be verified through the court record in *People v. Walker. See McNally v. Colo. State Patrol*, 122 F. App'x 899, 903 (10th Cir. 2004).

The relevant issue for Plaintiff's claims of prosecution without probable cause against Deputy Cochran is whether there was a reasonable basis for probable cause permitting Deputy Cochran to draft her affidavit in support of the warrants to seize Plaintiff's property. *McNally,* 122 F. App'x at 903 (holding Plaintiff would have to demonstrate defendants lacked probable cause to arrest and prosecute to prove malicious prosecution). This issue was litigated in *People v. Walker* during the July 23, 2019 Motions Hearing and the December 4-6, 2019 criminal trial in *People v. Walker*. Defendants respectfully request that this Court take judicial notice of these proceedings.

In *People v. Walker,* Plaintiff presented the probable cause issue in a Motion to Suppress Physical Evidence and Observations resulting from the search warrants the Sheriff executed while investigating Plaintiff. *See* **Exhibit B, Motion to Suppress Physical Evidence and Observations**. At the July 23, 2019 Motions Hearing, the Court issued a minute order denying the Motion to Suppress. NEED CITE.   This is consistent with the Court allowing testimony at trial concerning the evidence and observations through the search warrant. *See* **Exhibit C, *People v. Walker*, Park County Court Case No. 2019M000043, Div. A, Jury Trial Day One - Partial Transcript – Testimony Only, December 4, 2019.** Considering the prosecution presented evidence resulting from the seizure warrant, such evidence must not have been subject to the exclusionary rule. This means the Court necessarily found the affidavit was supported by probable cause and there was no Fourth Amendment violation. *Ford v. United States*, 273 U.S. 593, 47 S. Ct. 531, 71 L. Ed. 793, Treas. Dec. 42121 (1927) (Validity of seizure is question for court and not jury). If there was no probable cause, or a lack of a good-faith basis for probable cause, that evidence would have been excluded. *Leon*, 468 U.S. at 900 (The exclusionary rule should be modified to allow the admission of evidence seized in reasonable, good-faith reliance on a search warrant, even if the warrant was subsequently found to be defective). Accordingly, the probable cause issue has been litigated through Plaintiff's Motion to Suppress and at the Motions Hearing and was adjudicated evidenced by the Court's minute order denying the Motion to Suppress.

In *McNally v. Colo. State Patrol*, the court held Plaintiff's malicious prosecution claim was "barred by issue preclusion because Plaintiff had litigated and lost the issue of probable cause at his criminal trial." 122 F. App'x 899, 903 (10th Cir. 2004). As set forth above, these facts are present in the instant matter. Therefore, under *McNally*, the previous litigation of probable cause

now bars Plaintiff's claims of prosecution without probable cause. Accordingly, under *Stanton* the first element of issue preclusion is met: Nothing new can be considered in this instant case because the validity of Deputy Cochran's observations contained in the affidavit was necessarily litigated in *People v. Walker*, with that Court finding a probable cause basis for the warrant.

The remaining three elements of issue preclusion are also present: (1) Plaintiff was a party in his criminal case and therefore Plaintiff was a party to the prior proceeding; (2) there was a verdict that has not been appealed, therefore there was a final judgment under C.R.C.P. 54; and (3) Plaintiff was found not guilty and therefore Plaintiff had a full and fair opportunity to litigate the issues in the prior proceeding, because he won at trial. Accordingly, Plaintiff is barred by issue preclusion from bringing claims based on the legal issue of probable cause. Therefore, this Court should dismiss the claims against Deputy Cochran and the Sheriff pursuant to Fed. R. Civ. P. 12(b)(6) because they are barred by issue preclusion.

## IV.   CONCLUSION

Plaintiff has failed to state a claim on which relief can be granted. The allegations in Plaintiff's Amended Complaint are insufficient to allege that the prosecution of Plaintiff for animal cruelty resulted in a violation of Plaintiff's constitutional rights. Further, the facts alleged do not reveal any indication a constitutional violation occurred by way of Deputy Cochran or the Sheriff's actions.  Thus, Plaintiff fails to plead facts to overcome Deputy Cochran's qualified immunity. Additionally, Plaintiff fails to allege facts to state a plausible claim for relief against the Sheriff in its official capacity. Therefore, Defendant Deputy Cochran Leigh Cochran and Defendant Park County Sheriff's Office respectfully requests that the Court dismiss all of Plaintiff's claims against them pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted this 9th day of June, 2020.

*/s/ Andrew R. McLetchie*

Andrew R. McLetchie
Eden R. Rolland
Matthew K. Sidran
FOWLER, SCHIMBERG,
FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
Telephone: 303-298-8603
Fax: 303-298-8748
a_mcletchie@fsf-law.com
e_rolland@fsf-law.com
m_sidran@fsf-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June, 2020, I caused a true and correct copy of the foregoing **MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Robert M. Liechty
ROBERT M. LIECHTY PC
1800 Gaylord St.
Denver, CO 80206
303-861-5300
rliechty@crossliechty.com
*Attorneys for Plaintiff*

Cynthia Lowery-Graber
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
cynthia.lowery-graber@bclplaw.com
*Attorneys for Colorado Humane Society*
*and Bobbi Priestley*

*/s/ Eden R. Rolland*
Eden R. Rolland

Apdx 083

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

      Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER, and
ASHLEIGH OLDS,

      Defendants.

---

**ORDER**

---

Plaintiffs were prosecuted under Colorado state animal cruelty statutes for the alleged maltreatment of horses under their care, a jury found them not guilty, and Plaintiffs filed the present action against the officers who were involved in the investigation resulting in their prosecution and the veterinarian enlisted to assist those officers. This Court previously issued an Order on September 29, 2015 (ECF No. 110, the "Previous Order") granting summary judgment and dismissing many of Plaintiffs' claims, but leaving intact Plaintiffs' claims against Sheriff Fred Wegener in his official capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations relating to (i) the seizure of Plaintiffs' horses and (ii) malicious prosecution; one claim against Officer Cindy Hardey in her individual capacity under 42 U.S.C. § 1983 relating to the seizure of Plaintiffs' horses; and Plaintiffs' breach of contract claim. As to the remaining official

capacity claim against Sheriff Wegener, this Court granted leave for Sheriff Wegener to file a

motion for summary judgment, which was subsequently filed with the Court on October 15, 2015.

(ECF No. 115.)   This matter is presently before the Court on that motion and Plaintiffs' response

thereto.   (ECF No. 117.)   For the reasons explained below, Sheriff Wegener's motion for

summary judgment is GRANTED.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine dispute of material fact and

the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70

(10th Cir. 1994).   Whether there is a genuine dispute as to a material fact depends upon whether

the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided

that one party must prevail as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).   Once the

moving party meets its initial burden of demonstrating an absence of a genuine dispute of material

fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate

evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at

trial.   *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation

omitted).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is

"genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could

return a verdict for either party.   *Anderson*, 477 U.S. at 248.   In considering whether summary

judgment is appropriate, the facts must be considered in a light most favorable to the non-moving

party.   *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

If a movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in her complaint, but must respond with specific facts showing a genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary judgment.   *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial.   *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted).   "Conclusory and self-serving affidavits are not sufficient."   *Id*.   The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence.   Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3).   "[O]n a

3

motion for summary judgment, it is the responding party's burden to ensure that the factual dispute

is portrayed with particularity, without depending on the trial court to conduct its own search of the

record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and

citation omitted). The Court is "not obligated to comb the record in order to make [Plaintiff's]

arguments for [her]." *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall

include the specific page or statutory subsection to which reference is made." D.C. Colo. L. Civ.

R. 7.1(e).

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court previously engaged in an extensive recitation of the facts developed in this case

in its Previous Order entered on September 29, 2015 (ECF No. 111) and the Court will presume

the parties' knowledge of that Order.

Sheriff Wegener previously moved for judgment on the pleadings pursuant to Fed. R. Civ.

P. 12(c) as to claims brought against him in his official capacity. (ECF No. 63.) U.S. Magistrate

Judge Michael Watanabe entered a Report and Recommendation on January 23, 2015 (ECF No.

90) finding that Defendants' motion should be denied on the grounds that the First Amended

Complaint (ECF No. 22) alleges specific decisions and actions taken by Sheriff Wegener that,

because of his status as a policymaker, would constitute the official policy of the Park County

Sheriff's office and subject it to §1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469,

477-84 (1986); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211-12 (10th Cir.

2007); *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). In its

4

Previous Order, the Court adopted Magistrate Judge Watanabe's Report and Recommendation in full and denied the motion to dismiss the official capacity claims brought against Sheriff Wegener.

However, in denying that motion the Court noted the seeming inconsistency in its result by granting summary judgment in favor of Sheriff Wegener as to claims brought against him in his individual capacity yet declining to grant judgment on the pleadings as to his official capacity claims where "the same factual basis upon which Plaintiffs assert their claims against Sheriff Wegener in his official capacity are the same facts upon which Plaintiffs base their claims against Sheriff Wegener in his individual capacity."   (ECF No. 110 at 39.)   The Court pointed out that the inconsistency was owing to the fact that the two claims had been put before the Court for determination in differing procedural contexts – Sheriff Wegener sought dismissal of his individual capacity claims in a motion for summary judgment, yet sought dismissal of his official capacity claims in the form of a motion for judgment on the pleadings.   The Court noted in its Previous Order "the seemingly contradictory conclusion that the same set of facts could result in different outcomes as to claims brought against Sheriff Wegener in his official capacity versus claims brought against him in his individual capacity."   (*Id.*)   To resolve this inconsistency, the Court granted Sheriff Wegener leave to file the present motion.

## III.   ANALYSIS

Plaintiffs have not come forward with any evidence that would indicate that Sheriff Wegener had any direct involvement in the decision to apply for a warrant to have Plaintiffs' horses seized or to prosecute Plaintiffs maliciously.   Indeed, Plaintiffs do not even address their malicious prosecution claim or what involvement any Defendant had in the facts surrounding that

claim.   As to the seizure of the horses, Plaintiffs posit that Sheriff Wegener "delegated the duty of appeasing the concerned citizens to Defendant Gore" who in turn had the horses seized in an effort to carry out that duty.   (ECF No. 117 at 8.)   However, even if this Court were to assume these facts as true, they would not be sufficient to impose municipal liability upon the Park County Sheriff's Office under the relevant legal standards.   *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *Pembaur*, 475 U.S. 469.

"A municipality or other local government may be liable under [§1983] if the governmental body itself 'subjects' a person to a deprivation of rights or causes a person 'to be subjected' to such a deprivation."   *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692).   "[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."   *Monell*, 436 U.S. at 691.   Instead, to establish municipal liability, a plaintiff must show: (1) the existence of a municipal policy or custom; and (2) a direct causal link between the policy or custom and the constitutional injury alleged.   *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)).   The existence of a policy or custom can be established by more than one means, including demonstrating the existence of

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to

the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotation marks

omitted).

As to the third means by which municipal liability could arise, only "under appropriate

circumstances" may "a single decision by policymakers . . . be sufficient to create liability under §

1983." *Brammer-Hoelter* , 492 F.3d at 1211.   As the Tenth Circuit has explained:

> While *Monell* found liability on the basis of an official policy as the moving force
> of the constitutional violation, it fell to the [Supreme] Court in *Pembaur* to
> establish that actions taken by a municipality's final policymakers also represent
> acts of official policy giving rise to municipal liability . . . .   An act by a
> municipality's final policymaking authority is no less an act of the institution than
> the act of a subordinate employee conforming to a preexisting policy or custom.
> As the Court in *Pembaur* explained '[n]o one has ever doubted, for instance, that a
> municipality may be liable [section] 1983 for a single decision by its properly
> constituted legislative body—whether or not that body had taken similar action in
> the past or intended to do so in the future—because even a single decision by such a
> body unquestionably constitutes an act of official government policy.'

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) (quoting

*Pembaur*, 475 U.S. at 480) (further internal citations and quotation marks omitted); *see also*

*Thomas v. City of Snyder, Okl.*, No. 95-6252, 103 F.3d 145 (Table), 1996 WL 662453, at *4 (10th

Cir. 1996) ("[W]hen a municipal official who is 'responsible for establishing final policy with

respect to the subject matter in question' makes 'a deliberate choice to follow a course of action . .

. from among various alternatives,' municipal liability will attach to that decision.") (quoting

*Pembaur*, 475 U.S. at 483-84); *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("In the case

where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff

must show the particular illegal course of action was taken pursuant to a decision made by a person

with authority to make policy decisions on behalf of the entity being sued.").

Here, even assuming that Sherriff Wegener did have authority sufficient to cause him to be considered a final policymaker for the Park County Sheriff's Office, Plaintiffs claim that Sheriff Wegener delegated the responsibilities of making decisions regarding Plaintiffs' horses is not sufficient to establish liability for the municipality.   Significantly, Plaintiffs do not argue or submit any evidence showing that Sheriff Wegener had specific knowledge of the fact that a warrant was issued to seize Plaintiffs' horses following their placement into protective custody. Instead, Plaintiffs merely state that Sheriff "Wegener delegated the duty of appeasing the concerned citizens to Defendant Gore" who, as alleged by Plaintiffs, had the horses seized in furtherance of that delegated responsibility.   However, the mere conclusory allegation that Sheriff Wegener delegated responsibility to one of his subordinates does nothing to prove that the seizure of Plaintiffs' horses was an act "taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Jenkins*, 81 F.3d at 994.   Indeed, it would tend to prove the contrary, as Sheriff Wegener clearly would not have made a decision to have Plaintiffs' horses seized if he had delegated that decision to his subordinates.

Likewise, this is not a case where municipal liability could attach to an action through "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval . . . ." *Bryson*, 627 F.3d at 788.   Plaintiffs have not presented any evidence, nor has this Court found upon its own review of the record, showing that Sheriff Wegener became aware that a warrant was issued to seize Plaintiffs' horses, including the reasons for seeking that warrant, and ratified or

otherwise gave his approval for the actions of Officers Gore, Hardey or Priestly.

Plaintiffs further appear to argue that the actions and decisions of Officer Gore and Officer Priestly are sufficient to create municipal liability.   (ECF No. 117 at 9.)   However, individual actions can only lead to municipal liability where those acts are taken by one with "*final policymaking authority*" or ratification by one with such authority.   *Bryson*, 627 F.3d at 788 (emphasis added).   Thus, in order to attach liability to the Park County Sheriff's Office solely based on the actions of Officers Gore or Priestly, this Court would first need to determine that they were final policymakers for that entity.

The decision as to whether an official has "final policymaking authority" is a question of state law.   *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).   The Tenth Circuit has identified three factors to consider when deciding whether someone has final policymaking authority: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final – *i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."   *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (internal quotation marks omitted).   "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."   *Pembaur*, 475 U.S. at 481-83 (citation omitted).   "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable."   *Id.*

Here, Plaintiffs have presented no evidence establishing that either Officers Gore or

9

Priestly were in a position of such authority, nor does this Court's review of the record reveal that either Defendant would have such authority, as both Defendants were merely the subordinates of Sheriff Wegener. Because neither Officer Gore nor Priestly are final policymakers for the Park County Sheriff's Office, liability for the municipality may not attach based solely upon their actions.

## IV.     CONCLUSION

Based on the foregoing, it is ORDERED that Defendant Sheriff Wegener's Motion for Summary Judgment Regarding the Remaining Official Capacity Claims Pursuant to the Court's September 29, 2015 Order (ECF No. 115) is GRANTED. The only claims remaining before the Court in this matter are one claim against Officer Hardey in her individual capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations relating to the seizure of certain of Plaintiffs' horses and Plaintiffs' breach of contract claim.

DATED this 18th day of November, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

10

<table>
<tr>
<td>

**PARK COUNTY COURT, STATE OF COLORADO**
Park Combined Court
300 Fourth St.
P.O. Box 190
Fairplay, CO 80440
719-836-2940

</td>
<td>

DATE FILED: June 26, 2019 2:24 PM
FILING ID: 44544E4678042
CASE NUMBER: 2019M43

</td>
</tr>
<tr>
<td>

Plaintiff: PEOPLE OF THE STATE OF COLORADO


Defendant:  MARK W WALKER

</td>
<td>

**▲ COURT USE ONLY ▲**

</td>
</tr>
<tr>
<td>

**Attorney for Defendant:**
**Name:**      Benjamin C. Whitney, Reg. #38080
                    Arthur H. Bosworth, #1837
**Address:**   DILL DILL CARR STONBRAKER &
                    HUTCHINGS, PC
                    455 Sherman Street, Suite 300
                    Denver, Colorado 80203
**Phone No.:** 303-777-3737
**Fax No.:**   303-777-3823
**E-mail:**    bwhitney@dillanddill.com
                    abosworth@dillanddill.com

</td>
<td>

Case No.:   19M43

Division:  A

</td>
</tr>
<tr>
<td colspan="2">

**MOTION TO SUPPRESS PHYSICAL EVIDENCE AND OBSERVATIONS**

</td>
</tr>
</table>

COMES NOW, Defendant Mark Walker, by his attorney Benjamin C. Whitney of the law firm DILL DILL CARR STONBRAKER & HUTCHINGS, P.C., and moves this Court suppress any and all physical evidence seized pursuant to the search warrants described below and any visual observations made by law enforcements, during the execution of said search warrants, and in support states the following:

1.     The Park County Sheriff's Office ("PCSO") began investigating Mr. Walker on or about January 28, 2019 in response to a citizen report about some "skinny" horses.

2.     During the course of the PCSO investigation, Deputy Leigh Cochran prepared several search warrants.  Each was subsequently signed and

1

filed with the court, and will be referred to by their court filing number and attached as exhibits to this motion.  They were:

    a.  2019PS13 – For an area of land comprising approximately 2800 acres owned by Badger Basin Ranch, Inc. ("Badger Basin Ranch") , signed by Park County Judge Brian Green on February 20, 2019. (Exhibit A).

    b.  2019PS14 – Also for Badger Basin Ranch, signed by Park County Judge Brian Green on February 20, 2019. (Exhibit B).

    c.  2019PS15 – For an area of land comprising approximately 4600 acres owned by Hartsel Springs Ranch of CO, Inc. ("Hartsel Springs Ranch"), signed by Park County Judge Stephen Groome on February 20, 2019. (Exhibit C).

    d.  2019PS16 – For an area of land comprising approximately 35 acres owned by the Harry Durbin Revocable Trust ( the "Durbin Property"), signed by Park County Judge Stephen Groome on February 20, 2019. (Exhibit D).

    e.  2019PS18 – For Hartsel Springs Ranch, signed by Park County Judge Stephen Groome on February 27, 2019. (Exhibit E).

3.  2019PS14 appears to be a correction of 2019PS13, as they are identical except for the addition of language to 2019PS14 authorizing collection of samples of feed and hay for testing.  Upon information and belief, the search of the Badger Basin Ranch was performed under the authority of 2019PS14, and 2019PS13 is redundant.

4.  Badger Basin Ranch, Hartsel Springs Ranch and the Durbin Property are all separate properties.  Badger Basin Ranch and the Durbin Property are near to each other, while Hartsel Springs Ranch is several miles away from the other two.  Badger Basin Ranch and Hartsel Springs Ranch are very large, open properties.

5.  On February 21, 2019, PCSO along with agents from the Colorado Humane Society ("CHS") and others acting at the direction of PCSO executed 2019PS14 at Badger Basin Ranch, 2019PS15 at Hartsel Springs Ranch and 2019PS16 at the Durbin Property.

6.    Evidence was seized at each of these separate properties, pictures were taken, and observations were made.

7.    The search warrants were insufficient on their faces, and there was not probable cause for believing the existence of the grounds on which the warrant was issued.

8.    A warrant must be supported by probable cause, and particularly describe the place to be searched and the persons or things to be seized.  U.S. Const. amend. IV, *People v. Gutierrez*, 222 P.3d 925 (Colo. 2009).

9.    Although probable cause is incapable of precise definition, "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  *Gutierrez*, 222 P.3d at 937.  Probable cause requires "less than evidence which would justify condemnation or conviction… but more than mere suspicion."  *Id*.  Probable cause is determined based on review of the totality of the circumstances.  *Id*.

10.   An officer seeking the issuance of a search warrant "must present an affidavit containing facts sufficient to provide the magistrate with a substantial basis for determining the existence of probable cause."  Id. (internal citations omitted).

11.   The judge "shall make the probable cause determination only with reference to the facts contained **within the four corners of the affidavit** and the reasonable inferences that may be drawn from those facts."  *Id*. (emphasis added).

12.   A court reviewing the validity of a search warrant must determine whether the authorizing magistrate had a substantial basis for concluding that probable cause existed.  *People v. Pacheco*, 175 P.3d 91 (Colo. 2006).

13.   When an affidavit is based on an informer's tip, "the totality of the circumstances inquiry looks to all indicia of reliability – including the informer's veracity and the basis of his knowledge, the amount of detail provided by the informer, and whether the information provided was current."  *Id*. at 95.

Apdx 096

14. An affidavit must contain enough facts "to allow a magistrate to determine how the informant obtained the information on which the affiant relies." *Id.*

15. In this case, 2019PS14 was a five page affidavit, with a large amount of detail about the course of investigation, specific animals, specific animals' conditions and statements that would support a conclusion that there was at least probable cause to believe the crime of cruelty to animals had been committed.

16. Mr. Walker is not challenging the search conducted pursuant to 2019PS14.

17. The search warrants 2019PS15 and 2019PS16 are very different. They have almost no facts contained within them, and do not provide enough information to provide probable cause for their issuance.

18. The affidavits in support of 2019PS15 and 2019PS16 should be analyzed within the four corners of the individual documents, without referring to the additional information contained in 2019PS14. *Gutierrez*, 222 P.3d 925; *but see People v. Scott*, 227 P.3d 894 (Colo. 2010) (holding that multiple affidavits could be read together for the purposes of a probable cause analysis, when the record showed that the same magistrate reviewed and signed two affidavits within hours of each other).

19. In this case, one judge reviewed 2019PS13 and 2019PS14, while a separate judge reviewed 2019PS15 and 2019PS16. Therefore, 2019PS15 and 2019PS16 should be analyzed only by looking within the four corners of those documents.

20. 2019PS15 fits on two pages, although the bulk of that is a lengthy legal description of the property, a lengthy description of the items to be seized, and other general information.

21. The factual content of the affidavit is contained within four paragraphs.

22. The entirety of the first paragraph is a description of Deputy Cochran's experience.

Apdx 097

23. The second paragraph contains a description of "thin" horses on Badger Basin Ranch. It contains no information about the existence of or condition of any horses on Hartsel Springs Ranch, which is the location 2019PS15 was written for.

24. The third paragraph contains the statement of an anonymous informant who is identified as an "acquaintance" of Mr. Walker's. The factual statements attributed to this informant are that:

    a. Mr. Walker had more horses off Park County Road 53.
    b. The condition of those horses was **unknown**. (emphasis added).
    c. The horses belong to Mr. Walker, and they may be pregnant females.
    d. To the best of his knowledge, no feed or water has been provided to any of the horses during the harsh winter conditions.

25. The fourth paragraph makes a number of general statements about Mr. Walker, the weather, and the need for animals to eat.

26. Law enforcement took no steps prior to applying for the warrant to corroborate the anonymous informant's tip. Independent police corroboration may elevate a tip to the level of probable cause, but no corroboration was attempted here, so the informant's tip must stand or fall on its own. *Pacheco*, 175 P.3d at 95.

27. As it stands, the only factual information in the warrant is that Mr. Walker owns some unknown number of horses, which may or may not be pregnant females, and which are in an unknown condition, may not have been provided food or water to "the best of his knowledge".

28. There is no additional information contained in the affidavit about what to "the best of his knowledge" means.

29. The affidavit is silent on: whether this informant saw the horses himself or is relying on hearsay; how recent this information is; how many horses there are; or any other facts that could be used to ascertain the veracity of the informant's tip.

Apdx 098

30.   This affidavit provides no information upon which a reviewing judge could independently determine the informant's veracity or reliability, and therefore the anonymous informant's tip should be disregarded.  See id.

31.   Beyond the tip, there is no information in the affidavit that the horses, if there are any at all, are being or have been mistreated.   There is no information in the affidavit that any crime has been committed, let alone a crime for which evidence is currently present at the location described in the affidavit.

32.   2019PS15 is a bare bones affidavit which does not provide probable cause.

33.   2019PS16 suffers from similar defects as well as additional problems.

34.   The affidavit for 201P9S16 contains four paragraphs of facts, with the first being Deputy Cochran's experience.

35.   The second paragraph contains information that there were "thin" horses at another location.

36.   The third paragraph contains the factual information provided by an anonymous informant identified as an acquaintance of Mr. Walker.

37.   The informant stated that: Mr. Walker had yearling horses in the Thousand Peaks Ranch area; the informant did not know whether the horses were checked or fed; and the address was unknown.

38.   In this situation, law enforcement did try and corroborate the information provided by the informant.  Officers located eight horses and one burro after following directions supplied by the informant.

39.   According to the affidavit, the horses were in a pen and had water and grass hay.

40.   The quality of the feed is described as unknown.  It is further described as having a "yellow appearance," but there is no information in the affidavit

Apdx 099

about the significance of the feed being yellow. The affidavit does not indicate whether yellow feed is good, bad or indifferent. The affidavit does not state that feed being yellow means it is old, new, clean or dirty. The affidavit does not state that there was insufficient food.

41.   Therefore, taking the affidavit in its totality, an anonymous informant provided a tip that horses may or may not be checked or fed, and law enforcement then confirmed that the horses were in fact fed and watered.

42.   The horses were described as thin appearing, but the affidavit does not state the horses were too thin, or that their appearance suggested the horses were not healthy.

43.   The informant's tip, even taken as true, does not give rise to probable cause to believe a crime was committed because it is so vague. Setting that aside, when officers attempted to corroborate the tip that horses may have not been fed, they actually proved the opposite. When they followed this lead they discovered the horses did in fact have food and water. For some reason, law enforcement persisted in writing a search warrant for these horses, despite themselves disproving the informant's tip.

44.   Taking the food issue out of the affidavit, the only remaining factual assertion is that the horses had no shelter and little to no cover to block the wind. However, there is nothing else in the affidavit to suggest whether this is a problem. The affidavit makes a general assertion that horses need supplemental feeding during periods of cold weather and deep snow for survival. There is no equivalent statement that a lack of protection from the wind is needed to properly care for horses. The conclusory statements made in the affidavit do not give rise to probable cause.

45.   2019PS16 is a bare bones affidavit which does not provide probable cause.

46.   Finally, 2019PS18 fails to state probable cause for a crime.

47.   2019PS18 certainly contains more facts than the previous two affidavits discussed, but the majority of the facts describe actions previously taken by law enforcement and animals already seized. 2019PS18 was drafted and

signed after nearly all of the investigation had already been completed in this case.

48.   Ultimately, 2019PS18 is a search warrant to seize additional animals. Probable cause must exist to believe those additional animals would be evidence of a crime. Whether, at the time of presenting this search warrant for signature, probable cause existed to believe that a crime of cruelty to animals related to other animals had already occurred is irrelevant.

49.   The question is whether probable cause exists within the four corners of 2019PS18 to take additional investigatory steps. Regardless of the multiple searches already conducted, an additional intrusion implicates Mr. Walker's rights.

50.   The only factual information provided in support of an additional search is that Deputy Cochran observed four mares and "[f]rom visual observation it appeared that the horses maybe [sic] in a compromised body condition score."

51.   The affidavit then states that a veterinarian was called and she will be (meaning in the future after the signing of the search warrant) doing an assessment of the animals. The affidavit then states that that all animals in a compromised body score will be seized, which again demonstrates a high level of speculation that any animals are in fact in a compromised condition.

52.   Given the absence of any information from a veterinarian, the narrow question on review is whether a single fact, namely that an officer observed four horses that may be in a compromised body condition score, amounts to probable cause. Mr. Walker asserts that it is not.

53.   When officers seized physical evidence and made observations executing all these search warrants, they violated Mr. Walker's right to be free from unreasonable searches and seizures.

Wherefore, Mr. Walker asks this Court order the suppression of physical evidence and observations, and all evidence which is a direct or indirect fruit of the physical evidence and observations, pursuant to the Fourth, Fifth, Sixth and

Fourteenth Amendments to the United States Constitution; C.R.S. §16-3-301, §16-3-303 and §16-3-304; Crim.P. 41; and Article II, Sections 7, 16 and 25 of the Colorado Constitution.

Respectfully submitted on June 26, 2019.

DILL DILL CARR STONBRAKER & HUTCHINGS, P.C.

/s/Benjamin C. Whitney
Benjamin C. Whitney, #38080
**Attorney for Defendant**

## CERTIFICATE OF SERVICE

I certify that on June 26, 2019, a true and correct copy of the foregoing **MOTION TO SUPPRESS PHYSICAL EVIDENCE AND OBSERVATIONS** was served via ICCES, on the following:

Lisa M Scanga
11th Judicial District Attorney's Office

/s/ Michele Overton

COUNTY COURT, COUNTY OF PARK, STATE OF COLORADO

CASE NO. 2019 M 000043, DIV. A

_____

TRANSCRIPT OF PROCEEDINGS (Jury Trial Day One - Partial
Transcript - Testimony Only)

_____

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

     Plaintiff,

v.

MARK W. WALKER,

     Defendant.

_____

     The above-entitled matter came on for hearing on
Wednesday, December 4, 2019 at 1:17 p.m. before the
HONORABLE BRIAN LOUIS GREEN, County Judge.

APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFF: | MARK HURLBERT |
| FOR THE DEFENDANT: | BENJAMIN C. WHITNEY |
| | ARTHUR H. BOSWORTH |
| ALSO PRESENT: | MARK W. WALKER |
| WITNESSES: | SARAH KIMSEY |
| | LEE COCHRAN |
| | TAYLOR PETERSON |
| | GERALD GARCIA |
| | GARRET LEONARD |

1   look?  Let's start with the bay horse first.  How did the

2   bay horse look?

3       A.   Very thin.  Weakened, struggling.

4       Q.   How about the Grullo?

5       A.   Very thin.  Weakened.

6       (Pause in the proceedings.)

7       Q.   When the search warrant was executed, who all was

8   there?

9       A.   There was a large group of people that Agent

10  Paisley along with Deputy Peterson had contacted to aid in

11  the search warrant.  It was quite a few people that were

12  experienced in, with horses and moving and trailering.

13      Q.   And when the search warrant was executed, how did

14  you differentiate horses between other horses?

15      A.   Well, we had the one group that Mr. Walker had put

16  in the central location and all of those were very thin.

17  And then he had some other horses that had been moved up to

18  the front of the ranch.  And then there were two other

19  locations where more horses were located.

20      Q.   So there were three separate locations?

21      A.   Yes, sir.

22      Q.   Where the search warrant was executed?

23      A.   Yes, sir.

24      Q.   And but identifying one horse from another, did

25  you have names for them, numbers for them, how did you do

1   that?

2        A.   When they started, we had a vet and the people

3   with the Harmony gave them each individually a number as we

4   assessed the animals and went along in the warrant.

5        (Pause in the proceedings.)

6        Q.   May I hand you what's marked as

7   People's 8, 9, and 10.  What are those of photos of?

8        A.   This first photo is the group that we identified

9   as the most compromised, the thinnest horses.

10       Q.   And how about the next two?

11       A.   These photos were taken by Animal Control Officer

12   Peterson of some of the thin horses in this group.  And this

13   is during the time the warrant was served.

14       Q.   Do you remember seeing that horse?

15       A.   Yes.

16       Q.   And do you remember seeing that the, and you said

17   there was a group of horses in the first one.  Does one of

18   them have snow on the back?

19       A.   Yes.

20       Q.   Okay.  Do you remember seeing that horse as well?

21       A.   Yes.

22       Q.   Is that a fair and accurate representation of,

23   there all the same horse?

24       A.   This horse, well the same horse is in two of these

25   pictures.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-CV-00364-PAB-NYW

MARK WALKER**,**

Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE,
DEPUTY LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONY EQUINE CENTER, and
BOBBI PRIESTLEY

Defendants.

---

**SUPPLEMENT TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

---

Defendants, Park County Sheriff's Office ("the Sheriff" or "the Sheriff's Office") and Deputy Leigh Cochran ("Deputy Cochrane") (collectively "Defendants"), by and through their attorneys Fowler, Schimberg, Flanagan & McLetchie, P.C., hereby submit their following Supplement to Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), and in support thereof, Defendants state as follows:

1.      Defendants filed their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion to Dismiss") on June 9, 2020. **ECF No. 33.**

Appellate Case: 21-1119   Document: 010110536823   Date Filed: 06/17/2021   Page: 110

2.      On June 10, 2020, Defendants received a copy of a minute order that is relevant to arguments presented in the Motion to Dismiss, which is referenced therein. *See* **ECF No. 33 at Page 14, Paragraph 1.**

3.      This is a minute order from *People v. Walker*, Park County Court Case No. 2019M000043, made during a July 23, 2019 motions hearing. *See* **Exhibit D**.

Respectfully submitted this 15th day of June, 2020.

<div style="text-align: right;">

*/s/Andrew R. McLetchie*
Andrew R. McLetchie
Eden R. Rolland
Matthew K. Sidran
FOWLER, SCHIMBERG,
FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
Telephone: 303-298-8603
Fax: 303-298-8748
a_mcletchie@fsf-law.com
e_rolland@fsf-law.com
m_sidran@fsf-law.com

</div>

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2020, I caused a true and correct copy of the foregoing **SUPPLEMENT TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)** to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Robert M. Liechty
ROBERT M. LIECHTY PC
1800 Gaylord St.
Denver, CO 80206
303-861-5300
rliechty@crossliechty.com
*Attorneys for Plaintiff*

Cynthia Lowery-Graber
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
cynthia.lowery-graber@bclplaw.com
*Attorneys for Colorado Humane Society*
*and Bobbi Priestley*

*/s/Sylvia Osiecka*
Sylvia Osiecka

Apdx 108

Print Minute Orders          6/10/20        8:43 AM
Status:              CLSD            County Court, Park County
Case #:  2019 M  000043     Div/Room:  A     Type: Animal Violation
            The People of the State of Colorado vs. WALKER, MARK W


  FILE DATE          EVENT/FILING/PROCEEDING
  7/23/2019          Minute Order (print)
JUDGE:  BLG       CLERK:           REPORTER:
02.42  DEF WITH ATTY BOSWORTH  ATTY WHITNEY. DDA MCCUAIG. PROCEED WITH MOTION
HEARING. COURT DENIES MOTION TO SUPPRESS PHYSICAL EVIDENCE RE SEARCH WARRANT
ISSUE. DISCUSSION ON PROCESS. STATUS PLEA CUTOFF REMAINS AS 08 20 19 AT 2 PM.
DEF APPC WAIVED THAT DATE.                          /GLE          /GLE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 20-cv-00364-PAB-NYW

MARK WALKER,

     Plaintiff,

vs.

PARK COUNTY SHERIFF'S OFFICE,
LEIGH COCHRAN,
DUMB FRIENDS LEAGUE HARMONEY EQUINE CENTER, and
BOBBI PRIESTLEY,

     Defendants.

---

## ORDER

By Magistrate Judge Nina Y. Wang

     This matter is before the court on Defendants Park County Sheriff's Office, Leigh Cochran, Dumb Friends League Harmony Equine Center, and Bobbi Priestly (collectively "Defendants") Motion to Stay Discovery ("Motion" or "Motion to Stay"), filed June 10, 2020.  [#34].  The undersigned Magistrate Judge considers the Motion pursuant to 28 U.S.C. § 636(b) and the Memorandum dated June 10, 2020 [#35].  This court concludes that oral argument will not materially assist in the resolution of this matter.  Accordingly, having reviewed the Motion and Response, the applicable case law, and the entire docket, this court **GRANTS** the Motion to Stay for the reasons stated herein.

## BACKGROUND

     This matter arose from the seizure of fifty-eight horses from Plaintiff Mark Walker ("Plaintiff" or "Mr. Walker"), an outfitter and experienced horse breeder, by Defendants in February of 2019.  *See generally* [#1].  Mr. Walker initiated this suit on February 12, 2020,

asserting claims for unreasonable seizure in violation of the Fourth Amendment, civil theft, outrageous conduct, and defamation. [*Id.*]. On May 19, 2020, Mr. Walker filed an Amended Complaint asserting five claims: (1) "unconstitutional seizure of the horses" against all Defendants; (2) "unconstitutional malicious prosecution" against all Defendants; (3) civil theft against Defendants Dumb Friends League Harmony Equine Center ("DFL") and Bobbi Priestly ("Ms. Priestly"); (4) outrageous conduct against Ms. Priestly; and (5) defamation against Ms. Priestly. *See* [#18].

In response to Plaintiff's Amended Complaint, the Defendants filed two Motions to Dismiss, seeking dismissal of all claims against them. *See* [#32; #33]. Ms. Priestly and DFL filed their "Motion to Dismiss Pursuant to F.R.C.P. 12(b)(1) and (6)," on June 5, 2020, and Defendants, Park County Sherriff's Office and Leigh Cochran, filed their "Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6)," on June 9, 2020. [*Id.*]. Both Motions to Dismiss are currently pending before the Honorable Phillip A. Brimmer, the presiding judge in this matter.

On June 10, 2020, Defendants filed the instant Motion to Stay Discovery requesting that the court stay all remaining discovery under Federal Rules of Civil Procedure 16 and 26, with the exception of Plaintiff's obligations to serve his initial disclosures, until after the court rules on the Motions to Dismiss. [#34 at 6]. In the Motion, describing their conferral efforts pursuant to Local Rule of Civil Practice 7.1(a), Defendants aver they "conferred with counsel for Plaintiff regarding the relief requested herein and was informed that Plaintiff takes no position with respect to the relief requested herein." [*Id.* at 1]. Unclear as to how to specifically interpret Plaintiff's position, on June 12, 2020, the court ordered any response by Plaintiff to the Motion to Stay be filed no later than June 17, 2020. [#36]. On that date, Mr. Walker filed the Plaintiff's Response to Motion for Stay [#38], stating "[h]e takes no position on the motion for stay," and he "would like to get his

case to trial quickly, but he understands that his case has legal complexities that the court needs to resolve. Thus, he also has an interest in not spending time and money if the resolution will be against him." [*Id.* at 1].

## LEGAL STANDARD

"The Federal Rules of Civil Procedure do not provide for the stay of proceedings while a motion to dismiss is pending.  Instead, Rule 1 instructs that the rules of procedure 'shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.'" *Sutton v. Everest Nat'l Ins. Co.*, No. 07 CV 00425 WYD BNB, 2007 WL 1395309, at *1 (D. Colo. May 9, 2007).  Nonetheless, when ruling on a motion to stay, courts weigh the following factors: (1) the plaintiff's interests in expeditiously litigating this action and the potential prejudice to plaintiff of a delay; (2) the burden on the defendants; (3) the convenience to the court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.  *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 1:02-CV-01934-LTB-PAC, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006).  But "stays of the normal proceedings of a court matter should be the exception rather than the rule," *Christou v. Beatport, LLC*, No. 10-CV-02912-CMA-KMT, 2011 WL 650377, at *1 (D. Colo. Feb. 10, 2011), and courts in this District generally disfavor stays, *see, e.g.*, *Chavez v. Young Am. Ins. Co.*, No. CIVA 06CV02419PSFBNB, 2007 WL 683973, at *2 (D. Colo. Mar. 2, 2007).

## ANALYSIS

Defendants argue that "given the existence of the two pending and fully dispositive motions to dismiss, it would reduce costs for all parties, as well as conserve judicial resources to await rulings on said motions before proceeding with Fed.R.Civ.P. 16 and 26 discovery related deadlines." [#34 at 2].  Defendants continue that, in consideration of the first and second *String*

*Cheese* factors, commencing discovery will require all parties to expend potentially unnecessary resources and travel time and likely require the issuance of a protective order.   [*Id.* at 4-5]. Defendants further argue that granting a stay would promote "economy" and "efficiency" and preserving judicial resources, the allegations in the Amended Complaint do not suggest the existence of any nonparties with any significant particularized interests in the case, and a stay would increase the possibility that unnecessary expenditures of public and private resources are minimized and judicial and attorney resources conserved.   [*Id.* at 5, 6].   This court agrees.

First, although a stay is not warranted merely because Defendants filed a Motion to Dismiss that they believe is dispositive of this entire matter, *see Church Mut. Ins. Co. v. Coutu*, No. 17-cv-00209-RM-NYW, 2017 WL 3283090, at *3 (D. Colo. Aug. 2, 2017) ("[N]o element of the *String Cheese* factors requires that this court make a preliminary determination as to the likelihood of success of either the dispositive motion or the ultimate merits of this case" when considering the appropriateness of a stay), courts may be more inclined to stay discovery pending the resolution of a Motion to Dismiss impacting immunity or jurisdictional issues, *see, e.g.*, *Burkitt v. Pomeroy*, No. 15-cv-02386-MSK-KLM, 2016 WL 696107, at *1 (D. Colo. Feb. 22, 2016) ("Questions of jurisdiction and immunity should be resolved at the earliest stages of litigation, so as to conserve the time and resources of the Court and the parties.").   The court notes that in their Motion to Dismiss, DFL and Ms. Priestly contend the court lacks subject matter jurisdiction over three of Mr. Walker's five claims.   [#32 at 7-9].

Next, the first and second *String Cheese* factors both weigh in favor of a stay.   In his Response to the Motion to Stay, Mr. Walker states that although he "would like to get his case to trial quickly," "he understands that his case has legal complexities that the court needs to resolve. . . . [and] has an interest in not spending time and money."   [#38]   He further "takes no position on

Apdx 113

the motion for stay." [*Id.*]. He makes no argument that he will be prejudiced by the relief sought in the Motion. Defendants, meanwhile, allege they will be subject to "unnecessary fees, expenses and travel time associated with proceeding." [#34 at 5]. While Defendants do not contend their discovery burdens in this case will be out of the ordinary for those imposed on all litigants, *see Webb v. Brandon Exp. Inc.*, No. 09-cv-00792-WYD-BNB, 2009 WL 4061827, at *2 (D. Colo. Nov. 20, 2009) ("Parties always are burdened by discovery and the other requirements for the preparation of a case. That is a consequence of our judicial system and the rules of civil procedure."), the court finds their argument more compelling in light of Mr. Walker's lack of a position on the requested relief. Additionally, Defendants Ms. Priestly, Leigh Cochran, and the Park County Sherriff's Office have all asserted qualified immunity from Plaintiff's claims in their Motions to Dismiss. *See* [#32 at 3; #33 at 4]. Qualified immunity is "an immunity from suit rather than a mere defense to liability," *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006), the "driving force" behind which is "a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Finally, the convenience of the court and interests of nonparties and the public warrant a stay. A stay in discovery would conserve any judicial resources necessary to consider potential discovery disputes that could arise in this matter. Further, the court agrees with Defendants that, on its face, the Amended Complaint does not suggest there are nonparties to this matter with particularized interests that would be harmed by a stay. Lastly, in addition to the public interest in a conservation of judicial resources, the court notes that Defendants Park County Sherriff's Office and Leigh Cochran, who is an officer in the Sherriff's Office, serve the public interest through law enforcement. The public would benefit from a stay to the extent that they would not be distracted from the performance of their duties by on-going discovery in this matter.

Appellate Case: 21-1119   Document: 010110536823   Date Filed: 06/17/2021   Page: 118

In sum, the *String Cheese* factors weigh in favor of staying this action pending resolution of Defendants' Motions to Dismiss.  The court therefore concludes that a stay is warranted.

## CONCLUSION

Therefore, for the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant's Motion to Stay Discovery [#34] is **GRANTED**;

(2)     Discovery in this matter is **STAYED** pending resolution of the Defendants' "Motion to Dismiss Pursuant to F.R.C.P. 12(b)(1) and (6)" [#32] and "Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6)" [#33]; and

(3)     If this matter proceeds in whole or part following Judge Brimmer's resolution of the Motions to Dismiss, **within three days** of such resolution, the parties are **ORDERED** to jointly telephonically contact chambers at 303-335-2600 to set a status conference.

DATED: June 18, 2020                    BY THE COURT:

_____
Nina Y. Wang